## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **BERNHARDT TIEDE, II;** | § | |
| **TEXAS PRISONS COMMUNITY** | § | |
| **ADVOCATES; BUILD UP, INC., A/K/A** | § | |
| **JUSTICE IMPACTED WOMEN'S** | § | |
| **ALLIANCE; TEXAS CITIZENS UNITED** | § | |
| **FOR REHABILITATION OF ERRANTS;** | § | |
| **and COALITION FOR TEXANS WITH** | § | |
| **DISABILITIES,** | § | |
| | § | **Civil Action No.:** |
| *Plaintiffs,* | § | **1:23-cv-01004-RP** |
| | § | |
| **v.** | § | |
| | § | |
| **BRYAN COLLIER, in his official capacity** | § | |
| **as Executive Director of Texas Department** | § | |
| **of Criminal Justice,** | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION
## AND REQUEST FOR EXPEDITED BRIEFING

# TABLE OF CONTENTS

Page

STATEMENT OF FACTS ................................................................................................ 2

    A.    Temperatures Inside Texas Prisons are Dangerously High Each Summer, Causing Prisoners to Die and Suffer Each Summer .................................. 2

    B.    Mr. Tiede Suffered a Transient Ischemic Attack from Heat. .................................. 7

    C.    Temperatures will be Dangerously High this Summer. ........................................... 9

    D.    The Risk that Extreme Heat Poses to TDCJ Inmates is Obvious, Long-Standing, Pervasive, and Well-Documented. ........................................... 9

    E.    TDCJ's Current Heat Policy is Inadequate. ........................................... 11

ARGUMENT ................................................................................................ 12

I.    EXPOSING INMATES TO EXTREME TEMPERATURES VIOLATES THE EIGHTH AMENDMENT .................................................. 12

    A.    Plaintiffs Meet the Eighth Amendment's Objective Standard .............................. 13

    B.    Plaintiffs Satisfy the Eighth Amendment's Subjective Standard. ......................... 14

II.    THE PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IMMEDIATE AND IRREPARABLE HARM ................................................. 16

III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST FACTORS FAVOR ENTERING THE PRELIMINARY INJUNCTION. .......................................... 16

IV.    PLAINTIFFS SHOULD NOT HAVE TO POST A BOND. ............................................ 19

CONCLUSION .............................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amegy Bank Nat'l Assn. v. Monarch Flight II, LLC*,
   2011 WL 4948986 (S.D. Tex. Oct. 18, 2011) ...................................................................16

*Ball v. LeBlanc*,
   792 F.3d 584 (5th Cir. 2015) ...................................................................13, 14, 19

*Battle v. Anderson*,
   564 F.2d 388 (10th Cir. 1977) ...................................................................18

*Blackmon v. Garza*,
   484 F. App'x 866 (5th Cir. 2012) ...................................................................13, 16

*Brown v. Plata*,
   563 U.S. 493 (2011) ...................................................................18

*Corrigan Dispatch Co. v. Casa Guzman, S.A.*,
   569 F.2d 300 (5th Cir. 1978) ...................................................................19

*Eggers v. Evnen*,
   48 F.4th 561 (8th Cir. 2022) ...................................................................17

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ...................................................................15

*Gates v. Collier*,
   501 F.2d 1291 (5th Cir. 1974) ...................................................................17

*Gates v. Cook*,
   376 F.3d 323 (5th Cir. 2004) ...................................................................15, 16

*Helling v. McKinney*,
   509 U.S. 25 (1993) ...................................................................13, 14, 16

*Henderson v. Stadler*,
   112 F. Supp. 2d 589 (E.D. La. 2000) ...................................................................17

*Hinojosa v. Livingston*,
   807 F.3d 657 (5th Cir. 2015) ...................................................................12

*Hobby Lobby Stores, Inc. v. Sebelius*,
   723 F.3d 1114 (10th Cir. 2013) ...................................................................18

*Ingebretsen v. Jackson Pub. Sch. Dist.*,
    88 F.3d 274 (5th Cir. 1996) ...................................................................................18

*Jackson Women's Health Org. v. Currier*,
    760 F.3d 448 (5th Cir. 2014) .................................................................................18

*Jones'el v. Berge*,
    164 F. Supp. 2d 1096 (W.D. Wis. 2001) .............................................................18

*Jones'El v. Berge*,
    No. 00-C-421-C, 2003 WL 23109724 (W.D. Wis. Nov. 26, 2003) .......................18

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ...............................................................................12

*Madrid v. Gomez*,
    889 F. Supp. 1146 (N.D. Cal. 1995) .....................................................................18

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) .................................................................................12

*Nken v. Holder*,
    556 U.S. 418 (2009) .............................................................................................17

*Procunier v. Martinez*,
    416 U.S. 396 (1974) .............................................................................................18

*Roper v. Simmons*,
    543 U.S. 551 (2005) .............................................................................................13

*Rufo v. Inmates of Suffolk Co. Jail*,
    502 U.S. 367 (1992) .............................................................................................17

*Ruiz v. Johnson*,
    37 F. Supp. 2d 855 (S.D. Tex. 1999) ...................................................................10

*Simms v. Dist. of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) .......................................................................18

*Smith v. Sullivan*,
    553 F.2d 373 (5th Cir. 1977) ..........................................................................14, 17

*Udey v. Kastner*,
    805 F.2d 1218 (5th Cir. 1986) .............................................................................17

*Valentine v. Collier*,
    140 S. Ct. 1598 (2020) .........................................................................................20

*Veasey v. Abbott,*
    870 F.3d 387 (5th Cir. 2017) ........................................................................18

*Webb v. Livingston,*
    618 F. App'x 201 (5th Cir. 2015) ................................................................16

*Wilson v. Seiter,*
    501 U.S. 294 (1991) ......................................................................................13

*Winter v. Nat'l. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ..........................................................................................17

*Yates v. Collier,*
    868 F.3d 354 (5th Cir. 2017) ...........................................................12, 13, 19

## Consitutional Provisions, Statutes, & Regulations

U.S. Const., amend. VIII ......................................................................... *passim*

18 U.S.C. § 3626(a)(1)(A) ..........................................................................19

25 Tex. Admin. Code § 297.8 (a)(1) ..........................................................10

37 Tex. Admin. Code § 251.1 ....................................................................10

37 Tex. Admin. Code § 259.160 .................................................................10

Every summer, an average of fourteen people die because of the extreme heat inside Texas prisons, while hundreds of other inmates suffered from heat-related illnesses, due to the lack of air conditioning for around 85,000 of Texas state prisoners.[1]

As Executive Director, Bryan Collier has known for years that the Texas Department of Criminal Justice's ("TDCJ") uncooled prison housing poses a substantial risk of serious harm to the health of the thousands of Texas inmates who have been forced to suffer in brutally hot conditions each summer.[2] He knows that the temperatures inside the un-air-conditioned inmate housing areas of roughly 70% of TDCJ's units this summer will routinely reach 100° Fahrenheit or higher (and some potentially as high as 150°) in the areas where inmates live.[3] He also knows that TDCJ's existing heat-mitigation measures have not and will not protect inmates from the substantial risk of death or serious harm from the extreme heat.[4] And despite the hundreds of who have died because of the heat, Mr. Collier has failed to ensure that TDCJ takes the measures needed to provide safe living conditions for these individuals.

---

[1] Ex. C, Decl. of Antonella Zanobetti ("A. Zanobetti Decl."), ¶ 15; Ex. K-1, Julianne Skarha et al., *Provision of Air Conditioning and Heat-Related Mortality in Texas Prisons*, JAMA Network (Nov. 2, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2798097; *see also* Ex. K-2, Jodie McCullough, *As the death toll in stifling Texas prisons climbs, congressional Democrats ask for investigation*, (Texas Tribune Aug. 21, 2023) https://www.texastribune.org/2023/08/21/texas-prison-heat-deaths/. ("At least 41 people have died in stifling, uncooled prisons of either heart-related or unknown causes during Texas' relentless and record-breaking heat wave this summer, according to a Texas Tribune analysis.").

[2] Dkt. No. 48-1, First Am. Compl. ¶ 3; Ex. A, Decl. of Dean Williams ("D. Williams Decl."), ¶ 8; Ex. K-3, TDCJ, *TDCJ Air Conditioning Construction Projects*, https://www.tdcj.texas.gov/ac/index.html (last viewed April 22, 2024); Ex. K-4, *Cole v. Collier*, Sep. 10, 2019 Hearing Transcript, at 49:22–25; Ex. K-5, Collier Deposition, 106:17–22, 110:25–111:10. Plaintiffs do not concede the truth of the facts asserted by TDCJ on its construction projects website, as no discovery has been conducted to determine its factual basis, but assume for the sake of argument in this preliminary motion that it is roughly correct. *See* Dkt. No. 30, p. 5, n.13 (arriving at an estimate of only 37,364 air-conditioned beds in TDCJ).

[3] *See, e.g.*, Ex. K-5, Collier Deposition, 178:14–18, 184:18–25.

[4] Dkt. No. 48-1, ¶ 4; Ex. K-5, Collier Deposition, 316:19–317:1, 324:8–20. The insufficiency of TDCJ's heat mitigation measures has long been recognized. For example, the Texas House Committee Corrections issued a report in November 2018 expressly acknowledging that "[b]ased on the medical information known about human health and heat-related health risks, ***TDCJ cannot rely only on mitigation factors to assure the well-being of inmates*** and corrections personnel." Ex. K-6, Interim Report 2018, House Committee on Corrections, Texas House of Representatives (Nov. 16, 2018), https://www.house.texas.gov/_media/pdf/committees/reports/85interim/Corrections-Committee-Interim-Report-2018.pdf (emphasis added).

The risk of serious harm from the extreme heat this coming summer is substantial for *all* inmates in TDCJ uncooled facilities, regardless of their age or preexisting medical conditions. Plaintiffs therefore ask this Court to issue a preliminary injunction requiring Mr. Collier to maintain safe indoor temperatures anywhere TDCJ houses inmates. Specifically, Mr. Collier must ensure that TDCJ maintains a safe temperature between 65° and 85° Fahrenheit in the housing and occupied areas of facility where inmates are assigned. **Because the summer heat is quickly approaching, Plaintiffs ask that this motion be considered on an emergency basis with an** <u>**expedited briefing schedule**</u> **and that the Court** <u>**schedule a hearing as soon as practicable**</u>.

Without this emergency relief, individuals currently incarcerated in TDCJ's uncooled housing will spend another sweltering Texas summer baking in the extreme heat. And the well-documented lesson from summers past is that many inmates will suffer from serious heat-related illnesses and that over a dozen will not survive to see the fall.[5]

## STATEMENT OF FACTS

### A.    Temperatures Inside Texas Prisons are Dangerously High Each Summer, Causing Prisoners to Die and Suffer Each Summer.

Heat is the main weather-related killer in the United States, resulting in more fatalities than floods, lightening, tornadoes, and hurricanes combined.[6] But in a state known for its scorching summer heat, most living quarters in Texas state prisons are not air-conditioned and pose a substantial risk of serious harm to inmates when outside temperatures reach 95º F or higher.[7]

As this Court knows, last summer was one of the hottest on record, and Texans suffered

---

[5] Ex. K-7, TDCJ, *Statistical Report Fiscal Year 2023*, https://www.tdcj.texas.gov/documents/ Statistical_Report_FY2023.pdf; Ex. K-3, TDCJ, *TDCJ Air Conditioning Construction Projects*.

[6] Ex. K-8, National Weather Service, *Heat Index*, https://www.weather.gov/phi/heat; Ex. K-9, The Economist, *Heatwaves kill more Americans than hurricanes, tornadoes and floods*, https://www.economist.com/united-states/2022/09/01/heatwaves-kill-more-americans-than-hurricanes-tornadoes-and-floods.

[7] Ex. K-1, Skarha et al.; Ex. K-2, McCullough (Texas Tribune Aug. 21, 2023), *supra* note 1.

through a series of heat waves.[8] That extreme heat likely caused over a dozen people to die and thousands of others to suffer from heat-related illnesses in TDCJ prisons.[9] According to the Texas Attorney General's own Custodian Death Reports, over 100 people died in Texas prisons last summer. Studies from researchers at Texas A&M University and Harvard University, likewise, indicate that the heat caused or contributed to a significant portion of these deaths.[10]

This problem is not new. It is obvious, longstanding, well-documented, and has been repeatedly acknowledged by TDCJ officials in the past. Experts have estimated that 271 deaths in Texas prisons between 2001 and 2019 attributable to extreme heat exposure, which is about 15 deaths per year.[11] TDCJ's own Heat Policy concedes the dangers associated with "excessive heat," including but not limited to heat cramps, heat exhaustion, and heatstroke.[12] The conditions are dire for all inmates—both those that are healthy and those more vulnerable to the heat.[13]

Mr. Collier's and TDCJ's response to this devastating reality is to either obscure it or ignore it altogether. They have refused to attribute inmate deaths to heat-related issues since at least 2012.[14] But "[b]ased on this data and given that temperature levels keep increasing over the years, TDCJ's claim that not a single inmate in unairconditioned prisons has died from the heat since 2012 is not possible."[15] And they have ignored the issue by failing to take the necessary steps to

---

[8] Ex. B, Decl. of Susi Vassallo ("S. Vassallo Decl."), ¶ 15; Ex. K-10, National Weather Service, *Exceptional Heat of Summer 2023*, *available at* https://www.weather.gov/lub/events-2023-2023summer-heat.

[9] First Am. Compl. ¶ 33; *see* Ex. K-1, Skarha et al.; Ex. K-2, McCullough (Texas Tribune Aug. 21, 2023), *supra* note 1; Ex. K-11, Brant Bingamon, *Texas Prisons Are Cooking People Alive. Are We Okay With That? Part 1 in a series about heat in prison*, Austin Chron. (Aug. 11, 2023), https://www.austinchronicle.com/news/2023-08-11/texas-prisons-are-cooking-people-alive-are-we-okay-with-that.

[10] Ex. K-1, Skarha et al.; Ex. K-11, Bingamon, *supra* note 9.

[11] Ex. C, A. Zanobetti Decl., ¶¶ 15-16.

[12] Ex. K-12, Correctional Managed Health Care Policy Manual, Heat Stress, D-27.2, Effective Date 05/28/2019, https://tdcj.texas.gov/divisions/cmhc/docs/cmhc_policy_manual/D-27.02.pdf.

[13] Ex. B, S. Vassallo Decl., ¶¶ 27-38.

[14] Ex. K-13, *Texas Says No Inmates Have Died Due to Stifling Heat in its Prisons Since 2012. Some Data May Suggest Otherwise*, CBS News (July 19, 2023, 7:10 AM), https://www.cbsnews.com/news/texas-prisons-heat-deaths-disputed-claims-inmate-families-worry/.

[15] Ex. C, A. Zanobetti Decl., ¶ 21; *see also* Ex. F, Decl. of Priya Banerjee, ¶ 28 ("It is highly unlikely that

protect inmates from the summer heat.[16]

It is equally clear that "heat-related illness and death are preventable. The risks are well known, and so is the solution. Simple measures such as access to air conditioning are essential to decreased morbidity and mortality. Air conditioning is not a luxury but a lifesaver."[17] Access to air conditioning will "most certainly have a protective effect for heat-related mortality."[18] The overwhelming majority of prison units (roughly 70%) in the TDCJ system lack air conditioning in some or all inmate housing areas.[19] Indeed, despite years of serious of harm and death from the extreme heat, TDCJ claims it still has only 45,496 "cool beds" currently "available," with another 2,149 becoming available.[20] This is plainly inadequate for an inmate population of 134,000, meaning that even if TDCJ's numbers are accurate, more than 85,000 inmates in Texas prisons will be trapped in uncooled housing once again this summer.[21]

A core body temperature around 98.6° is "essential to normal physical functioning."[22] But exposure to excessive heat and high humidity limits the human body's ability to regulate its temperature. In response to heat, the heart rate increases and the peripheral blood vessels dilate or open to maintain normal core body temperature. But when heat is extreme and peripheral blood

---

heat did not cause or contribute to any custodial deaths in TDCJ since 2012, and actually highly probable that heat caused or contributed to many custodial deaths in TDCJ. Reviewing the pathology/autopsy deaths, as well as the temperatures and heat index at the time, will confirm this.").

[16] Ex. A, D. Williams Decl., ¶¶ 8, 11; Ex. B, S. Vassallo Decl., ¶ 41.

[17] Ex. B, S. Vassallo Decl., ¶ 39.

[18] Ex. C, A. Zanobetti Decl., ¶ 19.

[19] *Compare* Ex. K-3, TDCJ, *TDCJ Air Conditioning Construction Projects*, *with* Ex. K-14, TDCJ, *Unit Directory*, https://www.tdcj.texas.gov/unit_directory/.

[20] Ex. K-3, TDCJ, *TDCJ Air Conditioning Construction Projects*. Since 2018, TDCJ claimed it has added only 10,582 "cool beds" to its units (or roughly 1750 beds per year).

[21] Ex. K-15, Prison Policy Initiative, *Texas Profile,* https://www.prisonpolicy.org/profiles/TX.html (134,000) or Ex. K-7, TDCJ, *Statistical Report Fiscal Year 2023* (129,653 on hand). Texas has the largest state prison population in the country. *See* Ex. K-16, United States Department of Justice, Bureau of Justice Statistics, *Prisoners in 2022 – Statistical Tables* (November 2023), p. 7, *available at* https://bjs.ojp.gov/document/p22st.pdf.

[22]*See* Ex. K-17, Excessive Heat Events Guidebook, United States Environmental Protection Agency Office of Atmospheric Programs, https://www.epa.gov/sites/default/files/2016-03/documents/eheguide_final.pdf, p. 10; *see also* Ex. B, S. Vassallo Decl., ¶ 12.

vessels are maximally dilated, the body may no longer be able to dissipate heat effectively, so core body temperature begins to rise, causing significant morbidity and mortality.[23]

One way to assess the heat levels that inmates have and will continue to face is the heat index. The heat index is a better approximation of the heat that the human body really experiences than what a thermometer shows because heat index accounts for both temperature and humidity.[24] TDCJ acknowledges and incorporates into its policies a heat index chart published by the National Weather Service ("NWS") that illustrates how exposure to high heat indexes increases the risk of heat-related illnesses:[25]

### NOAA's National Weather Service
#### Heat Index
##### Temperature (°F)

| Relative Humidity (%) | 80 | 82 | 84 | 86 | 88 | 90 | 92 | 94 | 96 | 98 | 100 | 102 | 104 | 106 | 108 | 110 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 | 80 | 81 | 83 | 85 | 88 | 91 | 94 | 97 | 101 | 105 | 109 | 114 | 119 | 124 | 130 | 136 |
| 45 | 80 | 82 | 84 | 87 | 89 | 93 | 96 | 100 | 104 | 109 | 114 | 119 | 124 | 130 | 137 | |
| 50 | 81 | 83 | 85 | 88 | 91 | 95 | 99 | 103 | 108 | 113 | 118 | 124 | 131 | 137 | | |
| 55 | 81 | 84 | 86 | 89 | 93 | 97 | 101 | 106 | 112 | 117 | 124 | 130 | 137 | | | |
| 60 | 82 | 84 | 88 | 91 | 95 | 100 | 105 | 110 | 116 | 123 | 129 | 137 | | | | |
| 65 | 82 | 85 | 89 | 93 | 98 | 103 | 108 | 114 | 121 | 128 | 136 | | | | | |
| 70 | 83 | 86 | 90 | 95 | 100 | 105 | 112 | 119 | 126 | 134 | | | | | | |
| 75 | 84 | 88 | 92 | 97 | 103 | 109 | 116 | 124 | 132 | | | | | | | |
| 80 | 84 | 89 | 94 | 100 | 106 | 113 | 121 | 129 | | | | | | | | |
| 85 | 85 | 90 | 96 | 102 | 110 | 117 | 126 | 135 | | | | | | | | |
| 90 | 86 | 91 | 98 | 105 | 113 | 122 | 131 | | | | | | | | | |
| 95 | 86 | 93 | 100 | 108 | 117 | 127 | | | | | | | | | | |
| 100 | 87 | 95 | 103 | 112 | 121 | 132 | | | | | | | | | | |

**Likelihood of Heat Disorders with Prolonged Exposure or Strenuous Activity**

☐ Caution   ☐ Extreme Caution   ☐ Danger   ☐ Extreme Danger

This chart stratifies the likelihood that a person will suffer from a heat-related disorders at four heat index ranges. TDCJ's policy also adapts from the National Weather Service to provide further descriptions to these color-coded risk levels:[26]

---

[23] Ex. B, S. Vassallo Decl., ¶¶ 12, 17-18.
[24] Ex. K-18, National Weather Service, *What is the heat index?*, https://www.weather.gov/ama/heatindex; Ex. B, S. Vassallo Decl., ¶ 14.
[25] *Id.*; Ex. K-12, CMHC Policy Manual, D-27.02 Heat Stress, p. 5.
[26] Ex. K-12, CMHC Policy Manual, D-27.02 Heat Stress, p. 5.

| Likelihood of heat disorders with prolonged exposure or strenuous activity | Heat Index | Risk Level |
|---|---|---|
| Yellow = Caution | 80 to 90°F | Possible fatigue with prolonged exposure |
| Gold = Extreme Caution | 91°F to 103°F | Heat-related illness possible with long exposure |
| Orange = Danger | 103°F to 115°F | Heat stroke possible and heat-related illness likely |
| Red = Extreme Danger | Greater than 115°F | High risk of heat stroke |

And these figures show the substantial risks the extreme heat posed to average *healthy* people—not just to those who have an increased risk of heat-related illness or injury due to medical conditions, medications, disabilities, or age.

Still, inmates and staff in TDCJ's uncooled units are regularly exposed to long periods of dangerous and extreme heat, raising their core body temperatures to unsafe levels. Indeed, temperatures inside these facilities regularly reach 110° or higher for prolonged periods.[27] In 2018 and 2019, the heat index for dozens of TDCJ units exceeded 100°:[28]




---

[27] Ex. K-19, Josh Marcus, *Temperature Inside Baking Texas Prisons With No AC Regularly Hits 110 Degrees, Study Finds*, Independent (Jul. 26, 2022, 8:10 PM), https://www.independent.co.uk/independentpremium/us/texas-prison-heat-climate-change-air-conditioning-b2132464.html (quoting Dr. J. Carlee Purdum); Ex. K-20, Claire Colbert, *Temperatures Inside Texas Prison Units Regularly Reach 110 Degrees, new report says*, CNN.com (published July 23, 2022), https://www.cnn.com/2022/07/23/us/texas-prison-temperatures-report/index.html.

[28] Ex. K-21, J. Carlee Purdum, Ph.D. et al., *Extreme Temperatures and Covid19 in Texas Prisons*, Tex. A&M U. Hazard Reduction & Recovery Ctr. 18 (2022), https://tamucoa.b-cdn.net/app/uploads/2022/07/22-01R.pdf.

And TDCJ's own records have documented heat indexes in prisons as high as 150°.[29]

This extreme heat has caused prisoners to experience heat-related illnesses—including severe heat rash, cramps, disorientation, dehydration, chest pain, vomiting, and loss of consciousness.[30] In 2018 alone, at least 79 incarcerated people and prison staff members reported heat-related illnesses.[31] TDCJ processed more than 5,700 heat-related grievances between September 2020 and August 2021.[32] Hundreds have also died because of this extreme heat— between 2001 and 2019, 271 deaths have been attributed to the extreme heat these inmates were exposed to inside TDCJ uncooled units.[33] Over the same period, not one heat-related death occurred in TDCJ's climate-controlled prisons.[34] This summer, it is predicted that the results will be similar to what was previously found regarding heat-related morbidity and mortality, although the strength of the analysis could be affected by how many deaths occurred during that period.[35]

### B. Mr. Tiede Suffered a Transient Ischemic Attack from Heat.

Mr. Tiede has been directly affected by TDCJ's continued failure to protect inmates from extreme heat. He is 65 years old and has multiple conditions that make him especially vulnerable to heat-related illness and death—including diabetes, hypertension, cardiovascular disease, and COPD.[36] He is housed at the Estelle Unit in Huntsville, Texas. Mr. Tiede, like all people housed in uncooled TDCJ prisons during the summer months, has lived in inhumane conditions.

---

[29] *See* Ex. K-22, Temperature Log from TDCJ Hutchins Unit; *see* Ex. K-23, R. Storie Deposition, 100–101 (identifying and authenticating the logs).

[30] Ex. K-24, Brant Bingamon, *The State Claims No One Is Dying From 120+° F in Prisons, Part 2: The State's Response to the Prison Heat Crisis,* Austin Chron. (Aug. 18, 2023), https://www.austinchronicle.com/news/2023-08-18/the-state-claims-no-one-is-dying-from-120-plus-df-heat-in-prisons/ (quoting Angela Gonzalez, whose husband is housed in the Jim Ferguson Unit).

[31] Ex. K-21, Purdum, Ph.D. et al., *supra* note 29 at 2.

[32] Ex. K-25, Hannah Grabenstein, *'I Thought I Was Going to Die There.' What's it's Like to Live with Rising Temperatures in Prison*, PBS NewsHour (Aug. 19, 2022, 4:26 PM), https://www.pbs.org/newshour/nation/i-thought-i-was-going-to-die-there-what-its-like-to-live-with-rising-temperatures-in-prison.

[33] Ex. C, A. Zanobetti Decl., ¶ 16.

[34] *See supra* note 1; Ex. K-1, Skarha et al.; Ex. K-2, McCullough (Texas Tribune Aug. 21, 2023).

[35] Ex. C, A. Zanobetti Decl., ¶ 18.

[36] Ex. D, Third Decl. of Jennette Cross, MD ("J. Cross Third Decl."), ¶ 7.

Last summer, Mr. Tiede's prison cell regularly reached temperatures of 110 to 112°. As a result, in June 2023, Mr. Tiede had an acute heat-related health crisis, suffer a stroke, that resulted in facial paralysis and disfigurement and ongoing chronic health conditions related to heat exposure.[37] Following a hospital stay due to heat-related illness, TDCJ returned Mr. Tiede to the same overheated cell.[38] His facial paralysis never resolved, so Mr. Tiede suffers from visual impairment, and his general health has markedly declined.[39] Dr. Jeanette Cross, who treated Mr. Tiede, emphasized that given his age and medical vulnerability, that "exposure to extreme heat conditions" would present "a severe risk to his life and well-being."[40] She added that "[i]f Mr. Tiede is returned to un-airconditioned housing, subjecting him to extreme heat conditions, there remains a substantial threat that [he] will suffer the irreparable harm of severe injury and/or death."[41]

Although the Court granted a temporary injunction on September 14, 2023, TDCJ is still able to move Mr. Tiede to an uncooled cell at their discretion, or determine that his heat sensitivity score no longer requires a cool cell. This discretion is not delegated to treating medical staff[42]—it is instead a housing decision that TDCJ security apparatus allegedly makes by applying an undisclosed secret algorithm to the inmates' electronic medical records. Dkt. No. 33, p. 2. TDCJ also continues to oppose Mr. Tiede's basic request that he not be housed under dangerous and deadly conditions. As summer approaches, Mr. Tiede faces the same danger.

---

[37] Dkt. No. 30-24, Decl. of Bernhardt Tiede, II ("B. Tiede Decl."), ¶ 9.

[38] *Id.* at ¶ 11.

[39] *Id.* at ¶ 18; Ex. D, J. Cross Third Decl., ¶¶ 11-16.

[40] Dkt. No. 30-24, B. Tiede Decl., ¶ 17.

[41] *Id.* at ¶ 19.

[42] Ex. K-26, TDCJ Health Services Liaison Facility Types List, p. 2; Ex. K-27, McWhorter Testimony, 952–953, 990; Ex. K-28, CMHC Policy A-08.4, Attachment A, *available at* https://www.tdcj.texas.gov/divisions/cmhc/docs/cmhc_policy_manual/A-08.04_Attachment_A.pdf.

### C.      Temperatures will be Dangerously High this Summer.

Temperatures in Texas have been steadily increasing for the past 20 years. "With observed increases in mean temperature come concomitant increases in extreme temperatures." And "[t]hese increases in the temperature are virtually guaranteed to continue" into the future. Indeed, Linda Mearns, a climatologist and researcher at the National Center for Atmospheric Research, has further stated that "increasing temperatures, increasing extreme temperatures, and more frequent heat waves" are among the most certain expectations for future climate trends, including trends in Texas. "This most likely will result in an increasing heat index, and number of hours per day with extreme heat index values."[43]

The dangerous Texas summers are predictable.[44] Given the trends in the data and expectations based on climate change, oppressive temperatures are expected this summer. Indeed, the National Oceanic and Atmospheric Association ("NOAA") predicts above-average temperatures starting next month and throughout Texas for the entire summer.[45] And as this extreme summer heat approaches, the thousands of TDCJ inmates housed in uncooled units face serious health risks, with equally predictable and dire health consequences: heat exhaustion, heat stroke, and death.

### D.      The Risk that Extreme Heat Poses to TDCJ Inmates is Obvious, Long-Standing, Pervasive, and Well-Documented.

Mr. Collier and TDCJ officials are aware of these facts and figures and know that the extreme heat inside Texas prisons will continue to kill and seriously harm inmates. Since at least 1999, Texas courts have acknowledged the link between excessive heat and deaths in TDCJ

---

[43] Ex. E, Decl. of Linda Mearns ("L. Mearns Decl."), ¶¶ 12-14, 23.
[44] Ex. A, D. Williams Decl., ¶ 8.
[45] Ex. E, L. Mearns Decl., ¶ 23.

prisons.[46] Although still a gross underestimation, TDCJ has even admitted that at least twenty-two prisoners died in TDCJ facilities from heat-related causes between 1998 and 2012.[47] Mr. Collier testified that inmates confined in temperatures at or above 95° are at a serious health risk.[48]

Rep. Terry Canales said to the Texas House of Representatives: "[W]e are cooking people in prisons."[49] The former head of the TDCJ Correctional Officers Union, likewise, publicly warned of the risks of extreme heat to TDCJ inmates:

> We're not trying to make this lush, we're trying to make it humane. These are third world conditions. We're supposed to run prisons, not concentration camps. These are institutions for incarceration. The incarceration is their punishment. Not cooking them to death.[50]

Underscoring the obviousness of the problem is that the State of Texas has already recognized that incarcerated individuals must be housed in safe temperatures. Since 1994, state-wide regulations adopted by the Texas Commission on Jail Standards have required all county jails in Texas to maintain indoor temperatures between 65° and 85°.[51] Thus, about 70,000 individuals are housed in Texas county jails at any given time in climate-controlled cells.[52] Notably, this range departs significantly from that required inside other government buildings in Texas to maintain "comfortable" levels (*i.e.*, between 68° and 78°).[53] Other correctional systems across the country

---

[46] *See Ruiz v. Johnson*, 37 F. Supp. 2d 855, 904 (S.D. Tex. 1999).

[47] First Am. Compl. ¶ 69 (providing a list of the twenty-two heat related deaths that the TDCJ has acknowledged).

[48] Ex. K-4, *Cole v. Collier*, Sep. 10, 2019 Hearing Transcript, at 49:22–25.

[49] Ex. K-29, Texas Prison Heat Bill Hearing at 32:29 (statement of Terry Canales, H. Rep. and Sponsor of H.B.1708).

[50] Ex. K-30, Maurice Chammah, *"Cooking Them to Death": The Lethal Toll of Hot Prisons*, MARSHALL PROJECT (Oct. 11, 2017, 7:00 AM), https://www.themarshallproject.org/2017/10/11/cooking-them-to-death-the-lethal-toll-of-hot-prisons.

[51] 37 Tex. Admin. Code § 259.160; 37 Tex. Admin. Code § 251.1.

[52] Ex. K-31, Texas Commission on Jail Standards, *Incarceration Rate Report – Highest and Lowest August 1, 2022*, *available at* https://www.tcjs.state.tx.us/wp-content/uploads/2022/08/IncarcerationRateRptCurrent.pdf; *see also* https://www.tcjs.state.tx.us/population-reports/.

[53] *See* 25 Tex. Admin. Code § 297.8 (a)(1) (providing that "room temperature for a typical occupied office or classroom environment should be kept between 72 to 76 degrees Fahrenheit in the summer and 70 to 75 degrees in Fahrenheit in the winter and controlled within a temperature range of ±2 degrees in Fahrenheit for a given day").

have, likewise, adopted similar standards requiring their units to maintain temperatures in housing

levels within safe ranges to protect inmates.[54] TDCJ has refused to implement the same standard.

### E.    TDCJ's Current Heat Policy is Inadequate.

Mr. Collier has implemented limited measures like ostensibly requiring units to admit

certain "heat-sensitive inmates" to "respite" areas for short periods, or offering inmates fans, extra

showers, or ice. These measures have been ineffective and may, in fact, exacerbate the problem.[55]

TDCJ prisoners continue to suffer heat-related injuries despite TDCJ's "mitigation measures":

- **Fans are inadequate and counterproductive.** Medical toxicologist Dr. Susi Vassallo has explained that "fans elevate the risk of heat-related illness, increasing the heat load on the body by moving hot air across the skin."[56]

- **"Cool down showers" are inadequate.** Showers only have a limited and short-term effect on heat risk and are not a sustainable solution, especially considering the current staffing shortage and the need for officers to supervise inmates who are showering. And "the provision of additional ice, on its own, does not mitigate the risk of heat-related illness."[57]

- **TDCJ's "respite" program is insufficient.** Moreover, the "respite" areas are generally not cool, because they are small and often packed with inmates, whose combined body heat offsets the limited cooling effect of the portable air conditioning units placed in these rooms.[58]

The extensive evidence of continued heat-related illness and deaths shows that TDCJ's

current heat-mitigation policy is constitutionally inadequate. Rather, ordering Mr. Collier to ensure

that temperatures inside the housing and occupied areas of TDCJ prisons are maintained at safe

levels between 65° and 85° is the only reasonable and least intrusive means that is necessary to

---

[54] *See* Mary E. Adair, *Beat the Heat: Texas's Need to Reduce Summer Temperatures in Offender Housing*, 51 St. Mary's L.J. 713, 730–33 (2020).
[55] Ex. B, S. Vassallo Decl., ¶ 41.
[56] *Id.*
[57] *Id.*
[58] *See, e.g.*, Ex. K-24, Bingamon, *supra* note 31; Ex. K-32, Vassallo Testimony at 134:25-136:5 (explaining why respite policy is inadequate to deal with health issues posed by heat in housing without air conditioning).

protect the safety and well-being of inmates.[59]

Mr. Collier has knowingly failed to ensure that TDCJ inmates are housed in safe conditions despite the continued risk of serious illness and death from exposure to extreme heat each summer. This Court's immediate intervention is necessary to protect inmates from dying or suffering serious harm this summer.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction if (1) they are likely to succeed on the merits, (2) there is a substantial threat of irreparable injury, (3) the balance of harms favors an injunction, and (4) the public interest supports preliminary relief.[60] Mr. Collier and TDCJ know that 85,000 Texas inmates have been and will continue to be subjected to extended periods of extreme heat in living quarters that pose a substantial risk of serious harm to them and endanger their lives. As another Texas summer with potentially record-setting heat approaches, this Court's emergency intervention is necessary, given the magnitude of the danger and Mr. Collier's deliberate indifference to Texas inmates' constitutional rights.

## I. EXPOSING INMATES TO EXTREME TEMPERATURES VIOLATES THE EIGHTH AMENDMENT.

As this Court has already explained: "It is well-established in the Fifth Circuit that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures."[61] And the Fifth Circuit has "consistently

---

[59] In fact, toxicology expert Dr. Susan Vassallo opined that having a working air conditioner has been "associated with an 80% reduction in the risk of death due to heat and cardiovascular disease and a 66% reduction in mortality due to cardiovascular disease. In one study, it was estimated that 50% of the deaths related to a heat wave could have been prevented with a working air conditioner. Lack of air-conditioning was reported in 91% of deaths in one report. In my opinion, these data are directly applicable the Texas prisons. To be sure*, excess morbidity and mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combatted by bringing the temperature in the prisons down.*" Ex. B, S. Vassallo Decl., ¶ 40.

[60] *See Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023); *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022).

[61] Dkt. No. 17 at 3 (quoting *Yates v. Collier*, 868 F.3d 354, 359–61 (5th Cir. 2017)) (marks omitted); *see also Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir. 2015).

found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain mitigating measures were available."[62] Thus, a prison official's failure to take reasonably adequate measures to protect inmates from extreme heat violates the Eighth Amendment when (1) "prison conditions pose an unreasonable risk of serious damage to a prisoner's health" (i.e., the objective standard), and (2) the official "acted with deliberate indifference to the risk posed" (i.e., the subjective standard).[63] What is cruel or unusual is not set in stone, but is instead based on what is "socially acceptable"[64] or consistent with "[a] sufficient national consensus."[65]

Here, the Court has already determined that Mr. Tiede is "substantially likely to prove an Eighth Amendment violation because of his enhanced sensitivity to extreme heat due to his medical conditions."[66] But as Mr. Collier knows, the risk of serious harm and death from extended exposure to extreme heat conditions is not limited to those with "enhanced sensitivity" to heat— rather, all inmates housed in uncooled units over the summer face such risks and TDCJ's efforts to mitigate those risks have been unreasonable and wholly inadequate. Thus, like Mr. Tiede, the Organizational Plaintiffs are likely to establish an Eighth Amendment violation as to all inmates that will be housed in uncooled conditions.

## A.    Plaintiffs Meet the Eighth Amendment's Objective Standard.

Extreme temperatures pose a substantial risk of serious harm to TDCJ inmates, regardless of whether they have any underlying conditions.[67] As detailed above, even when a healthy person

---

[62] *Yates*, 868 F.3d at 361 (collecting cases); *see, e.g.*, *Blackmon v. Garza*, 484 F. App'x 866, 871 (5th Cir. 2012) (reversing summary judgment because a reasonable jury could conclude prison official's efforts mitigate heat were inadequate to satisfy the Eighth Amendment's demands).

[63] *Ball v. LeBlanc*, 792 F.3d 584, 592 (5th Cir. 2015) (quoting *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993)); *see also Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (stating that "a low cell temperature at night combined with a failure to issue blankets" can violate the Eighth Amendment).

[64] *Ball*, 792 F.3d at 599 (recognizing that standard for Eighth Amendment is the "socially acceptable level").

[65] *Roper v. Simmons*, 543 U.S. 551, 562 (2005).

[66] Dkt. No. 17 at 4.

[67] *Ball*, 792 F.3d at 592–93 (affirming the district court's finding that evidence of inmates' heightened

is exposed to prolonged periods of extreme temperatures, they are at serious risk for heat-related sequalae—including, but not limited to, heat syncope, heat exhaustion, heat stroke, and death. In particular, heat stroke has a 30-80% mortality rate, and those who survive are at substantial risk for permanent neurologic injury.

Indeed, medical disorders directly caused by heat impact *all* individuals, including young and healthy individuals like many inmates in the TDCJ facilities. As Dr. Vassallo explains, "all people, even young healthy people, are at substantial risk of suffering serious medical disorders resulting directly from the heat, including heat cramps, heat syncope, heat exhaustion and heat stroke."[68] This risk "is well-documented and well-established in the medical literature."[69]

And, although Plaintiffs "need not show that death or serious injury has already occurred"[70] to satisfy the objective standard, the evidence described above shows that TDCJ inmates housed in uncooled units have already been seriously harmed and hundreds have died in TDCJ facilities because of the extreme heat. As Dr. Zanobetti notes, studies have shown that "an extreme heat day" in TDCJ facilities "was associated with a 13% increase in mortality in prison facilities without [air conditioning]."[71] As a result, Plaintiffs easily meet the objective standard.

### B. Plaintiffs Satisfy the Eighth Amendment's Subjective Standard.

The second element requires that Mr. Collier "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."[72] This

---

vulnerability to high temperatures coupled with high summer temperatures in inmate housing posed a substantial risk of serious harm); *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977) (stating that "[i]f the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health[,] relief should be granted").

[68] Ex. B, S. Vassallo Decl., ¶ 27.

[69] *Id.*

[70] *Id.* at 595-96; *see also Helling*, 509 U.S. at 33 ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition.").

[71] Ex. C, A. Zanobetti Decl., ¶ 15.

[72] *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see also Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

knowledge can be inferred "from circumstantial evidence," and the Court "may conclude that [Mr. Collier] knew of a substantial risk of serious harm from the very fact that the risk was obvious."[73] For instance, this knowledge may be shown by evidence that the risk is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and "the circumstances suggest that the defendant-official" was exposed to that information.[74] This standard is easily met here.

Mr. Collier and TDCJ have long known that heat-related deaths and illnesses continue to plague inmates in uncooled units. The TDCJ has admitted that nearly two dozen inmates died due to heat-related issues from 1998 to 2012.[75] And Mr. Collier himself acknowledged under oath that he knew during the summer of 2019 that people confined in temperatures of 95° were at a serious health risk.[76] The substantial risks that inmates in uncooled units face have been so persistently and pervasively well-documented and so well-known **for decades** that Mr. Collier cannot reasonably disavow knowledge of the risks here.[77]

It is just as obvious and well-documented that the measures that TDCJ has implemented to mitigate those risks have been inadequate. At least forty people likely died from the extreme heat and hundreds of others suffered from heat-related illness in uncooled units in TDCJ facilities across the state. Despite knowing about the ongoing hazards that inmates in uncooled units face, Mr. Collier has failed to remedy risks by ensuring that TDCJ maintains safe indoor temperatures.[78]

---

[73] *Farmer*, 511 U.S. at 842.

[74] *Id.*

[75] *See* Statement of Facts at pp. 11-12, *supra*.

[76] Ex. K-4, *Cole v. Collier*, Sep. 10, 2019 Hearing Transcript, at 49:22–25 (admitting that he knew and believed that people confined in temperatures of 95 degrees Fahrenheit are at a serious health risk).

[77] *See* Statement of Facts at pp. 11-12, *supra*.

[78] *Webb v. Livingston*, 618 F. App'x 201, 208 (5th Cir. 2015) ('[T]he open and obvious nature of the alleged conditions further supports the reasonable inference that Appellants were deliberately indifferent."); *Gates*, 376 F.3d at 340 (affirming trial court's finding of a prison system's deliberate indifference based on the open and obvious nature of extreme heat in prison facilities).

As Plaintiffs are likely to succeed on the merits of their Eighth Amendment claims, the Court should enter a preliminary injunction to protect Plaintiffs' members and constituents from the extreme risk of harm they are likely to suffer this summer.

## II.  THE PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IMMEDIATE AND IRREPARABLE HARM.

This Court has already determined that Mr. Tiede has suffered and will suffer irreparable harm should he be returned to uncooled housing. But the evidence detailed above also shows that Plaintiffs' members and constituents housed by TDCJ in an uncooled unit this summer will suffer this summer.

"[A] harm is irreparable where there is no adequate remedy at law."[79] And the risks that TDCJ inmates face from the extreme heat, including heat-related illness and death, justify preliminary relief.[80] No adequate legal remedy exists for Plaintiffs' continued suffering in these conditions. Given the impending extreme summer heat, "[a]nyone held in an unairconditioned prison in Texas during the summer months is at substantial risk of serious harm and death."[81]

## III.  THE BALANCE OF HARMS AND THE PUBLIC INTEREST FACTORS FAVOR ENTERING THE PRELIMINARY INJUNCTION.

The harm to Plaintiffs, their constituents, and their members also outweighs any hardship to Mr. Collier and TDCJ. In deciding whether a preliminary injunction is proper, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[82] And where a state official or entity is the opposing party,

---

[79] *Amegy Bank Nat'l Assn. v. Monarch Flight II, LLC*, 2011 WL 4948986, *5 (S.D. Tex. Oct. 18, 2011).

[80] *See Blackmon*, 484 F. App'x at 872 (headaches, dizziness, nausea, lightheadedness, difficulty catching breath, and blurred vision, even without medical documentation of the symptoms, are sufficient injuries).

[81] Ex. B, S. Vassallo Decl., ¶ 42; *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) (noting that the court "need not await a tragic event" to afford injunctive relief to inmates living in "an unsafe, life-threatening condition in their prison").

[82] *Winter v. Nat'l. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).

the government's interest and the public interest merge.[83]

Here, the balance of harms and the public interest weigh heavily in favor of entering a preliminary injunction requiring Mr. Collier to maintain safe indoor temperatures where TDCJ houses inmates. As detailed, those who are currently housed or may be transferred to TDCJ's uncooled housing will be subjected to extreme heat conditions this summer, placing them in substantial risk of serious harm. If the Court withholds immediate relief, these inmates are likely to suffer grievous injury and, almost certainly in some cases, death.

By contrast, Mr. Collier and TDCJ will face minimal, if any, harm if the Court grants a preliminary injunction. And monetary costs alone cannot justify abridging constitutional rights.[84] On this point, *Jones'El v. Berge* is instructive.[85] There, Judge Crab rejected the Wisconsin Department of Corrections' argument that it did not have to comply with its constitutional obligation to house inmates in safe temperatures because of the cost of providing air conditioning:

> It is no defense for defendants to argue that the taxpayers may object to providing air conditioning to state prisoners. Defendants constructed a facility in which inmates are subjected to temperatures that can pose a serious risk to their well-being, particularly if they are taking medications or have health conditions that prevent their bodies from adjusting to high heat. If air conditioning is the only means of avoiding that risk, that is a function of defendants' decision to build the facility as they did. Leaving inmates vulnerable to serious health consequences or death is not a reasonable alternative.[86]

The public interest, likewise, favors entering a preliminary injunction. "[I]t is always in the

---

[83] *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (addressing same factors in the stay context); *Eggers v. Evnen*, 48 F.4th 561, 564-65 (8th Cir. 2022) (collecting cases applying principle to preliminary injunctions).

[84] *See Rufo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 396 (1992) ("[T]he lack of resources can never excuse a failure to obey constitutional requirements"); *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986) (financial hardship "can never be an adequate justification for depriving any person of his constitutional rights"); *Henderson v. Stadler*, 112 F. Supp. 2d 589, 602 (E.D. La. 2000) *overruled on other grounds* 287 F.3d 374 (5th Cir. 2002) (injury to constitutional rights outweighs monetary costs); *Smith*, 553 F.2d at 378 ("[L]ack of funds to implement the trial court's order" did not justify defendants' failure to remedy ongoing constitutional violations); *Gates v. Collier*, 501 F.2d 1291, 1319 (5th Cir. 1974) ("Where state institutions have been operating under unconstitutional conditions and practices, the defense[ ] of fund shortage . . . ha[s] been rejected by the federal courts.").

[85] *Jones'El v. Berge*, No. 00-C-421-C, 2003 WL 23109724 (W.D. Wis. Nov. 26, 2003), *aff'd sub nom. Jones-El v. Berge*, 374 F.3d 541 (7th Cir. 2004).

[86] *Id.* at *1.

public interest to prevent the violation of a party's constitutional rights."[87] And at a minimum, the proposed injunction "would not disserve the public interest because it will prevent constitutional deprivations."[88] Keeping inmates in extreme temperatures for extended periods of time serves no legitimate penological purpose,[89] and "can only be considered punishment for punishment's sake."[90]

Moreover, courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration."[91] And "a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution."[92] The Court instead "has the authority and duty to insure that the Constitution does not stop at the prison gate, but rather inures to the benefit of all, even to those citizens behind prison walls."[93]

Here, the State's likely claim that the injunction will frustrate its interest in administering its prisons is minimized by the relief that is narrowly drawn and extends no further than necessary to address the constitutional violation.[94] As former Executive Director of the Colorado Department of Corrections Dean Williams has opined: "Cooling prisons to safe temperatures, such as between

---

[87] *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013); *see also Veasey v. Abbott*, 870 F.3d 387, 394 (5th Cir. 2017) (quoting *Hobby Lobby*); *Simms v. Dist. of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (collecting cases).

[88] *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014); *see also Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996).

[89] *Cf. Madrid v. Gomez*, 889 F. Supp. 1146, 1172 (N.D. Cal. 1995) ("Leaving inmates in outdoor cages for any significant period—as if animals in a zoo—offends even the most elementary notions of common decency and dignity. It also fails to serve any legitimate penological purpose in any kind of weather, much less cold and rainy weather.").

[90] *Jones'el v. Berge*, 164 F. Supp. 2d 1096, 1098-1117 (W.D. Wis. 2001) (finding an Eighth Amendment violation where the temperatures "fluctuates wildly," and "[i]nmates have no way to regulate the temperature in their cells. There is no air conditioning and the solid cell doors and lack of windows prevents air from circulating.").

[91] *Brown v. Plata*, 563 U.S. 493, 511 (2011).

[92] *Procunier v. Martinez*, 416 U.S. 396, 405 (1974), *overruled on other grounds*, *Thornburgh v. Abbott*, 490 U.S. 401 (1989).

[93] *Battle v. Anderson*, 564 F.2d 388, 394 (10th Cir. 1977).

[94] *See Ball*, 792 F.3d at 598 (noting that injunctive relief in the prison context must be "narrowly drawn" and "extend[] no further than necessary" under 18 U.S.C. § 3626(a)(1)(A)).

65-85 degrees as required by the Texas Commission on Jail Standards, and states like North Carolina, is the only long-term solution that does not compromise the safety and lives of prisoners and staff. No mitigation measures short of maintaining safe temperatures in the prison housing areas can adequately protect people from these extreme temperatures."[95] As Dr. Vassallo has concluded, "excess morbidity and mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combatted by bringing the temperature in the prisons down."[96]

Because the evidence shows that "other acceptable and less-intrusive remedies" have been tried and found unsuccessful, requiring Mr. Collier to implement measures that maintain safe indoor temperatures where TDCJ houses inmates is the necessary and appropriate remedy.[97] It is well-established that the "use of air conditioning reduce[s] the risk of total mortality during hot days."[98] Indeed, "adopting a universal [air conditioning] policy in all Texas prisons is likely essential for the health of one of the most vulnerable populations in the United States."[99]

In short, the injunction seeks relief that is narrowly tailored to the substantial risk of harm faced by all TDCJ inmates housed in unairconditioned cells, based on extensive evidence, and requires Mr. Collier to comply with his constitutional obligations. As a result, both the balance of equities and the public interest strongly support granting the requested injunction.

## IV.    PLAINTIFFS SHOULD NOT HAVE TO POST A BOND.

Plaintiffs request that they not be required to post any cash bond. The Court has the discretion to issue a preliminary injunction without requiring the Plaintiffs to give security.[100]

---

[95] Ex. A, D. Williams Decl., ¶ 32.
[96] Ex. B, S. Vassallo Decl., ¶ 40.
[97] *Yates*, 868 F.3d at 370–71, n.8 (recognizing that requiring TDCJ to provide air conditioning may be an appropriate and permissible remedy to address excessive heat).
[98] Ex. C, A. Zanobetti Decl., ¶ 14; *Yates*, 868 F.3d at 368 (explained that air-conditioning is a "self-evident" and "obvious" remedy to provide "relief from injuries caused by excessive heat").
[99] Ex. C, A. Zanobetti Decl., ¶ 20.
[100] *See Corrigan Dispatch Co. v. Casa Guzman, S.A.*, 569 F.2d 300, 302-303 (5th Cir. 1978) (bond amount "is a matter of discretion of the trial court; it may elect to require no security at all").

## CONCLUSION

"It has long been said that a society's worth can be judged by taking stock of its prisons." *Valentine v. Collier*, 140 S. Ct. 1598, 1601 (2020) (Sotomayor, J.). Considering the state of the TDCJ prison system, the deaths, and torturous conditions that have been allowed to persist in TDCJ facilities for decades reflects poorly on us all. The Constitution demands better.

Plaintiffs ask the Court to enter a preliminary injunction (i) declaring TDCJ's current Heat Policy to be constitutionally inadequate under the Eighth Amendment to the U.S. Constitution; (ii) enjoining Mr. Collier to ensure that TDCJ maintains a safe indoor temperature between 65° to 85° Fahrenheit in the housing areas and occupied areas of any facility where inmates are assigned; and (iii) any other injunctive relief sufficient to protect the health and safety of the prisoners and to prevent cruel and unusual suffering from extreme heat conditions. **And because summer is only weeks away, Plaintiffs also request that the Court set an expedited briefing schedule on this Motion and schedule a hearing to consider this Motion as soon as practicable.**

DATED: April 25, 2024                   Respectfully submitted,


                                        */s/ Brandon Duke*
                                        _____

Jodi Cole                               Jeff Edwards
Texas Bar No. 24045602                  Texas Bar No. 24014406
Law Office of Jodi Cole, PLLC           David Anthony James
203 East Murphy Street                  Texas Bar No. 24092572
Alpine, TX 79830                        Lisa Snead
Telephone:    432.837.4266              Texas Bar No. 24062204
Facsimile:    512.692.2575              Paul Samuel
Email:   jcole@jodicole.com             Texas Bar No. 24124463
                                        Edwards Law
Erica Grossman (*pro hac vice*)         603 W. 17th Street
Holland, Holland Edwards & Grossman,    Austin, TX 78701
LLC                                     Telephone:    512.623.7727
1437 High Street                        Facsimile:    512.623.7729
Denver, CO 80218                        Email:   jeff@edwards-law.com
Telephone:    303-860-1331                       david@edwards-law.com
Facsimile:    303-862-6506                       lisa@edwards-law.com
Email: erica@hheglaw.com                         paul@edwards-law.com

Thomas A. Olsen (*pro hac vice*)        Brandon Duke
Kevin D. Homiak (*pro hac vice*)        Texas Bar No. 24094476
Ellen R. Blatt (*pro hac vice*)         Caitlin Gernert
Wheeler Trigg O'Donnell LLP             Texas Bar No. 2409414
370 Seventeenth Street, Suite 4500      Winston & Strawn, LLP
Denver, CO 80202-5647                   800 Capitol Street, Suite 2400
Telephone:    303.244.1800              Houston, TX 77002
Facsimile:    303.244.1879              Telephone:    713-651-2600
Email:   olsen@wtotrial.com             Email:   bduke@winston.com
         homiak@wtotrial.com                     cgernert@winston.com
         blatt@wtotrial.com

**Attorneys for Plaintiffs Bernhardt Tiede, II, TPCA,
TX C.U.R.E., Lioness, and Coalition for Texans with Disabilities**

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case File System of the Western District of Texas.

DATED: April 25, 2024                                */s/ Brandon Duke* _____

## **CERTIFICATE OF CONFERENCE**

I certify that Counsel for Plaintiffs conferred with counsel for Defendant regarding the relief requested in this Motion by email on April 23, 2024. Counsel for Defendant confirmed that Defendant opposes the relief requested.

DATED: April 25, 2024                                */s/ Brandon Duke* _____