**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| BERNHARDT TIEDE, II; TEXAS PRISONS COMMUNITY ADVOCATES; BUILD UP, INC. a/k/a LIONESS: JUSTICE IMPACTED WOMEN'S ALLIANCE; COALITION FOR TEXANS WITH DISABILITIES; TEXAS CITIZENS UNITED FOR REHABILITATION OF ERRANTS, | § § § § § § § § § | |
| Plaintiffs, | § § | Civil Action No.: 1:23-cv-01004-RP |
| v. | § § | |
| BRYAN COLLIER, in his official capacity as Executive Director of Texas Department of Criminal Justice, | § § § § | |
| Defendant. | § § | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to the Court's request, Plaintiffs submit the following proposed Findings of Fact

and Conclusions of Law on Plaintiffs' Emergency Motion for Preliminary Injunction (ECF 50).

# TABLE OF CONTENTS

FINDINGS OF FACT.................................................................................................. 4

I. The Organizational Plaintiffs' Incarcerated Members and Constituents Face A Substantial Risk Of Serious Harm From Extreme Heat........................... 4

    A. Lioness: Justice Impacted Women's Alliance ........................................... 4

    B. Texas Citizens United for Rehabilitation of Errants................................... 5

    C. Texas Prisons Community Advocates ....................................................... 7

    D. Coalition of Texans with Disabilities ....................................................... 8

II. Plaintiff Bernhard Tiede, II Faces A Substantial Risk of Serious Harm if He Is Moved to An Unairconditioned Cell...................................................... 9

III. Temperatures Inside TDCJ's Prisons Are Dangerously High Each Summer. ..................................................................................................... 11

    A. The Risks of Extreme Heat Are Well-Established. .................................. 11

    B. Texas Prisons Are Hot and Getting Hotter. ............................................ 14

IV. Extreme Heat Poses a Substantial Risk of Serious Harm to TDCJ Inmates......... 17

    A. TDCJ Has Repeatedly Acknowledged the Risk that Extreme Heat Poses to TDCJ Inmates. ........................................................................ 17

    B. Publicly Available, Peer-Reviewed Research Studies Have Warned Mr. Collier That Hundreds of TDCJ Inmates Continue to Die from Extreme Heat. ........................................................................ 18

    C. TDCJ Admits that Multiple TDCJ Inmates Died from Extreme Heat in Summer 2023. ............................................................... 20

    D. At Least Two More TDCJ Inmates Died from the Heat in Summer 2023...................................................................................... 26

    E. Evidence of Two Other Inmate Deaths under Questionable Circumstances was Also Presented During the Preliminary Injunction Hearing. ........................................................................ 31

    F. Heat-Related Deaths Are Being Undercounted and Underreported Because of TDCJ's Practices. ................................................. 33

    G. TDCJ is Likely Undercounting Inmates' Heat-Related Injuries............... 36

1

H.     TDCJ Staff Continue to Suffer Heat-Related Injuries. ............................. 38

V.    Mr. Collier Knows that TDCJ's Heat-Mitigation Policies Are Inadequate.......... 39

    A.     TDCJ's Heat Score System is Arbitrary, Inadequate, and Ineffective. ................................................................................... 43

    B.     Respite Areas Are Inadequate and Ineffective........................................ 45

    C.     Cold Showers Don't Work.......................................................... 49

    D.     Fans Are Inadequate and Counter-Productive in Extreme Heat. .............. 51

    E.     Access to Cold Water is Inconsistent and Does Not Reduce the Long-Term Effects of the Heat on TDCJ Inmates................................... 51

    F.     Evidence Submitted by Mr. Collier Raises Substantial Concern About Whether TDCJ Implements its Heat Mitigation Measures in Accordance With TDCJ Policy................................................... 52

VI.    Air-Conditioning is the Only Effective Protection from Extreme Heat. ............. 54

    A.     Reducing Temperatures to Safe Levels Is the Least Restrictive Means to Address the Risks Posed by Extreme Heat. ............................. 54

    B.     Air-Conditioning the Entire TDCJ System is Feasible........................... 57

    C.     TDCJ's Current Plan to Install Air-Conditioning is Inadequate.............. 58

    D.     Other Prisons Air Condition Their Systems. ........................................ 59

CONCLUSIONS OF LAW ............................................................................ 60

I.    Mr. Tiede is Likely to Succeed on the Merits of his Eighth Amendment Claim................................................................................... 61

II.    The Organizational Plaintiffs are Likely to Succeed on The Merits. .................. 62

    A.     Plaintiffs Have Sufficiently Shown an Eighth Amendment Violation. ............................................................................... 63

    B.     The Organizational Plaintiffs Have Established Associational Standing. .............................................................................. 76

    C.     The Prison Litigation Reform Act's Exhaustion Requirement Does Not Apply to the Organizational Plaintiffs. ........................................ 79

III.    TDCJ Prisoners Will Suffer Irreparable Harm Absent Injunctive Relief. ........... 80

IV.    The Remaining Factors Favor Injunctive Relief....................................................... 82

V.     The Court Will Waive The Bond Requirement. ...................................................... 85

VI.    The Court Has the Power to Issue the Requested Relief. ..................................... 85

**FINDINGS OF FACT**

I.    **THE ORGANIZATIONAL PLAINTIFFS' INCARCERATED MEMBERS AND CONSTITUENTS FACE A SUBSTANTIAL RISK OF SERIOUS HARM FROM EXTREME HEAT.**

A.    **Lioness: Justice Impacted Women's Alliance ("Lioness")**

Lioness is a traditional voluntary organization "made up of formerly incarcerated and currently incarcerated women, girls, [and] gender expansive individuals in Texas."[1] Because the Texas Department of Criminal Justice ("TDCJ") currently houses people based on their biological sex, rather than on their gender identity, TDCJ currently houses transgender women with men in its facilities.[2] Lioness's "roughly 700 members" advocate for "appropriate and livable conditions at TDCJ facilities" and work "to get its members and constituents safe from extreme heat."[3] Lioness's board "consists entirely of formerly incarcerated women."[4] More than 400 of its members are TDCJ inmates, and about 250 of those members are assigned to unairconditioned units.[5] Lioness's members all joined the organization voluntarily, support its mission, help guide its priorities, offer input and direction in this litigation, and receive updates about the case.[6] Lioness's incarcerated members also "guide all of [the organization's] work," by letting Lioness know "what's currently going on in their units," and then Lioness "campaign[s] around those issues."[7]

---

[1] Final Hearing Tr. (July 30, 2024) at 26:19-22. Lioness is part of Build Up, Inc., a nonprofit organization formed under the laws of New Jersey. (*See* Final Hearing Tr. (July 30, 2024) at 67:7–10; *see also* ECF 90-1, Ex. L, Toon 2d Decl. ¶¶ 1–2; Def.'s Hearing Ex. 30.)

[2] Final Hearing Tr. (July 30, 2024) at 68:18–69:6.

[3] ECF 90-1, Ex. L, Toon 2d Decl. ¶¶ 2–8; *see also* Final Hearing Tr. (July 30, 2024) at 50:25–51:8; ECF 50-8, Ex. H, Toon Decl. ¶¶ 4–7;

[4] Final Hearing Tr. (July 30, 2024) at 52:21-23.

[5] Final Hearing Tr. (July 30, 2024) at 51:9-11, 54:7-9; ECF 90-1, Ex. L, Toon 2d Decl. ¶¶ 2–8; Pls.' Hearing Ex. 62 (list of Lioness members currently incarcerated in TDCJ facilities).

[6] ECF 90-1, Ex. L, Toon 2d Decl. ¶¶ 7, 9, 16–23.

[7] Final Hearing Tr. (July 30, 2024) at 53:19–22.

Extreme heat in TDCJ prisons has been on Lioness's radar "from day one."[8] It is a priority for Lioness because of its board members' "lived experience," and it remains of paramount importance, because Lioness members have "confirmed" that harm from extreme heat and lack of air-conditioning continue this summer.[9] This is nothing new. Lioness receives "[a] very large number" of complaints from its incarcerated members "every summer" about the heat in TDCJ prisons, the lack of air-conditioning, and TDCJ's inadequate heat-mitigation measures.[10] The volume of those complaints has increased since 2022.[11] Lioness has also identified specific members housed in unairconditioned TDCJ units who "have been harmed or are at risk of harm from the extreme heat in TDCJ facilities."[12] Lioness decided to join this lawsuit because it is "concerned about incarcerated Texans' health and . . . their life," because "the majority of [Lioness's] membership is under the direct authority of [TDCJ]."[13]  The decision to join the lawsuit was "not only a response to the complaints" Lioness received from its members about the extreme heat, but also a result of its formerly incarcerated board members' "lived experience" in the TDCJ system.[14]

## B.    Texas Citizens United for Rehabilitation of Errants ("TX C.U.R.E.")

TX C.U.R.E. is an Austin-based criminal justice advocacy nonprofit.[15] It was "created to fight systemic and systematic mistreatment of people incarcerated in TDCJ's custody, and to

---

[8] Final Hearing Tr. (July 30, 2024) at 53:23-54:6.

[9] *Id.*

[10] *Id.* at 56:18–22.

[11] *Id.* at 56:14–57:5.

[12] ECF 90-1, Ex. L, Toon 2d Decl. ¶¶ 5, 13–23 (identifying members by their initials "because many of our members fear retaliation by TDCJ for providing testimony or participating in a lawsuit against it").

[13] Final Hearing Tr. (July 30, 2024) at 57:6-12.

[14] *Id.* at 57:13-16.

[15] ECF 90-1, Ex. M, C. Malouff Decl. (June 4, 2024) ¶ 3.

provide those who are incarcerated with resources they need in and out of prison."[16] TX C.U.R.E.'s constituents include all of the approximately 132,600 individuals incarcerated in the TDCJ system—including approximately 89,000 individuals who are currently housed in unairconditioned living areas.[17] TX C.U.R.E. has constituents in every unit in TDCJ.[18] TX C.U.R.E. advocates for its incarcerated constituents by communicating with them to try to address specific issues, and by testifying in front of the Texas Legislature on heat-related issues.[19] TX C.U.R.E.'s Board of Directors includes individuals formerly incarcerated in the TDCJ system and loved ones of those who are currently incarcerated.[20]

TX C.U.R.E.'s staff frequently communicates with its incarcerated constituents and their family members, who are seeking help with addressing inhumane conditions in TDCJ's prisons.[21] These incarcerated constituents' needs drive the policy goals of the organization, which include seeking relief from the extreme heat in TDCJ's unairconditioned units.[22] TX C.U.R.E. identified 19 constituents who have written and requested help with excessive heat, a lack of air-conditioned housing, and other related issues.[23] All of these constituents have "suffered from exposure to excessive heat" and "are directly affected by TDCJ's lack of temperature control throughout its

---

[16] ECF 90-1, Ex. M, C. Malouff Decl. ¶ 3.

[17] Final Hearing Tr. (July 30, 2024) at 188:10-23; Pls.' Hearing Ex. 128; ECF 90-1, Ex. M, C. Malouff Decl. ¶ 4.

[18] Final Hearing Tr. (July 30, 2024) at 189:4-6.

[19] *Id.* at 190:3-9.

[20] ECF 90-1, Ex. M, C. Malouff Decl. ¶ 5.

[21] *Id.* ¶ 6.

[22] *Id.* ¶ 9.

[23] *Id.*; *see also id.* (attachment to C. Malouff Decl. listing 19 examples of TX C.U.R.E. constituents).

prisons."[24] TX C.U.R.E. decided to join this lawsuit to serve its constituents by helping address their continued suffering from the extreme heat in unairconditioned TDCJ facilities.[25]

### C.    Texas Prisons Community Advocates ("TPCA")

TPCA's mission is to serve incarcerated individuals and their families. TPCA has focused on issues of extreme heat and a lack of air-conditioning in TDCJ prisons from its inception.[26] TPCA's constituents include every prisoner in the TDCJ population.[27] TPCA advocates for its incarcerated constituents in numerous ways—including working on bills seeking to require humane temperatures in TDCJ prisons, providing expert testimony about the conditions in TDCJ units before the Texas Legislature, co-authoring research reports about those conditions, conducting advocacy training for system-impacted family members, and organizing community events to raise awareness about the conditions within TDCJ units.[28] Most of TPCA's advocacy work focuses on the effects of extreme heat, lack of air-conditioning, and inadequate heat mitigation measures in Texas prisons.[29] TPCA's founder and president, Dr. Amite Dominick, has also communicated directly with Defendant Bryan Collier on behalf of TPCA about extreme heat and lack of air-conditioning in Texas prisons.[30]

TPCA's staff frequently communicates with its incarcerated constituents, and it has approximately 50 volunteer "team members" incarcerated in the TDCJ system whose needs and

---

[24] ECF 90-1, Ex. M, C. Malouff Decl. ¶ 10.

[25] Final Hearing Tr. (July 30, 2024) at 192:11-193:1, 194:17-23.

[26] Final Hearing Tr. (July 31, 2024) at 341:18-342:2; ECF 90-1, Ex. N, A. Dominick Decl. (June 6, 2024) ¶ 5.

[27] Final Hearing Tr. (July 31, 2024) at 346:6-12.

[28] Final Hearing Tr. (July 31, 2024) at 346:22-347:21; ECF 90-1, Ex. N, A. Dominick Decl. ¶ 6.

[29] Final Hearing Tr. (July 31, 2024) at 347:18-21.

[30] *Id.* at 341:6-8.

concerns drive the policy goals of the organization.[31] TPCA communicates with its incarcerated constituents through various means, including by phone, mail, and emails.[32] TPCA's Director of Incarcerated Individuals, Brittany Robertson, communicates daily with individuals incarcerated in TDCJ facilities and receives "complaints" from them about heat in Texas prisons every day.[33] TPCA joined this lawsuit because of the complaints TPCA received from incarcerated volunteers and constituents, and the experience of Dr. Dominick's own ex-husband, who has been incarcerated in the TDCJ system since 2015.[34]

### D.    Coalition of Texans with Disabilities ("CTD")

CTD is a nonprofit corporation, and its mission is to ensure that persons with disabilities can work, live, learn, play, and participate fully in the community of their choice.[35] CTD's constituency consists of all persons with a disability in Texas, including those incarcerated in Texas prisons.[36] Since an estimated 40% of TDCJ inmates have a disability, roughly 52,000 of the 130,000 people incarcerated in Texas prisons are CTD constituents, including every person with a disability incarcerated in every TDCJ facility that lacks air-conditioning.[37] CTD brought this lawsuit in its representative capacity on behalf of and to vindicate the rights of TDCJ inmates with disabilities who are being housed in inhumane conditions and directly harmed by extreme heat.[38]

---

[31] Final Hearing Tr. (July 31, 2024) at 347:22-348:16 (Dr. Dominick); *id.* at 363:12-21 (Ms. Robertson); ECF 90-1, Ex. N, A. Dominick Decl. ¶ 8; Pls.' Hearing Ex. 147.

[32] Final Hearing Tr. (July 31, 2024) at 347:22-348:1; Pls.' Hearing Ex. 146.

[33] Final Hearing Tr. (July 31, 2024) at 363:1-364:7.

[34] *Id.* at 350:6-17.

[35] ECF 50-7, Ex. G, C. Bearden Decl. (Apr. 17, 2024) ¶ 3.

[36] *Id.* ¶ 5.

[37] *Id.*

[38] *Id.* ¶ 7.

Several courts have held that CTD has associational standing to represent Texans with disabilities.[39]

## II.    PLAINTIFF BERNHARD TIEDE, II FACES A SUBSTANTIAL RISK OF SERIOUS HARM IF HE IS MOVED TO AN UNAIRCONDITIONED CELL.

Mr. Tiede is a TDCJ inmate who has been directly affected by Mr. Collier's failure to protect inmates from extreme heat. He is 65 years old and has multiple medical conditions that make him especially vulnerable to heat-related illness and death—including diabetes, hypertension, cardiovascular disease, and chronic obstructive pulmonary disease.[40] In April 2024, Mr. Tiede was diagnosed with an "[a]cute or subacute infarct of the left thalamus"—i.e., a stroke.[41]

Despite his age and severe medical conditions that make him particularly vulnerable to heat, TDCJ housed Mr. Tiede in an unairconditioned cell during the summer of 2023 that regularly reached temperatures above 100°.[42] In June 2023, Mr. Tiede had a "transient ischemic attack"—a small stroke—from heat exposure that resulted in permanent injuries.[43] At the time, he was living in unairconditioned housing, and (as he testified) it was "really, really hot outside."[44] Yet, after Mr. Tiede returned from receiving treatment in the hospital for the transient ischemic attack, TDCJ

---

[39] *See, e.g., Steward v. Abbott*, 189 F. Supp. 3d 620, 631-32 (W.D. Tex. 2016) (Garcia, J.) (CTD had associational standing to bring suit against State of Texas on behalf of Medicaid beneficiaries with intellectual disabilities); *Richardson v. Tex. Sec'y of State*, No. SA-19-cv-000963-OLG, 2019 WL 10945422, *6 (W.D. Tex. Dec. 23, 2019) (Garcia, J.) (CTD had associational standing to bring claim on behalf of disabled Texas voters); *see also Coalition of Texans with Disabilities v. Smith*, No. 03-99-00064-CV, 1999 WL 816734 (Tex. App.—Austin Oct. 14, 1999) (CTD had associational standing to assert claim on behalf of Texans with mobility impairments prevented from accessing religious buildings).

[40] ECF 50-4, Ex. D, Cross 3d Decl. ¶ 7;  Final Hearing Tr. (July 30, 2024) at 120:14-121:13; Pls.' Exs. 210, 239.

[41] Pls.' Hearing Ex. 210 at 1832.

[42] ECF 30-24, Mr. Tiede Decl. ¶¶ 3–6; ECF 50-4, Ex. D, Cross 3d Decl. ¶¶ 5–7, 18.

[43] ECF 30-24, Mr. Tiede Decl. ¶ 9; ECF 50-4, Ex. D, Cross 3d Decl. ¶¶ 7, 12–15; Final Hearing Tr. (July 30, 2024) at 95:22-96:11, 121:20-22.

[44] Final Hearing Tr. (July 30, 2024) at 103:18-25.

placed him back in the same unairconditioned cell, presenting "a severe risk to his life and well-being."[45] Confronted with that risk, Mr. Tiede filed suit against TDCJ, which moved Mr. Tiede to an airconditioned cell only after this Court entered a temporary restraining order compelling TDCJ to do so.[46]

Plaintiffs' medical expert in toxicology, emergency room medicine, and heat medicine, Dr. Susi Vassallo, testified, based on published medical studies, that individuals who are 65 and older, and those with diabetes, pulmonary disease, or cardiovascular disease are especially vulnerable to the heat.[47] Dr. Vassallo opined that Mr. Tiede is thus particularly vulnerable to heat.[48] In her opinion, placing Mr. Tiede in unairconditioned housing would put him at substantial risk of death or serious harm.[49] Mr. Tiede, likewise, testified that his health improves when he is in air-conditioning, and that it declines when he is in extreme heat.[50]

TDCJ and its officials testified that Mr. Tiede has been appropriately housed at all times during his custody.[51] Despite his various heat-sensitive co-morbidities, TDCJ's "heath score algorithm" had not assigned Mr. Tiede a "heat score"—i.e., a score given to inmates, based on certain criteria, which requires that they be placed in an airconditioned cell. In other words, according to TDCJ policy, Mr. Tiede's medical conditions did not and still do not require that he

---

[45] ECF 30-24, Mr. Tiede Decl. ¶¶ 11–16; ECF 50-4, Ex. D, Cross 3d Decl. ¶¶ 7, 12–15.

[46] ECF 17; ECF 30-24, Mr. Tiede Decl. ¶ 17.

[47] Final Hearing Tr. (July 31, 2024) at 17:25-20:21, 28:5-31:13, 34:7-17; Pls.' Hearing Exs. 6, 13, 15.

[48] Final Hearing Tr. (July 31, 2024) at 47:16-49:10; Pls.' Hearing Ex. 13; Pls.' Hearing Ex. 6.

[49] Final Hearing Tr. (July 31, 2024) at 49:19-24.

[50] Final Hearing Tr. (July 30, 2024) at 128:21-129:1.

[51] Final Hearing Tr. (Aug. 1, 2024) at 200:25-201:14; ECF 155, TDCJ 30(b)(6) Dep. at 195:20-196:2; 201:5-19.

be placed in an airconditioned cell.[52] TDCJ agrees that Mr. Tiede is at risk of being moved into unairconditioned housing because he does not have a heat score.[53] On the last day of the preliminary injunction hearing, Mr. Collier refused to commit to keeping Mr. Tiede in an air-conditioned cell for the duration of his sentence.[54] So, without a court order, Mr. Tiede is at risk of being moved to an unairconditioned cell at any time.[55]

## III.    TEMPERATURES INSIDE TDCJ'S PRISONS ARE DANGEROUSLY HIGH EACH SUMMER.

### A.    The risks of extreme heat are well-established.

According to the National Weather Service ("NWS"), heat "is one of the leading weather-related killers in the United States, resulting in hundreds of fatalities each year."[56] The NWS published a chart that illustrates how exposure to high heat indexes—a function of temperature and humidity—increases the risk of heat-related illnesses, which TDCJ has adopted into its heat policy[57]:

---

[52] Final Hearing Tr. (Aug. 1, 2024) at 200:25-201:14; ECF 155, TDCJ 30(b)(6) Dep. at 198:16-24.

[53] ECF 155, TDCJ 30(b)(6) Dep. at 205:7-206:7.

[54] Final Hearing Tr. (Aug. 2, 2024) at 252:24-254:9.

[55] Mr. Tiede also confirmed that he filed grievances on October 10, 2023, October 22 or 23, 2023, October 31, 2023, and November 15, 2023. (*See* Final Hearing Tr. (July 30, 2024) at 142:1-13.)

[56] "Heat Safety Tips and Resources," National Weather Service, *available at* https://www.weather.gov/safety/heat. Under Rule 201 of the Federal Rules of Evidence, that Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The Court finds that extreme heat's status as one of the leading weather-related killers in the United States is such a fact, and that the National Weather Service is a source whose accuracy cannot reasonably be questioned.

[57] Final Hearing Tr. (July 31, 2024) at 21:6-23:17; Pls.' Hearing Ex. 24.

NOAA's National Weather Service

Heat Index

The NWS correlates heat index ranges to risk levels for the general population:

- **Caution** (light yellow; heat index 80–90º): "Fatigue possible with prolonged exposure and/or physical activity."

- **Extreme Caution** (mustard yellow; heat index 91–104º): "Sunstroke, muscle cramps, and/or heat exhaustion possible with prolonged exposure and/or physical activity."

- **Danger** (orange; heat index 105–125º): "Sunstroke, muscle cramps, and/or heat exhaustion likely. Heatstroke possible with prolonged exposure and/or physical activity."

- **Extreme Danger** (red; heat index >126º): "Heat stroke likely."

Expert testimony and scientific studies presented at the hearing confirm that high temperatures pose a substantial risk of serious harm to anyone. Dr. Vassallo credibly testified that a heat index of 88º or higher poses a substantial risk of adverse health outcomes in all inmates—even young, healthy people.[58] Those risks include heat exhaustion, heat rash, dehydration, heat cramps, heat syncope, and heat stroke—the last of which carries a "high mortality rate" and can

---

[58] Final Hearing Tr. (July 31, 2024) at 23:2-38:23; Pls.' Hearing Exs. 10, 15, 23, 42, 54, 70.

have lasting negative health consequences.[59] Plaintiffs' epidemiology expert, Dr. Julie Skarha, confirmed that heat can cause a number of negative health outcomes beyond heat stroke and heat exhaustion, including heart attacks, asthma attacks, kidney failure, and an increase in risk of suicide.[60] Dr. Antonella Zanobetti, Plaintiffs' environmental epidemiology expert, likewise, opined that increased temperatures increase the risks of hospitalization, illness, and mortality.[61] And Mr. Collier's own expert in internal medicine, Dr. Jane Leonardson, agreed that people who are exposed to severe environmental heat in the range of 90-105º are at serious risk of illness and death.[62]

Plaintiffs' expert in forensic psychiatry, Dr. Jhilam Biswas, testified that high heat exacerbates mental illness; in high heat, people with mental health disorders exhibit higher rates of suicidality, agitation, impulsivity, and slowing of cognitive processing.[63] Heat affects sleep, and people with mental illness have more trouble controlling their disease if they cannot sleep.[64] Extreme heat causes mental health episodes requiring hospitalization.[65] And in high heat, suicidality increases "by a significant amount" among inmates.[66]

People with mental illnesses are particularly vulnerable to high heat. Conservative estimates from the federal Substance Abuse and Mental Health Services Administration (SAMHSA) indicate that 37%—i.e., more than one in three—inmates have a diagnosable mental

---

[59] Final Hearing Tr. (July 31, 2024) at 15:15-17:20, 32:20-37:23; Pls.' Hearing Exs. 15, 275.

[60] Final Hearing Tr. (July 30, 2024) at 150:23-151:8.

[61] *Id.* at 75:13-23, 79:1-9; Pls.' Hearing Exs. 46, 73, 75.

[62] Final Hearing Tr. (Aug. 1, 2024) at 143:12-16.

[63] Final Hearing Tr. (July 31, 2024) at 167:24-170:20, 177:17-179:9 ; Pls.' Hearing Exs. 11, 35, 76, 103.

[64] Final Hearing Tr. (July 31, 2024) at 177:11-178:7.

[65] Final Hearing Tr. (July 31, 2024) at 180:15-181:15; Pls.' Hearing Ex. 33.

[66] Final Hearing Tr. (July 31, 2024) at 178:8-14, 182:6-183:19; Pls.' Hearing Ex. 91.

illness at any given time.[67] When housed in extreme heat, they are "more likely to die or experience worse morbidity than individuals without mental illness."[68] For example, Dr. Biswas explained that one study showed that people with schizophrenia had a 200% higher risk of death when exposed to extreme heat.[69] People with substance abuse disorders and individuals taking psychotropic medications are also particularly vulnerable to high heat.[70] Dr. Biswas thus credibly concluded that "exposure to periods of extreme heat cause[s] a substantial risk of serious harm" to TDCJ inmates, by increasing the incidence of and exacerbating existing mental health conditions.[71]

### B.    Texas Prisons Are Hot and Getting Hotter.

Dr. Linda Mearns, a climatologist and researcher at the National Center for Atmospheric Research, has opined that "increasing temperatures, increasing extreme temperatures, and more frequent heat waves" are among the most certain expectations for future climate trends, including those in Texas.[72] "This most likely will result in an increasing heat index, and number of hours per day with extreme heat index values."[73] In other words, "[t]he trend of summer temperatures throughout Texas is certainly towards warmer temperatures [and] increasing heat index."[74] In particular, Texas "is expected to increase in mean annual temperature between 4.5º and 8.5º by the end of the 21st century."[75]

---

[67] Final Hearing Tr. (July 31, 2024) at 168:10-23.

[68] *Id.* at 177:1-16; Pls.' Hearing Ex. 103 at 13.

[69] Final Hearing Tr. (July 31, 2024) at 170:15-20.

[70] *Id.* at 181:2-15, 187:9-191:18; Pls.' Hearing Exs 43, 44, 50.

[71] Final Hearing Tr. (July 31, 2024) at 185:13-20.

[72] ECF 50-5, Ex. E, L. Mearns Decl. ¶ 23.

[73] *Id.* ¶¶ 12-14, 23.

[74] *Id.* ¶ 18.

[75] *Id.* ¶ 19.

TDCJ did not dispute Dr. Mearns's opinions, and the Court finds them to be credible. In addition, TDCJ recognizes that its prisons are hot in the summers. Mr. Collier's Rule 30(b)(6) designee, David Sweetin, agrees that temperatures in every prison in Texas are likely to exceed 85º each summer.[76] Mr. Collier also believes that summers are hot in Texas, they've been hot for years, they are likely to continue to be hot, and that it is hot inside Texas prisons without air-conditioning.[77] He agrees that it "certainly" makes sense to him that the heat index could reach 113º in Texas in August.[78] And, in fact, TDCJ reported to the Texas Legislature that the temperatures inside of its prisons exceeded 85º on the overwhelming majority of days from May 1, 2023 to September 30, 2023.[79] This testimony is also consistent with TDCJ's own prison temperature logs, which documented heat indexes outside of its prisons as high as 134º.[80]

---

[76] ECF 155, TDCJ 30(b)(6) Dep. at 214:1-4; 222:17-21.

[77] Final Hearing Tr. (Aug. 2, 2024) at 204:24-205:18.

[78] *Id.* at 217:12-14.

[79] Pls.' Hearing Ex. 102 at 11-20.

[80] Def.'s Hearing Ex. 76 (highlight added).

**TEXAS DEPARTMENT OF CRIMINAL JUSTICE**
Temperature Log

Unit: Stiles

| Date: 7/10/2022 | Outside Air Temperature | Humidity or Wind Speed | Heat Index or Wind Chill* | Person Recording |
|---|---|---|---|---|
| 12:30 a.m. | 84° | 85% | 95° | Hardy |
| 1:30 a.m. | 81° | 90% | 88° | Hardy |
| 2:30 a.m. | 81° | 90% | 89° | Hardy |
| 3:30 a.m. | 81° | 90% | 88° | Hardy |
| 4:30 a.m. | 80° | 91% | 85° | Hardy |
| 5:30 a.m. | 80° | 91% | 85° | Hardy |
| 6:30 a.m. | 80° | 92% | 85° | Hardy |
| 7:30 a.m. | 82° | 90% | 9 10² | Bordelon |
| 8:30 a.m. | 86° | 86²% | 103° | Bordelon |
| 9:30 a.m. | 86° | 89% | 103° | Bordelon |
| 10:30 a.m. | 89° | 16% | 108° | Bordelon |
| 11:30 a.m. | 93+ | 73% | 118° | Bordelon |
| 12:30 p.m. | 95° | 70% | 122° | Bordelon |
| 1:30 p.m. | 95° | 66% | 122° | Bordelon |
| 2:30 p.m. | 98° | 66% | 129° | Bordelon |
| 3:30 p.m. | 100° | 63% | 184° | Bordelon |
| 4:30 p.m. | 99° | 64% | 130° | Bordelon |
| 5:30 p.m. | 98° | 76% | c29° | Bordelon |
| 6:30 p.m. | 95° | 76% | 129° | Bordelon |
| 7:30 p.m. | 95° | 76% | 129° | Hardy |
| 8:30 p.m. | 77° | 89% | 78° | Hardy |
| 9:30 p.m. | 78° | 89% | 80° | Hardy |
| 10:30 p.m. | 81° | 89% | 88° | Hardy |
| 11:30 p.m. | 81° | 90% | 88° | Hardy |

\* Temperatures between 51 and 79 degrees Fahrenheit (°F) are not represented on the Wind Chill Index (Attachment A) or the Heat and Humidity Index (Attachment B). Indicate (N/A) in these fields when applicable.

Testimony from current and former TDCJ inmates further confirmed these high temperatures. For example, former TDCJ inmate Marci Marie Simmons testified that, in the summer of 2022, she observed a thermometer in the Dr. Lane Murray Unit, a TDCJ unit for women in Gatesville, reading 136°.[81] Her unit was so hot one day that she and a group of other inmates were able to cook an egg on the concrete floor.[82] During his incarceration in the Byrd Unit, a unit for men in Huntsville, former TDCJ inmate Charlie Malouff observed a digital temperature monitor reading 129° one day, 114° on another, and 118° on another.[83] And scores of TDCJ inmates continue to file grievances about the high heat in their unairconditioned units—last summer alone,

---

[81] Final Hearing Tr. (July 30, 2024) at 30:2-20.
[82] *Id.* at 28:19-24.
[83] *Id.* at 179:15-23.

there were 450 Step One inmate grievances about heat and heat-related issues.[84] Based on the foregoing, the Court finds that the inmate housing areas in Texas's unairconditioned prisons are unreasonably dangerous due to the extreme heat during the summer months.

## IV.    EXTREME HEAT POSES A SUBSTANTIAL RISK OF SERIOUS HARM TO TDCJ INMATES.

### A.    TDCJ Has Repeatedly Acknowledged the Risk that Extreme Heat Poses to TDCJ Inmates.

Although still a gross underestimation, TDCJ has admitted that at least 23 individuals died in TDCJ facilities from heat-related causes between 1998 and 2012.[85] Mr. Collier admitted he was aware of ten heat-related deaths in the summer of 2011 alone.[86] And TDCJ has identified hundreds of other inmates diagnosed with heat-related illnesses since 2011.[87] Mr. Collier agrees that heat has caused death or contributed to the death of TDCJ inmates in the past.[88] Five years ago, Mr. Collier testified in Texas federal court that inmates confined in temperatures at or above 95° face a serious health risk.[89]

Mr. Collier's Rule 30(b)(6) designee also testified in July 2024 that the temperatures TDCJ inmates are exposed to during the summer months are so high and dangerous that they are at a very real risk of harm and serious injury, unless adequate measures are taken to protect them.[90] He acknowledged that extreme heat is a dangerous condition in the system that "has killed inmates, and [has] caused numerous inmates and officers to suffer heat-related illnesses."[91] TDCJ Facilities

---

[84] Pls.' Hearing Ex. 102 at 4 (reflecting temperature related grievances from May through August).

[85] *Cole v. Collier*, No. 4:14-CV-1698, 2017 WL 3049540, at *1, *20 (S.D. Tex. July 19, 2017).

[86] Final Hearing Tr. (Aug. 2, 2024) at 207:22-208:2.

[87] *Cole*, 2017 WL 3049540, at *20.

[88] Final Hearing Tr. (Aug. 2, 2024) at 207:9-208:2.

[89] ECF 50-11, Ex. K-4, *Cole v. Collier*, Sept. 10, 2019 Hearing Tr. at 49:22–25.

[90] ECF 155, TDCJ 30(b)(6) Dep. at 229:22-230:4; *see also* Final Hearing Tr. (July 31, 2024) at 211:12.

[91] ECF 155, TDCJ 30(b)(6) Dep. at 131:12-132:8, 161:22-162:5.

Director Ron Hudson also agrees that elevated indoor temperatures impact inmates and correctional staff at unairconditioned facilities.[92]

According to TDCJ's Fiscal Year 2023 report to the Texas Legislature, TDCJ inmates filed 5,202 Step One grievances and 609 Step Two grievances related to the heat in the summer of 2023.[93] TDCJ's Administrative Review and Risk Management Division provides Mr. Collier's office a monthly report regarding heat-related grievances filed by TDCJ inmates, and Mr. Collier is aware of them.[94] According to Plaintiffs' corrections expert Dean Williams, that volume of grievances further shows extreme heat is a problem that needs to be addressed.[95]

### B. Publicly Available, Peer-Reviewed Research Studies Have Warned Mr. Collier That Hundreds of TDCJ Inmates Continue to Die from Extreme Heat.

In 2022, Plaintiffs' experts Dr. Zanobetti and Dr. Skarha published an epidemiological study on the association between extreme heat and mortality among inmates in Texas prisons with and without air-conditioning.[96] They found an increased risk of mortality in Texas prisons without air-conditioning during times of high heat, whereas there was no increase in risk of mortality in Texas prisons with air-conditioning during that same period.[97] As compared to days when the heat index is 85°, the risk of dying in a Texas prison without air-conditioning increased by 5% when the heat index is 95°, 10% when the heat index is 100°, and 15% when the heat index is 105°.[98] In

---

[92] Final Hearing Tr. (Aug. 2, 2024) at 133:18-23; Def.'s Ex. 21.

[93] Final Hearing Tr. (Aug. 1, 2024) at 270:14-272:25; Pls.' Hearing Ex. 102 at 4.

[94] Final Hearing Tr. (Aug. 1, 2024) at 269:10-270:13.

[95] Final Hearing Tr. (July 31, 2024) at 235:17-236:11.

[96] Pls.' Hearing Exs. 70 and 75.

[97] *Id.*

[98] Final Hearing Tr. (July 30, 2024) at 158:18-160:6; Pls.' Hearing Ex. 70 at 5.

other words, a one-degree increase above 85° corresponds to a 0.7% increase in the risk of mortality. [99]



Dr. Zanobetti and Dr. Skarha concluded there were 271 deaths attributable to extreme heat in Texas prisons without air-conditioning from 2001 to 2019—an average of 14 deaths per year.[100] According to Dr. Vassallo, however, this is likely an underestimate, as it does not account for the impact of heat on underlying illnesses.[101] The same study concluded that not a single heat-related death occurred in TDCJ's climate-controlled prisons during this period.[102] Based on their research,

---

[99] Pls.' Hearing Ex. 70 at 5 (explaining that the figure "shows the association between same-day daily maximum heat index above 85 °F and the percentage change in the risk of daily all-cause mortality by AC status").

[100] Final Hearing Tr. (July 30, 2024) at 90:22-91:4 (Dr. Zanobetti); *id.* at 160:7-15 (Dr. Skarha); Pls.' Hearing Ex. 70.

[101] Final Hearing Tr. (July 31, 2024) at 38:3-24.

[102] Pls.' Hearing Ex. 70.

Dr. Zanobetti and Dr. Skarha expect more TDCJ inmates to die from extreme heat in unairconditioned cells each summer.[103]

### C.    TDCJ Admits that Multiple TDCJ Inmates Died from Extreme Heat in Summer 2023.

After publicly denying that any inmate had died from the extreme heat in Texas prisons since 2011, TDCJ now concedes that there were three heat-related custodial deaths in the summer of 2023.[104] Mr. Collier admitted "there were three inmate deaths where elevated temperatures were cited in the final autopsies as a possible contributing factor"[105] and reported the following three deaths to the Texas Legislature.[106] Mr. Collier also acknowledged that he is briefed on any autopsy that identifies heat as a contributing factor, and that he would "probably" read the autopsy report, as well.[107]

### 1.    Elizabeth Hagerty – June 28, 2023

Elizabeth Hagerty was a 37-year-old female housed in an unairconditioned cell in the Dr. Lane Murray Unit.[108] At 12:10 a.m. on June 30, 2023, after Ms. Hagerty failed to respond to an officer conducting the unit count,[109] the officer found Ms. Hagerty unresponsive in her cell.[110] Less than forty minutes later, she was pronounced dead.[111] At the time she died, the temperature in her cell was 95.7°.[112] No core body temperature was documented.

---

[103] Final Hearing Tr. (July 30, 2024) at 84:21-85:2 (Dr. Zanobetti); *id.* at 163:3-7 (Dr. Skarha).
[104] Pls.' Hearing Ex. 102 at 5.
[105] Pls.' Hearing Ex. 254, Mr. Collier's Resp. to Interr. No. 1.
[106] Pls.' Hearing Ex. 102 at 5.
[107] Final Hearing Tr. (Aug. 2, 2024) at 211:17-212:2.
[108] Pls.' Hearing Ex. 169-A at 2.
[109] *Id.*
[110] *Id.*
[111] *Id.* at 6.
[112] *Id.* at 11.

Ms. Hagerty had a medical history of obesity, hypercholesterolemia, diabetes, asthma, substance abuse, and unspecified mood disorder.[113] At the time of her death, Ms. Hagerty's medications included (1) albuterol (a bronchodilator for asthma), (2) atorvastatin (to treat elevated cholesterol), (3) citalopram (a selective serotonin reuptake inhibitor to treat anxiety and depression), and (4) carbamazepine (to treat bipolar disorder).[114] A week before she died, Ms. Hagerty submitted a sick-call complaining about the heat and a heat rash on her entire body.[115] Four days later, she was seen again by medical staff and complained of two days of abdominal cramps and more than 20 episodes of vomiting.[116] Medical staff advised Ms. Hagerty to drink water.[117]

A University of Texas Medical Branch ("UTMB") pathologist performed an autopsy on Ms. Hagerty's body five days after her death.[118] Other than a heat rash, the autopsy revealed no significant anatomical findings, but noted hyponatremia (low sodium).[119] The pathologist determined that this was the result of dehydration from her recent gastrointestinal illness, which was likely due to COVID-19.[120] According to the autopsy report, hyponatremia caused Ms. Hagerty's death, although elevated environmental temperatures were noted to be a potential contributory factor.[121] Mr. Collier admitted that he knew in 2023 that Ms. Hagerty died after

---

[113] Pls.' Hearing Ex. 169-A at 29.

[114] *Id.* at 27.

[115] Pls.' Hearing Ex. 169 at 6.

[116] *Id.*

[117] Pls.' Hearing Ex. 169 at 6; Pls.' Hearing Ex. 169-A at 24.

[118] Pls.' Hearing Ex. 169 at 4.

[119] *Id.* at 11.

[120] *Id.*

[121] *Id.* at 12.

complaining of heat rash, and that UTMB doctors had concluded that heat may have been a contributing factor in her death.[122]

Plaintiffs' experts Dr. Vassallo and Dr. Uribe gave unrebutted testimony that Ms. Hagerty's death was heat-related.[123] Specifically, Dr. Vassallo opined that the heat exacerbated Ms. Hagerty's obesity, diabetes, asthma, and COVID-19.[124] Dr. Vassallo and Dr. Uribe credibly testified that Ms. Hagerty would not have died if she had been in an air-conditioned cell.[125]

### 2.    John Castillo – August 6, 2023

John Castillo was a 33-year-old male housed in an unairconditioned cell in the Alfred D. Hughes Unit, a TDCJ prison for men in Gatesville.[126] At 10:42 p.m. on August 6, 2023, Mr. Castillo's roommate notified a corrections officer that Mr. Castillo was sitting on the floor leaning against the bottom bunk with his head tilted backward.[127] He was unresponsive but still breathing.[128] The officer entered the cell and attempted to communicate with Mr. Castillo, but he remained unresponsive.[129] The officer noted that Mr. Castillo's breathing was shallow, and that his body temperature appeared elevated.[130] He was taken to the medical unit, where a nurse

---

[122] Final Hearing Tr. (Aug. 2, 2024) at 216:5-9.

[123] Final Hearing Tr. (July 31, 2024) at 61:3-5 (Dr. Vassallo); *id.* at 302:11-13, 303:1-13 (Dr. Uribe).

[124] *Id.* at 61:6-8.

[125] *Id.* at 61:9-12 (Dr. Vassallo); *id.* at 303:6-9, 309:7-12 (Dr. Uribe).

[126] Pls.' Hearing Ex. 161-B at 2.

[127] *Id.* at 2-3.

[128] *Id.*

[129] *Id.* at 2.

[130] *Id.* at 2-3.

reported he was "hot to the touch."[131] His core body temperature was 107.5°.[132] He was pronounced dead at 11:33 p.m.[133]

The ambient temperature inside the Hughes Unit was 94.4° on the day Mr. Castillo died.[134] Fans were on in his unit, and he had access to water.[135] In fact, he was seen on TDCJ surveillance footage going to the water cooler 23 times in the 24 hours before his death.[136] He had a medical history of epilepsy and depression.[137] At the time of his death, his medications included (1) oxybutynin (to treat bladder control disorders), (2) phenytoin (an antiseizure medication), and (3) sertraline (an SSRI).[138] According to TDCJ's Administrative Incident Review, Mr. Castillo was last seen by medical staff on June 23, 2023, for treatment of depression.[139] The provider did not document any recent seizure activity or complaints of seizures.[140]

A UTMB pathologist performed an autopsy on Mr. Castillo's body six days after his death.[141] She could not identify an anatomic cause of death.[142] Bleeding in his tongue, aspiration pneumonitis, and the absence of antiseizure medications in post-mortem toxicology tests suggested that Mr. Castillo had a seizure around the time of his death.[143] Based on these findings, the pathologist opined that Mr. Castillo's cause of death was seizure disorder, "with high

---

[131] Pls.' Hearing Ex. 161-B at 27.

[132] *Id.* at 64; Pls.' Hearing Ex. 161 at 12.

[133] Pls.' Hearing Ex. 161-B at 3.

[134] Pls.' Hearing Ex. 102 at 17.

[135] Pls.' Hearing Ex. 161 at 12.

[136] *Id.*

[137] *Id.*

[138] *Id.*

[139] Pls.' Hearing Ex. 161-B at 35.

[140] *Id.*

[141] Pls.' Hearing Ex. 161 at 4.

[142] *Id.* at 12.

[143] *Id.*

environmental temperature as an important contributory factor."[144] The pathologist's report also stated that, while seizures can result in hyperthermia, "it is well-established that hyperthermia can also induce seizures in susceptible individuals."[145] And she concluded that "[t]he degree of hyperthermia seen in this patient is much greater than would be expected in the setting of seizures alone."[146] Mr. Collier admitted to having read the report from the autopsy of Mr. Castillo, and to knowing in 2023 that UTMB doctors had concluded that heat was an important contributory factor in Mr. Castillo's death.[147]

Dr. Vassallo and Dr. Uribe agreed that Mr. Castillo's death was heat-related.[148] And they credibly testified that Mr. Castillo would not have died if he had been in an air-conditioned cell.[149]

### 3.  Patrick Womack – August 21, 2023

Patrick Womack was a 50-year-old male housed in restrictive housing in the unairconditioned H.H. Coffield Unit, a men's prison in Anderson County.[150] On the night of August 20, 2023, Mr. Womack asked a correctional officer for a cooldown shower, but the officer said there were not enough staff and refused to give him one.[151] Video surveillance on August 21, 2023, shows Mr. Womack passing water bottles under his cell door at 9:19 a.m., but he did not respond to a correctional officer's count at 10:07 a.m.[152] At 11:34 a.m., the commissary manager

---

[144] Pls.' Hearing Ex. 161 at 12.

[145] *Id.*

[146] *Id.*

[147] Final Hearing Tr. (Aug. 2, 2024) at 213:11-23, 214:15-215:6.

[148] Final Hearing Tr. (July 31, 2024) at 51:19-52:2 (Dr. Vassallo); *id.* at 316:18-21 (Dr. Uribe).

[149] *Id.* at 56:12-15 (Dr. Vassallo); *id.* at 288:11-15, 309:7-12 (Dr. Uribe).

[150] Pls.' Hearing Ex. 200 at 6; Pls.' Hearing Ex. 200-B at 1.

[151] Pls.' Hearing Ex. 200-B at 3, 8, 42.

[152] *Id.* at 3.

tried to talk to Mr. Womack, but he did not respond.[153] The manager said that he appeared to be asleep on his stomach.[154] At 1:33 p.m., officers reported that Mr. Womack was face-down in his bunk and unresponsive.[155] At 1:44 p.m., officers noted that he remained unresponsive, and his core body temperature was 106.9°.[156] He was pronounced dead 9 minutes later.[157] When corrections officers discovered Mr. Womack, the ambient outdoor temperature was 104°, and the heat index was 113°.[158] TDCJ reported to the Texas Legislature that the indoor temperature at the Coffield Unit was 99.1° at 3:00 p.m. on August 20 and 96.6° at 3:00 p.m. on August 21.[159]

Mr. Womack had an extensive history of mental illness including antisocial behavior, impulse control disorder, and major depressive disorder with suicidal ideation.[160] He had numerous suicide attempts, had over 70 encounters with Crisis Management, and was on TDCJ's mental health caseload.[161] Mr. Womack's medications included (1) benztropine (an anticholinergic); (2) haloperidol (an antipsychotic); and (3) sertraline (an SSRI).[162]

A UTMB pathologist performed an autopsy on Mr. Womack's body ten days after his death.[163] The body showed evidence of advanced decomposition.[164] Post-mortem toxicology showed that Mr. Womack had potentially toxic serum sertraline levels of 2500 ng/ml, which can

---

[153] Pls.' Hearing Ex. 200-B at 3.
[154] *Id.*
[155] *Id.* at 2.
[156] Pls.' Hearing Ex. 200 at 6.
[157] *Id.*
[158] *Id.*
[159] Pls.' Hearing Ex. 102 at 17.
[160] Pls.' Hearing Ex. 200 at 6.
[161] *Id.*
[162] *Id.*
[163] *Id.* at 4.
[164] *Id.* at 6.

cause hyperthermia.[165] The UTMB pathologist stated, "Classic heat stroke caused by elevated environmental temperatures can also occur in combination with drug-induced hyperthermia."[166] She then opined that Mr. Womack's cause of death was hyperthermia due to sertraline toxicity with environmental heat as a contributory factor.[167]

Dr. Vassallo and Dr. Uribe offered unrebutted testimony, however, that Mr. Womack's death was heat-related,[168] and Dr. Vassallo credibly testified that he died of a heat stroke.[169] Dr. Vassallo and Dr. Uribe also opined that sertraline toxicity absent environmental heat stress would not have caused a core body temperature of 106.9°.[170] Dr. Vassallo and Dr. Uribe testified that Mr. Womack would not have died if he had been in an air-conditioned cell.[171]

### D.    At Least Two More TDCJ Inmates Died from the Heat in Summer 2023.

Dr. Vassallo and Dr. Uribe also credibly testified that at least two other TDCJ inmates died from heat-related causes in Summer 2023:

#### 1.    John Southards – June 28, 2023

John Southards was a 36-year-old male housed in restrictive housing in an unairconditioned cell in the Estelle Unit in Huntsville.[172] During security rounds on June 28, 2023,

---

[165] Pls.' Hearing Ex. 200 at 11.

[166] *Id.*

[167] *Id.*

[168] Final Hearing Tr. (July 31, 2024) at 69: 16-25 (Dr. Vassallo); *id.* at 304:11-13, 305:18-21 (Dr. Uribe).

[169] *Id.* at 69:16-25.

[170] *Id.* at 304:16-305:14 (Dr. Uribe testifying that sertraline cannot increase the body temperature to 106.9 degrees); *see id.* at 67:8-69:15 (Dr. Vassallo explaining that a sertraline level of 2500 ng/ml would not necessarily have caused death and not have caused core body temperature to increase to 106.9).

[171] *Id.* at 70:4-7 (Dr. Vassallo); *id.* at 305:15-17, 309:7-12, 332:2-5 (Dr. Uribe).

[172] Pls.' Hearing Ex. 192-B at 2.

an officer found him laying down in his cell and having trouble breathing.[173] The officer called for assistance at 11:06 p.m.[174] Mr. Southards was moved to the infirmary, where resuscitation efforts continued. At the time, staff described him as diaphoretic (sweating heavily) and hot to the touch.[175] He was pronounced dead at 11:58 p.m.[176] The UTMB pathologist who performed the autopsy on Mr. Southards asked TDCJ for his core body temperature near the time of his death, but none was recorded.[177] The ambient temperature in his cell was 85.7° with a heat index of 96.2° at 3:00 a.m.[178]

Mr. Southards had a significant psychiatric history, including depression, anxiety, psychosis, and suicidal ideation with multiple suicide attempts.[179] His medical history was only significant for intermittent asthma and gastroesophageal reflux. His medications included (1) haloperidol (an antipsychotic), (2) oxybutynin (for bladder dysfunction), (3) venlafaxine (an SSRI), and (4) Benadryl (an antihistamine and anticholinergic).[180]

A UTMB pathologist performed an autopsy on Mr. Southards's body six days after his death.[181] The findings included heat rash on his upper extremities.[182] Although additional anatomical findings were described, none were considered a contributing factor in Mr. Southards's death.[183] The pathologist concluded that diphenhydramine toxicity caused Mr. Southards's death,

---

[173] Pls.' Hearing Ex. 192-B at 2.

[174] *Id.*

[175] Pls.' Hearing Ex. 192-A at 83.

[176] *Id.*

[177] *Id.* at 19, 83, 88.

[178] *Id.* at 88.

[179] *Id.*

[180] *Id.* at 68, 83.

[181] *Id.* at 81.

[182] *Id.* at 88.

[183] *Id.*

but stated "there is insufficient evidence to support heat-related stress as a contributory cause of death, given the lack of core body temperature data. However, the possibility cannot be excluded."[184] She also noted that there was "no documented information to suggest suicidal intent."[185] On December 8, 2023, TDCJ investigators determined that Mr. Southards had committed suicide and closed their investigation.[186]

Dr. Vassallo and Dr. Uribe opined that heat stroke caused Mr. Southards's death.[187] Both medical experts testified that Mr. Southards could not have died from diphenhydramine toxicity (i.e., a Benadryl overdose), because he was sweating when he was found, and Benadryl inhibits sweating.[188] They further concluded that the amount of Benadryl in Mr. Southards' system was not lethal.[189] Last, Dr. Vassallo and Dr. Uribe both credibly testified that Mr. Southards would not have died if he had been in an air-conditioned cell.[190]

### 2. Armando Gonzales – August 23, 2023

Armando Gonzales was a 42-year-old transgender female housed in the Alfred D. Hughes Unit, a prison in Gatesville.[191] At 10:00 p.m. on August 21, 2023, Ms. Gonzales was found unresponsive but breathing in her cell. After the incident command system was activated, medical staff found Ms. Gonzales lying on her left side, in a pool of vomit.[192] The autopsy noted that the "air-conditioning was out in the unit," and that the ambient temperature in Ms. Gonzales's cell at

---

[184] Pls.' Hearing Ex. 192-A at 88.

[185] *Id.*

[186] *Id.* at 41.

[187] Final Hearing Tr. (July 31, 2024) at 61:18-64:22 (Dr. Vassallo); *id.* at 296:19-21 (Dr. Uribe).

[188] *Id.* at 63:15-22 (Dr. Vassallo); *id.* at 297:1-13 (Dr. Uribe).

[189] *Id.* at 64:3-19 (Dr. Vassallo); *id.* at 297:15-17 (Dr. Uribe).

[190] *Id.* at 64:23-65:1 (Dr. Vassallo); *id.* at 297:23-298:2, 309:7-12 (Dr. Uribe).

[191] Pls.' Hearing Ex. 168-A at 2.

[192] *Id.* at 8.

the time she was found was between 97° and 100°.[193] She was taken to the onsite emergency room, where her rectal temperature was documented as 109.4° on repeated measurements.[194] Ms. Gonzales was transferred by ambulance to a hospital where she was hyperthermic and in shock. Despite multiple attempts over a 48-hour period, medical providers could not resuscitate her, and she was pronounced dead at 5:32 a.m. on August 23, 2023.[195]

Ms. Gonzales had been diagnosed with Hepatitis C and manic depressive disorder with psychosis; she also had a history of substance abuse.[196] She had cirrhosis of the liver,[197] and her medications included: (1) aripiprazole (to treat bipolar disorder); (2) citalopram (an SSRI); (3) spironolactone (a diuretic to treat fluid retention); (4) estradiol (a hormone); and (5) bupropion (to treat depression).[198]

A UTMB pathologist performed an autopsy on Ms. Gonzales's body thirteen days after she died.[199] The anatomic examination revealed lung hemorrhage and pneumonia, reflecting Ms. Gonzales's clinical illness.[200] Post-mortem toxicology was positive for midazolam, a sedative hypnotic drug; and fentanyl, an opioid analgesic.[201] The pathologist noted, however, that "the levels of drug may be altered by the long post mortem interval and severe degree of autolysis of tissues seen in this patient."[202] He nevertheless opined that Ms. Gonzales's death was caused by

---

[193] Pls.' Hearing Ex. 168 at 6, 11.

[194] *Id.* at 6.

[195] *Id.*

[196] *Id.* at 5-6.

[197] *Id.*

[198] *Id.* at 6.

[199] *Id.* at 4.

[200] *Id.*

[201] Pls.' Hearing Ex. 168 at 11.

[202] *Id.*

multidrug toxicity with opioid overdose and drug-related hyperthermia.[203] Mr. Collier received this autopsy report, as well.[204]

Dr. Vassallo disagreed with the pathologist's analysis.[205] She explained that multiple medications (including opioids) are used in the intensive care unit to sedate patients who have suffered medical incidents like heat stroke, which could explain the toxicology results.[206] Most importantly, it is "unquestionable" that opioids like fentanyl do not cause hyperthermia.[207] Instead, they cause *hypo*thermia—i.e., *decreased* body temperature.[208] Thus, in Dr. Vassallo's credible expert opinion, fentanyl could not have caused Ms. Gonzales's hyperthermia, and severe environmental heat stroke caused her death.[209] Dr. Uribe agreed that Ms. Gonazles's death was heat-related.[210] Dr. Vassallo and Dr. Uribe both credibly testified that Ms. Gonzales would not have died if she had been in an air-conditioned cell.[211]

Plaintiffs' corrections expert Mr. Williams testified that core body temperatures of 106° or 107° would be "cause for alarm across the [state government], . . . not just in the corrections system."[212] If he saw even "one death where [he] knew the core body temperature was in the range of 106 degrees, 107 degrees, . . . [he] would pull the fire alarm for [the] department."[213] As set forth in more detail below, Mr. Collier did not do so.

---

[203] Pls.' Hearing Ex. 168 at 11.

[204] *Id.* at 15.

[205] Final Hearing Tr. (July 31, 2024) at 54:15-56:5.

[206] *Id.*

[207] *Id.* at 54:22-55:13.

[208] *Id.* at 54:22-55:3, 55:21-24.

[209] *Id.* at 56:3-5.

[210] *Id.* at 291:10-292:6.

[211] *Id.* at 56:6-11 (Dr. Vassallo); *id.* at 292:7-9, 309:7-12 (Dr. Uribe).

[212] *Id.* at 234:1-5.

[213] Final Hearing Tr. (July 31, 2024) at 233:10-18.

E.    **Evidence of Two Other Inmate Deaths under Questionable Circumstances was Also Presented During the Preliminary Injunction Hearing.**

Two other inmate deaths were discussed during the hearing—both of which occurred under suspicious circumstances and were possibly heat-related.

1.    **Corey Smith – July 28, 2022**

Corey Smith was a 50-year-old transgender female housed in cell 4-E-2 in the Alfred D. Hughes Unit.[214] During a count on July 28, 2022, at approximately 2:00 a.m., a correctional officer found Ms. Smith prostrate on the floor of her cell and in acute medical distress.[215] At that time, her core body temperature was measured at 107.6°.[216] Ms. Smith was pronounced dead less than an hour later.[217] Ms. Smith's medical history included high cholesterol, asthma, substance abuse, and gender dysphoria disorder.[218] Her medications included (1) Benadryl; (2) estradiol (a hormone); and (3) spironolactone (to treat high blood pressure and heart failure).[219]

A UTMB pathologist performed an autopsy on Ms. Smith's body eight days after her death.[220] The autopsy report states that the cause of death was hyperthermia and attributed the hyperthermia to sertraline toxicity and serotonin syndrome.[221] Ms. Smith's post-mortem sertraline level was elevated at 1200 ng/ml.[222] While elevated levels of sertraline can increase core body

---

[214] Pls.' Hearing Ex. 277 at 2.

[215] *Id.*

[216] *Id.* at 123.

[217] *Id.*; Pls.' Hearing Ex. 277 at 2.

[218] Pls.' Hearing Ex. 277-A at 123.

[219] *Id.* at 24.

[220] *Id.* at 126.

[221] *Id.* at 123, 126, 133-34.

[222] Pls.' Hearing Ex. 277-A at 133.

temperature, Dr. Vassallo and Dr. Uribe both testified that a post mortem sertraline level of over twice Ms. Smith's level alone would not have caused a core body temperature to rise to 106°.[223]

In attempting to impeach Dr. Uribe's testimony regarding sertraline's role in Mr. Womack's death, *see supra* at Section IV(D)(iii), Mr. Collier's counsel referenced Ms. Smith's death.[224] Mr. Collier's counsel asserted that Ms. Smith died from sertraline-induced hyperthermia while housed in an air-conditioned cell.[225] Mr. Collier's counsel, however, was mistaken.[226] Mr. Collier's own witness, Timothy Fitzpatrick, testified that, in fact, Hughes 4-E-2 is not air-conditioned.[227] And, according to the temperature logs that TDCJ provided to the Texas Legislature, the indoor temperature at the Hughes unit was 93.6° on the day Ms. Smith died in her unairconditioned cell.[228]

### 2. Jason Wilson – July 5, 2024

In the weeks before his death, TDCJ inmate Jason Wilson sent TPCA Director Brittany Robertson several emails indicating that there were not enough corrections staff to pass out water, and that the temperatures in his unit were extremely high.[229] Mr. Wilson had been a TPCA team

---

[223] Final Hearing Tr. (July 31, 2024) at 304:16-305:14, 331:10-16 (Dr. Uribe testifying that sertraline cannot increase the body temperature to 106.9° when he discussed Mr. Womack's death); *see id.* at 67:1-69:15 (Dr. Vassallo explaining that a sertraline level of 2500 ng/ml would not necessarily have caused death and would not have caused a core body temperature to increase to 106.9° when she discussed Mr. Womack's death).

[224] Final Hearing Tr. (July 31, 2024) at 331:17-334:5.

[225] *Id.*

[226] Final Hearing Tr. (Aug. 1, 2024) at 218:14-16 ("[Mr. James] Do you know if the Hughes assignment 4-E-2 is air conditioned or not? [Mr. Fitzpatrick] It is not.").

[227] *Id.*

[228] Def.'s Hearing Ex. 70 at 2 (noting that the temperatures are taken indoors), 27 (noting the temperature).

[229] Final Hearing Tr. (July 31, 2024) at 366:14-370:11, 374:3-375:1; Pls.' Hearing Exs. 137, 264, 152.

member for a year before he died.[230] When Ms. Robertson called Mr. Wilson's unit to check on him on July 7, a TDCJ employee told her that he was doing okay, even though he had, in fact, died two days earlier.[231] During the hearing, Mr. Collier agreed that TDCJ handled Mr. Wilson's wellness check in an unprofessional manner, and he said he was investigating it.[232] He also agreed that Mr. Wilson's messages to Ms. Robertson about not having access to cold water are very concerning.[233] After Mr. Wilson's death, another inmate wrote to Ms. Robertson that "no officer came and checked on the pod that we were house[d] all night on July 4 til the next morning when they found Jason dead." [234]

### F.    Heat-Related Deaths Are Being Undercounted and Underreported Because of TDCJ's Practices.

Based on the available evidence, there is no dispute that high heat has caused or contributed to the deaths of numerous TDCJ inmates in unairconditioned units, including last summer. In addition, three TDCJ practices have likely led to heat-related deaths of TDCJ inmates being undercounted and unreported.

First, TDCJ does not consistently take the core body temperatures of deceased inmates found in high ambient temperatures, and it has no policy requiring temperatures be taken in those circumstances.[235] According to the medical literature, "[a] rectal temperature should be obtained in *all* patients suspected of heat stroke."[236] According to Dr. Vassallo, a core body temperature is

---

[230] Final Hearing Tr. (July 31, 2024) at 365:3-12.

[231] *Id.* at 372:10-16, 374:3-5; Pls.' Exs. 137, 264, 152.

[232] Final Hearing Tr. (Aug. 2, 2024) at 238:10-239:8.

[233] *Id.* at 241:19-242:2.

[234] Pls.' Hearing Ex. 264 at 8.

[235] ECF 155, TDCJ 30(b)(6) Dep. at 245:17-246:4.

[236] Pls.' Hearing Ex. 275 at 5 (emphasis added).

"absolutely fundamental" to determining whether a death is heat-related,[237] and failing to take a core body temperature violates the standard of care.[238] In fact, taking a temperature is so "fundamental to being a doctor" that the entire point of one oral board examination question is for the examinee to recognize that the temperature is missing from the data presented.[239]

Dr. Uribe agreed that taking a core body temperature is "essential," because it is a "quick way to establish one or more things that are possibly going wrong" with the body—especially in a "particularly hot or cold environment."[240] He testified that the "documentation of the core body temperature is critically important from a post mortem perspective."[241] "[T]he core body temperature [triggers] the diagnosis of hyperthermia," and the pathologist then has to figure out "why does this person have such an elevated temperature"—for instance, was it "because they were exposed to heat for a prolonged period of time," or "were they . . . on certain drugs or medications?"[242] Dr. Uribe opined that routinely failing to take core body temperatures could lead to heat being underreported as a contributing cause of inmate deaths.[243]

Correctional leaders understand the importance of taking core body temperatures. Mr. Williams confirmed that a proper death investigation should include measuring ambient temperature of the cell or the living area where the individual died, the heat index, and the individual's core body temperature.[244] A high core body temperature is "not just a clue," but

---

[237] Final Hearing Tr. (July 31, 2024) at 52:8-10.

[238] *Id.* at 57:21-58:6.

[239] *Id.*

[240] *Id.* at 298:23-299:23.

[241] *Id.* at 299:24-300:18.

[242] *Id.* at 300:3-13.

[243] *Id.* at 300:19-24.

[244] Final Hearing Tr. (July 31, 2024) at 246:7-23, 251:20-24.

"strong evidence that people are dying of heat stroke."[245] Indeed, Mr. Williams could only think of one reason *not* to take an individual's core body temperature: to avoid legal liability.[246]

Second, TDCJ only considers a death "heat-related" if the autopsy report lists hyperthermia as the sole cause of death.[247] In other words, heat must be the "sole causal factor" of the inmate's death for TDCJ to consider it "heat-related."[248] But, according to Dr. Vassallo, there is no medical distinction between identifying heat as a "contributing factor" or a "heat-related death."[249] Dr. Vassallo testified that, "if a death is found to have heat as a contributing cause, [she] as a medical professional [would] consider that to be a heat-related death."[250] Dr. Vassallo concluded that, if you "only considered deaths in which heat was found to be the sole cause and did not consider [deaths] where heat was found to be a contributing factor," you would undercount heat-related deaths.[251] Dr. Uribe agreed that heat-related deaths would be undercounted, if TDCJ took the position that a death is not heat-related unless heat is the sole, direct cause of death.[252]

Third, Dr. Uribe also testified that the standard of care for pathologists requires that an autopsy be performed within 48 hours of an individual's death.[253] The autopsies for the deaths listed here were all performed outside of this window: (i) Elizabeth Hagerty (5 days); (ii) John Castillo (6 days); (iii) Patrick Womack (10 days); (iv) John Southards (6 days); (v) Armando

---

[245] *Id.* at 251:2-19.

[246] *Id.* at 248:25-250:21.

[247] ECF 155, TDCJ 30(b)(6) Dep. at 244:25-245:12.

[248] *Id.*

[249] Final Hearing Tr. (July 31, 2024) at 71:21-72:19.

[250] *Id.* at 72:2-5.

[251] *Id.* at 72:6-16.

[252] *Id.* at 308:25-309:6.

[253] *Id.* at 292:14-293:1.

Gonzales (13 days); and (vi) Corey Smith (8 days).[254] Dr. Uribe explained that the timeliness of an autopsy is important because decomposition (autolysis) affects the accuracy of the results, particularly toxicology and laboratory values.[255] Dr. Uribe further opined that a systemic pattern of delayed autopsies would likely result in TDCJ underreporting heat as a cause of death.[256]

### G.    TDCJ is Likely Undercounting Inmates' Heat-Related Injuries.

In addition to heat-related deaths, Mr. Collier knows that TDCJ inmates also continue to develop heat-related injuries. In his interrogatory responses, Mr. Collier identified more than a dozen inmates diagnosed with heat exhaustion, heat stroke, or hyperthermia between May 5, 2023, and September 17, 2023.[257] Mr. Collier, likewise, reported to the Texas Legislature that 17 TDCJ inmates developed heat-related illnesses in 2023 alone[258]:

| Inmate Heat-Related Illnesses | FY 2023 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Sept | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | June | July | Aug | Total |
| Heat Cramps | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Heat related Illness, Exhaustion, Dehydration | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 4 | 2 | 8 | 17 |
| Heat Stroke | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **0** | **1** | **0** | **0** | **0** | **0** | **1** | **0** | **1** | **4** | **2** | **8** | **17** |

This number is almost certainly an undercount, since at least one report from UTMB identified 35 TDCJ inmates with heat-related illnesses in a single month (June 2023).[259] Mr. Collier acknowledged that he was aware of UTMB's June 2023 heat-related illness report, but claimed (without further explanation) that the data UTMB reported to TDCJ contained "significant inaccuracies."[260]

---

[254] *See* Sections IV.C.-IV.E., *supra*.

[255] Final Hearing Tr. (July 31, 2024) at 294:5-295:9.

[256] *Id.* at 295:10-19.

[257] Pls.' Hearing Ex. 206, Mr. Collier's Response to Plaintiffs' Interr. 8.

[258] Pls.' Hearing Ex. 102.

[259] Pls.' Hearing Exs. 84 & 85.

[260] Final Hearing Tr. (Aug. 2, 2024) at 225:10-228:3.

Former TDCJ inmates' firsthand accounts further illustrate the catastrophic consequences of extreme heat. For example, Ms. Simmons testified that the summer heat affected her physical and mental health during her ten-year incarceration in unairconditioned units from 2012 to 2022. She lost her appetite, could not sleep, and became weaker and more lethargic because of the heat.[261] She saw several other inmates become lethargic, pass out, and suffer heat-induced seizures.[262] She also saw "lots of women that [she] was housed with" require medical attention and be taken away in ambulances "very frequently" during the summer.[263]

According to Ms. Simmons, she and her fellow inmates tried to reduce the effects of the heat by dousing themselves in water from the toilets in their cells.[264] Ms. Simmons did this "[m]ore times than [she could] count."[265] Other women in Ms. Simmons's unit would even "inflict harm" on themselves and "make it look like a suicide attempt" to "get into the air conditioned crisis management center" and "get a break from the heat."[266]

Mr. Malouff was also housed in unairconditioned TDCJ units over multiple summers. He testified that the heat was "horrible"—you felt "dehydrated," and it "literally sucks the oxygen right out of you."[267] He witnessed two inmates go from "sweating profusely" to "no sweat" to "discoloration" to "kind of [] queasiness" and then pass out before finally receiving medical attention.[268] To Mr. Malouff, it looked like "they were having a heat stroke."[269] Mr. Malouff also

---

[261] Final Hearing Tr. (July 30, 2024) at 28:25-29:6

[262] *Id.* at 33:14-34:9.

[263] *Id.* at 34:10-17.

[264] *Id.* at 31:3-24, 35:15-36:8.

[265] *Id.* at 31:17-24.

[266] *Id.* at 35:17-36:8.

[267] *Id.* at 179:24-180:2.

[268] *Id.* at 181:23-182:9.

[269] *Id.* at 182:7-8.

said that inmates in administrative segregation would "fairly regularly" start fires in their unit, so that the corrections officers would respond by flooding the unit and the inmates could lay down on the ground in the pools of water.[270]

### H.    TDCJ Staff Continue to Suffer Heat-Related Injuries.

The substantial risk of serious harm the extreme heat poses to TDCJ inmates is also demonstrated by the effects extreme heat has on TDCJ staff. TDCJ's own training documents confirm that heat-related illness is the fifth-leading cause of serious injuries among TDCJ employees.[271] One document specifically recognizes that "[n]o one is immune from suffering a heat-related illness, from the fittest employee to those who may be prone to medical conditions."[272] It warns that "[i]ncreased body temperatures, if left uncontrolled, may lead to delirium, convulsions, seizures, and possibly even death."[273] And it suggests treating the person by moving them "out of direct sunlight [and] into an air conditioned environment, if possible."[274]

In 2022 and 2023, TDCJ staff filed nearly 80 workers' compensation claims related to the heat.[275] These are some of the employee statements[276]:

- "Overheated, got dizzy, fell down and could not move or respond."

- "I was sitting in my office and started to feel unwell and overheated. I felt liek [*sic*] I could not breath [*sic*]."

- "I was counting the wings at Beto when I became over heated. Reported to Capt. Kimberly Henslee. She then sent me to the chapel where I began to throw up, then Capt. Henslee sent me home."

---

[270] Final Hearing Tr. (July 30, 2024) at 180:3-19, 182:24-183:2.

[271] Def.'s Hearing Ex. 13D at 15

[272] *Id.*

[273] *Id.*

[274] *Id.*

[275] Pls.' Hearing Ex. 207, Mr. Collier's Resp. to Interr. No. 10.

[276] *Id.*

- "Driving home from work (Torres Unit/Food Service) after being exposed to excessive heat in the food service dept. Had a stroke on the way home."

- "Heat from unit really got to me, extremely overheated causing me to get sick, really dizzy, headache, messing wiht [*sic*] my diabetes."

- "While performing officer duty at the O.M. gate, too much heat."

- "Heat exhaustion, dehydration."

- "Heat exhaustion."

- "It happened because of the heat and I was dehydrated."

- "In C Row top felt light headed, requested water, after drinking three bottles I got dizzy and felt like I was going to pass out, left side of the body went numb."

- "While watching my workers in the bath house, I got overheated, very weak, confused and unable to respond. Also, I was dry heaving and felt nauseated, I vomited blood."

- "Was working in high heat when I started to feel dizzy, then later felt chest pain and body aches."

Ms. Simmons, likewise, testified that she saw "at least five" corrections officers in her unit pass out in the high heat.[277] Mr. Collier acknowledged during the hearing that TDCJ correctional officers continue to suffer from heat-related illnesses.[278] TDCJ reported 35 instances of heat-related illnesses of TDCJ staff to the Texas Legislature in 2023.[279]

## V.    MR. COLLIER KNOWS THAT TDCJ'S HEAT-MITIGATION POLICIES ARE INADEQUATE.

Mr. Collier acknowledged that, "despite TDCJ's heat mitigation policies and measures, heat was a factor in at least three [inmates'] death[s] last summer."[280] He admitted that 17 TDCJ inmates suffered heat-related illnesses in summer 2023, despite TDCJ's heat-mitigation

---

[277] Final Hearing Tr. (July 30, 2024) at 39:16-18.
[278] Final Hearing Tr. (Aug. 2, 2024) at 229:4-231:11.
[279] Pls.' Hearing Ex. 102.
[280] Final Hearing Tr. (Aug. 2, 2024) at 221:8-12.

measures.[281] And he recognized that, despite TDCJ's heat-mitigation policies and measures, TDCJ inmates submitted nearly 6,000 heat-related grievances in 2023 alone.[282] TDCJ's experience last summer shows what Mr. Collier has known for years: Respite rooms, fans, cold showers, cold water, and TDCJ's other heat mitigation measures do not address—much less ameliorate—the substantial risk of serious harm that extreme heat poses to TDCJ inmates.

In 2017, Judge Keith Ellison concluded that "the mitigation measures put in place by TDCJ are insufficient to combat the substantial risk of serious injury or death faced by the inmates at the [Wallace] Pack Unit during the summer months."[283] Judge Ellison explained that, "[s]ince the 12 heat-related deaths in 2011 and 2012, TDCJ has implemented, and attempted to implement, many of the mitigation measures discussed by the Fifth Circuit in *Ball v. LeBlanc*."[284] In Judge Ellison's view, however, these measures did not "reduce the substantial risk of heat-related illness faced by all of the men at the Pack Unit, and particularly not the men with heat sensitivities."[285] The following year, the Texas House Committee on Corrections reached the same conclusion: "Based on the medical information about human health and heat-related health risks, TDCJ cannot rely only on mitigation measures to ensure the well-being of inmates and corrections personnel."[286]

In July 2022, a study authored by Dr. Carlee Purdum and published by Texas A&M concluded that, "despite [TDCJ's] current heat mitigation policies, nearly every year, there are reports of incarcerated people and staff falling extremely ill and/or dying from complications from

---

[281] Final Hearing Tr. (Aug. 2, 2024) at 222:4-7, 224:10-14; Pls.' Hearing Ex. 102.

[282] Final Hearing Tr. (Aug. 2, 2024) at 221:13-222:3; Pls.' Hearing Ex. 102 at 4.

[283] *Cole*, 2017 WL 3049540, at *10.

[284] *Id.*

[285] *Id.*

[286] Plaintiffs' Hearing Ex. 34 at 58.

extreme heat in Texas prisons."[287] That study warned that "[i]ncreasing annual temperatures and the increase of days over 100 degrees in Texas will continue to exacerbate the degradation of health for both incarcerated people and staff" in the TDCJ system.[288] The study based its conclusions on survey responses from TDCJ inmates:

- 66% said they did not have access to ice.[289]

- 61% said they did not have access to cool-down showers.[290]

- 60% said wellness checks weren't happening regularly.[291]

- 47% reported being denied access to respite areas.[292]

- 29% said that they knew of at least one heat-related death in their own unit or another.[293]

- 11% said they did not receive access to cold water, and the respondents who reported receiving access to cold water described "a pattern or persistent inconsistency."[294]

TDCJ's heat-mitigation policies were in place during the years of Dr. Skarha's study, yet heat-related deaths continued unabated.[295] According to Dr. Skarha, if mitigation measures were effective in preventing heat-related deaths in Texas prisons without air-conditioning, she would have expected to see no effect from heat on mortality in those facilities.[296] But she did see an effect, even while TDCJ's mitigation measures were in place.[297]

---

[287] Pls.' Hearing Ex. 55 at 3-4.

[288] *Id.* at 4.

[289] *Id.* at 22.

[290] *Id.* at 27-28.

[291] Final Hearing Tr. (Aug. 2, 2024) at 237:16-238:4; Pls.' Hearing Ex. 55 at 14.

[292] Pls.' Hearing Ex. 55 at 31-32.

[293] Final Hearing Tr. (Aug. 2, 2024) at 235:11-17; Pls.' Hearing Ex. 55 at 18.

[294] Final Hearing Tr. (Aug. 2, 2024) at 240:16-241:18; Pls.' Hearing Ex. 55 at 20.

[295] Pls' Hearing Exs. 70 & 75.

[296] Final Hearing Tr. (July 30, 2024) at 172:24-173:7.

[297] *Id.* at 173:9-11.

Mr. Collier also personally acknowledged having received Dr. Purdum's and Dr. Skarha's studies in 2022 and being aware of their findings.[298] He said that he had TDCJ's "research director" Mr. Barbee "look at" the Skarha study,[299] but he did not recall having asked anyone at UTMB or anyone with an epidemiology degree to review that study.[300]

In the face of conclusions that 271 people likely died from heat in Texas prisons over 19 years, Mr. Collier's Rule 30(b)(6) designee testified that TDCJ did not give the Texas A&M study or Dr. Skarha's study "much credibility," because TDCJ did not "sanction" them and was not "involved" in them.[301] Mr. Collier's designee called Dr. Skarha's study "nothing more than writing on a piece of paper."[302] Mr. Collier's designee testified that TDCJ did not do anything to investigate the findings of either study.[303] Nor did Mr. Collier or anyone else who testified at the hearing on his behalf identify any actions or policy changes made in response to the Skarha study or the Purdum study.

Plaintiffs' corrections expert Dean Williams testified that, if he received notice of something like the Skarha study, he would not ignore it and it would instead have raised "high alarms" with him.[304] In Mr. Williams's view, not responding to deaths, scientific studies, staff illnesses, and inmates illnesses puts people's health and safety at risk.[305] Mr. Collier's own corrections expert, John Baldwin, agreed that if he received a study from a credible source alerting

---

[298] Final Hearing Tr. (Aug. 2, 2024) at 234:8-235:23, 243:10-245:11.

[299] *Id.* at 244:6-245:11.

[300] *Id.* at 244:21-245:11.

[301] ECF 155, TDCJ 30(b)(6) Dep. at 260:15-261:14.

[302] *Id.*, at 262:19-263:1.

[303] *Id.*, at 270:21-274:23, 283:18-284:14.

[304] Final Hearing Tr. (July 31, 2024) at 240:23-241:24.

[305] *Id.* at 242:23:243:2.

him to dangerous conditions in his prison system, he would review the study.[306] In fact, he acknowledged that receiving a study like Dr. Skarha's, showing 14 people died every year from extreme heat in unairconditioned housing, would cause him concern. He would review and evaluate a study like that.[307] Likewise, Mr. Baldwin acknowledged that, if he received information like what was contained in the Texas A&M study, he would investigate it.[308] And Mr. Morales testified that "any reasonable person in [his] position . . . or in Mr. Collier's position" would look into the Purdum study's findings. [309]

Even if he refused to give credence to multiple reputable studies, Mr. Collier knew TDCJ's heat mitigation policies were inadequate. He admittedly knew that dozens of TDCJ inmates had died or fallen ill because of extreme heat with those measures in place. Evidence presented at the hearing, which he attended, underscored those inadequacies.

## A.    TDCJ's Heat Score System is Arbitrary, Inadequate, and Ineffective.

The testimony during the preliminary injunction hearing revealed that TDCJ's heat score system is arbitrary, inadequate, and ineffective. Although all TDCJ inmates face a substantial risk of serious harm from the extreme heat in unairconditioned facilities,[310] only approximately 12,289 of the 134,500 individuals incarcerated in the TDCJ system (i.e., less than 10%) have a heat score.[311]  Mr. Collier's designee and Mr. Fitzpatrick confirmed that Mr. Tiede does not currently have a heat score, even though he is 65 years old and has been diagnosed with a stroke, diabetes,

---

[306] Final Hearing Tr. (Aug. 2, 2024) at 54:24-55:3.

[307] *Id.* at 55:18-23.

[308] *Id.* at 59:13-60:11.

[309] Final Hearing Tr. (Aug. 1, 2024) at 278:16-280:13.

[310] Final Hearing Tr. (July 31, 2024) at 127:7-11.

[311] Final Hearing Tr. (Aug. 1, 2024) at 25:3-5.

chronic obstructive pulmonary disease, hypertension, and obesity.[312] As Dr. Vassallo testified, if TDCJ's heat score system does not warrant housing Mr. Tiede in an air-conditioned cell, she has no confidence in the legitimacy or adequacy of the system.[313] Mr. Castillo apparently did not have a heat score, either, despite being diagnosed with epilepsy and taking an antiseizure medication and an SSRI at the time of his death.[314] Nor did Ms. Hagerty (despite being a diabetic, having an unspecified mood disorder, and on an SSRI at the time of her death),[315] Mr. Womack (despite being diagnosed with major depressive disorder, and being on an SSRI and an anticholinergic at the time of his death),[316] or Mr. Southards (despite being on an SSRI and an anticholinergic at the time of his death).[317]

Dr. Vassallo stated that "[s]tudies of heat-related deaths during heat waves have indicated that subjects with mental illness had an increased risk of death."[318] She explained that several classes or prescription drugs "impair thermoregulation," including: (1) cardiovascular drugs, (2) diuretics, (3) sympathomimetics or vasoconstrictors such as nasal decongestants like Sudafed medications, (4) anticholinergics, and (5) SSRIs.[319] She further concluded that "[p]eople over the age of 65 have 10-12 times increased risk of heat-related illness and death than those younger than 65," and that the "mortality from heatstroke in the elderly exceeds 50%."[320] UTMB's own policies

---

[312] ECF 155, TDCJ 30(b)(6) Dep. at 205:7-206:7; Final Hearing Tr. (Aug. 1, 2024) at 200:25-201:14.

[313] Final Hearing Tr. (July 31, 2024) at 124:13-125:5.

[314] Pls.' Hearing Ex. 161 at 12.

[315] Pls.' Hearing Ex. 169-A at 27.

[316] Pls.' Hearing Ex. 200, at 6

[317] Pls.' Hearing Ex. 192-A at 65.

[318] ECF 50-2, Ex. B, S. Vassallo Decl. ¶ 36.

[319] *Id.* ¶ 37.

[320] ECF 50-2, Ex. B, S. Vassallo Decl. ¶ 38.

identify many of the same conditions and medications that affect heat tolerance—which, by and large, are not incorporated into TDCJ's heat score algorithm.[321]

Indeed, as Dr. Leonardson acknowledged, the following individuals would not receive a heat score: (1) a 90-year old with hypertension; (2) an individual with seizure disorder; (3) an individual with diabetes who is under the age of 65; (4) an individual with liver cirrhosis who is under the age of 65 and not taking certain medications; (5) an individual with asthma or pulmonary disease who is under the age of 65; or (6) a 48-year-old inmate with diabetes, peripheral vascular disease, obesity, asthma, and bilateral below-the-knee amputations due to diabetic gangrene.[322] Even so, Dr. Leonardson is not aware of any policy requiring the TDCJ's health service liaison (who is not a doctor) to follow a doctor's recommendation that an inmate be placed in an air-conditioned cell.[323] Nor can TDCJ's health service liaison even "request assignment of an offender to an air conditioned or climate controlled facility."[324] Mr. Baldwin testified that inmates' medical providers should determine which inmates are vulnerable and need to be housed in air-conditioned cells.[325] And he agrees that TDCJ has "no business" telling UTMB which medical conditions do and do not receive a heat score.[326]

### B.    Respite Areas Are Inadequate and Ineffective.

Respite areas—i.e., designated air-conditioned areas in TDCJ facilities—are also inadequate and ineffective at reducing the substantial risk of harm posed by extreme heat, both in practice and even in theory.

---

[321] Final Hearing Tr. (Aug. 1, 2024) at 126:20-127:9, 135:17-136:22; Pls.' Hearing Ex. 274.

[322] Final Hearing Tr. (Aug. 1, 2024) at 114:16-115:6, 136:2-22, 140:11-24.

[323] *Id.* at 123:16-21.

[324] *Id.* at 134:7-18; Pls.' Hearing Ex. 31.

[325] Final Hearing Tr. (Aug. 2, 2024) at 51:6-10.

[326] *Id.* at 51:11-15.

In practice, inmates do not have sufficient access to respite areas. TDCJ policy states that inmates "may request access to a respite area 24 hours per day, seven days per week."[327] However, corrections staff is required to administer respite area access, and Mr. Collier acknowledged there are staffing shortages throughout TDCJ.[328] He called staffing a "significant problem," and TDCJ itself recognized in a report to the Texas Legislature that staffing is TDCJ's "most significant major issue."[329] Professor Michele Deitch, an expert in prison policy, testified that TDCJ's widespread understaffing has had an "enormous impact" on TDCJ's ability to implement its heat-mitigation measures.[330] She testified that understaffing prevents TDCJ from effectively managing the respite room system, and that the respite areas do not have enough space to accommodate everyone who would like to use them.[331] This is consistent with what has been publicly reported: TDCJ's respite areas are "crowded and uncomfortable," "packed with inmates," and "almost nonexistent" because of the agency's staffing crisis.[332]

Ms. Deitch's testimony is also consistent with testimony from current and former TDCJ inmates. In a video taken by film director Richard Linklater, Mr. Tiede confirmed that TDCJ has a "huge" staff shortage because corrections officers "don't want to come to work" in the heat, and that the ratio of corrections officers to inmates is completely "out of proportion" as a result.[333] He said that respite areas are "hard to come by" in his unit.[334] Ms. Simmons testified that she and other inmates in her unit could not use respite rooms late at night, and they "never had respite available"

---

[327] Def.'s Hearing Ex. 1 at 24.

[328] Final Hearing Tr. (Aug. 2, 2024) at 239:17-19.

[329] *Id.* at 254:10-20; Pls.' Hearing Ex. 266 at 303-304.

[330] Final Hearing Tr. (July 31, 2024) at 152:6-18.

[331] *Id.* at 149:1-24.

[332] ECF 50-35, Ex. 24.

[333] Pls.' Hearing Ex. 243.

[334] Pls.' Hearing Ex. 244.

after midnight.[335] Starting at about 10:00 a.m., women in her unit would start asking for respite, and sometimes the response from staff would be "respite's not open yet," or that they did not "have anybody [on staff] to open respite yet."[336] When Ms. Simmons was in a higher security level cell, respite was only available once a day around 8:00 or 9:00 p.m.[337]

Ms. Simmons further testified that her unit was often short-staffed, and even more so in the summer months, which affected her ability to use respite rooms.[338] There were also significant barriers to using the respite rooms—inmates were required to get fully dressed in their TDCJ uniform and clean their cells, and they "can only fit so many people" so they often had to wait in line, in the heat, to do so.[339] Once in the respite rooms, inmates were sometimes told "to face the wall," "not to talk," or to "sit on the floor."[340] And, although TDCJ policy states that inmates "shall be permitted to stay in the respite area as long as necessary," [341] Ms. Simmons testified that she could only stay in those areas for fifteen minutes to an hour.[342] As a result, the rooms were not effective in reducing the physical effects of the heat.[343] If inmates refused to leave the respite area, they would be physically removed and placed in solitary confinement.[344]

Mr. Malouff's access to respite rooms was similarly limited. While he was in the Pack Unit, the respite room was located in a different building that was a "quarter, half mile" away.[345]

---

[335] Final Hearing Tr. (July 30, 2024) at 41:1-11.

[336] *Id.* at 41:3-7.

[337] *Id.* at 41:7-11.

[338] *Id.* at 41:18-42:5, 43:6-11.

[339] *Id.* at 43:12-44:12.

[340] *Id.* at 46:1-10.

[341] Def.'s Hearing Ex. 1 at 24.

[342] Final Hearing Tr. (July 30, 2024) at 41:15-17.

[343] Final Hearing Tr. (July 30, 2024) at 47:23-25.

[344] *Id.* at 46:17-47:4.

[345] *Id.* at 185:8-13.

He had to put in a written request for a TDCJ staff member to escort him, and sometimes it would take a half-hour to an hour for him to be escorted—depending on the number of staff available.[346] There were times when his written request for respite "wasn't responded to at all."[347] And he could spend a "very short" period of time there—"maybe 15, 20 minutes"—before he was brought back to his unairconditioned dorm.[348] He believes short staffing also affected his ability to use respite rooms.[349] From his perspective, the respite rooms were not effective at reducing the effects of the heat on him because "it was short-term," "it really didn't do anything for you, and as soon as you left, you went right back into that heat."[350]

Nor are respite rooms even effective in theory. Even assuming inmates could readily access a respite area, that still puts the onus on them to affirmatively identify that they are exhibiting symptoms of a heat-related illness. The issue with that, according to Dr. Vassallo, "is that people don't know they are in trouble" from the heat, so they can "start having cognitive problems from heat illness before they realize they need to go to [a respite room]."[351] In other words, "the rapidity, the speed at which heatstroke strikes means that checking people that are walking around, somebody is sleeping in their bed, everything looks fine . . . , and they can still suffer a heatstroke without the correction staff realizing they're in trouble."[352] This is consistent with the medical literature on heat stroke, which notes that patients experiencing heat stroke may only initially

---

[346] *Id.* at 185:14-186:3.

[347] *Id.* at 186:4-6.

[348] *Id.* at 186:10-14.

[349] *Id.* at 186:7-9.

[350] *Id.* at 186:15-21.

[351] ECF 50-42, Ex. 32 at 135:19-136:15.

[352] ECF 50-42, Ex. 32 at 135:23-136:5.

complain of "weakness, lethargy, nausea, or dizziness," and "[t]he presentation of older adults with heat stroke may be subtle and nonspecific early in the course of the disease."[353]

Moreover, even if inmates were able to readily access respite areas, these areas are, by definition and design, a temporary respite from the permanent condition of extreme heat. As Dr. Vassallo testified in the *Cole v. Collier* case, when inmates are not in air-conditioning, "they are subjected to the temperatures . . . which are risky and cause harm, including sickness, morbidity, and mortality."[354] Thus, even if TDCJ inmates get "three or four or five hours" in respite—an implausible notion, given the evidence—"that leaves . . . 19 or 20 hours in these heat conditions."[355] In other words, "it's the total accumulated heat stress for the 20 hours you're in the [extreme] temperatures" that "matters" from a risk perspective.[356] This opinion was supported by a study, which concluded that there was "ten percent more death[s]" among people who simply visited an air-conditioned location, as compared to those who had air-conditioning in their homes full-time.[357]

### C.    Cold Showers Don't Work.

TDCJ policy says that, at times of high heat, prisons should "[a]llow additional showers for inmates when possible."[358] However, Professor Deitch testified that TDCJ's widespread understaffing issues prevent TDCJ staff from consistently bringing inmates to cold showers.[359] This testimony was supported by that of the former TDCJ inmates. Indeed, Ms. Simmons testified

---

[353] Pls.' Hearing Ex. 275.

[354] ECF 50-42, Ex. 32 at 135:25-136:12.

[355] *Id.* at 135:16-18.

[356] Final Hearing Tr. (July 31, 2024) at 43:1-12.

[357] *Id.* at 40:16-41:19; Pls.' Hearing Ex. 13.

[358] Defs.' Hearing Ex. 1 at 41-42.

[359] Final Hearing Tr. (July 31, 2024) at 352:6-12.

that cold showers were not available in her unit at all for several hours during count time or from 10:00 p.m. to 7:00 a.m.[360] Even when they were available, her unit had only one cold shower for "80 to 125 women" who "need[ed] to get relief from the heat."[361] And, as discussed, the night before he died, Mr. Womack's request for a respite shower was denied.[362] One of Mr. Womack's fellow inmates noted that this denial was "nothing unusual for [the] Coffield [Unit]," and that the "excuse is always we are understaffed." [363]

Moreover, even if TDCJ provided inmates sufficient access to cold showers, the relief provided from showers is, much like that provided by respite areas, temporary and fleeting. Dr. Vassallo testified that cold showers only work "while you're wet" and while you are experiencing "evaporative cooling."[364] As soon as you are dry, "you are no longer being cooled by that shower."[365] In other words, the shower will only "fix" the problem—i.e., extreme heat—"for about ten minutes" until the inmate "dries off."[366] Dr. Vassallo also discussed a metanalysis of various heat-mitigation measures, which concluded that increased cold showers or baths did not lead to a "statistically significant" difference in mortality rates from high heat.[367] In short, Dr. Vassallo believes that "taking frequent [cold] showers doesn't help" address the substantial risk of serious harm posed by extreme heat.[368]

---

[360] Final Hearing Tr. (July 30, 2024) at 49:12-14.

[361] *Id.* at 49:14-17.

[362] Pls.' Hearing Ex. 200-B at 2, 42.

[363] *Id.* at 42.

[364] Final Hearing Tr. (July 31, 2024) at 113:3-20.

[365] *Id.* at 113:19-20.

[366] *Id.* at 135:5-21.

[367] Final Hearing Tr. (July 31, 2024) at 42:7-14; Pls.' Hearing Ex. 13 at 5-6.

[368] Final Hearing Tr. (July 31, 2024) at 117:18-25.

### D.    Fans Are Inadequate and Counter-Productive in Extreme Heat.

According to Dr. Vassallo, fans do not lessen the risk of heat-related illness, either.[369] In fact, when the heat index exceeds 99°, "fans elevate the risk of heat-related illness, increasing the heat load on the body by moving hot air across the skin."[370] In other words, "increased wind speeds of hot air can actually raise the skin temperature and thus produce opposite results by increasing core body temperature."[371] This is consistent with guidance from the U.S. Environmental Protection Agency, which warns: "[U]sing a portable electric fan alone when heat index temperatures exceed 99°f actually *increases* the heat stress the body must respond to by blowing air that is warmer than the ideal body temperature over the skin surface."[372] Dr. Vassallo has therefore opined that "providing additional fans does nothing to address the health risks of the extreme temperatures."[373]

### E.    Access to Cold Water is Inconsistent and Does Not Reduce the Long-Term Effects of the Heat on TDCJ Inmates.

As Professor Deitch testified, TDCJ's widespread understaffing issues further prevent TDCJ staff from consistently bringing inmates ice or water.[374] This testimony was supported by the experiences of former TDCJ inmates, including Ms. Simmons, who testified that there was rarely enough ice water to meet the demand of the women in her unit, as they would only receive one cooler for a dorm with 124 women.[375] Mr. Malouff testified that, while he was incarcerated, it

---

[369] ECF 50-2, Ex. B, S. Vassallo Decl., ¶ 41.

[370] *Id.*, ¶ 41.

[371] Pls.' Hearing Ex. 13 at 5-6.

[372] ECF 50-28, Ex. 17, Excessive Heat Events Guidebook (March 2016), U.S. Environmental Protection Agency, at 37 (emphasis added).

[373] ECF 50-2, Ex. B, S. Vassallo Decl., ¶ 41.

[374] Final Hearing Tr. (July 31, 2024) at 152:6-18.

[375] Final Hearing Tr. (July 30, 2024) at 48:16-25.

could take up to eight hours for TDCJ staff to refill the water cooler in his unit.[376] Individuals incarcerated in TDCJ also reported to Ms. Robertson that they went "eight to nine hours at a time with no water" in July 2024, and Mr. Wilson repeatedly noted the shortage of water—and the fact that inmates in his unit would only receive water once per day—in the weeks before he died.[377]

Dr. Vassallo also opined that "the provision of additional ice [water], on its own, does not mitigate the risk of heat-related illness."[378]

F.    **Evidence Submitted by Mr. Collier Raises Substantial Concern About Whether TDCJ Implements its Heat Mitigation Measures in Accordance With TDCJ Policy.**

According to TDCJ policy, units are only required to provide inmates access to respite areas "during periods of excessive heat," and they are only required to provide inmates other heat mitigation measures—cold showers, fans, and ice water—"where the heat index is above 90°F."[379] So, TDCJ's heat mitigation measures depend on TDCJ staff to diligently and accurately monitor and report the heat index at their units.

Evidence presented by Mr. Collier at the preliminary injunction hearing cast substantial doubt on TDCJ's own processes and procedures for keeping track of the heat index and, in turn, whether TDCJ is complying with its own heat-mitigation policy. In an attempt to rebut testimony from Plaintiffs' witnesses, Mr. Collier's counsel introduced into evidence a manual temperature log reporting the outside air temperature, humidity, and heat index at the Mark W. Stiles Unit for July 2022.[380] During the direct examination of Mr. Collier, his counsel focused on the outside

---

[376] *Id.* at 187:4-10.

[377] Pls.' Hearing Exs. 137 & 264.

[378] ECF 50-2, Ex. B, S. Vassallo Decl., ¶ 41.

[379] Def.'s Hearing Ex. 1 at 41-42.

[380] Final Hearing Tr. (Aug. 2, 2024) at 195:12-15, 217:20-219:1 (admitting Def.'s Ex. 76 into evidence).

temperature at the unit on July 12, 2022, which was logged at a consistent 79º from 12:30 a.m. to 4:30 p.m.[381]

After having consulted an authoritative source on the matter during the hearing, this Court took judicial notice that, on July 12, 2022, the temperature actually reached a high of 96º in Beaumont, Texas (where the Stiles Unit is located), despite TDCJ's log indicating that the temperature never exceeded 87°.[382] Additionally, the log recorded the heat index as being *lower* than the ambient temperature, despite the 90% humidity.[383] And the temperatures included in the log for that day were noted as being recorded by different people, despite being written in the same handwriting.[384] Because of these discrepancies, the Court determined that the temperature log for July 12, 2022 was fabricated.[385]

The logs for several other days in Defendants' Exhibit 76 have similar discrepancies—including July 1 & 2, 2022 ("Wheeler" is in different handwriting, despite purportedly being entered by the same person); July 6, 2022 (similar handwriting for entries purportedly by different people); July 7, 2022 (similar handwriting and pen for entries purportedly by different people); July 13, 2022 (similar handwriting and pen for entries purportedly by different people); and July 14, 2022 (same).[386] Although the Court asked Mr. Collier's counsel on August 2, 2024 (the last day of the hearing) to provide an explanation for these discrepancies, and Mr. Collier's counsel agreed, Mr. Collier has not done so as of the date of this filing.[387]

---

[381] Def.'s Hearing Ex. 76 at 12.

[382] Final Hearing Tr. (Aug. 2, 2024) at 276:16-277:10.

[383] *Id.* at 277:10-15.

[384] *Id.* at 277:16-19.

[385] *Id.* at 278:20-279:1.

[386] Def.'s Hearing Ex. 76 *passim.*

[387] Final Hearing Tr. (Aug. 2, 2024) at 287:2-10.

The discrepancies in Defendant's Exhibit 76 and the discrepancies between the number of heat-related illnesses that UTMB reports to TDCJ and what TDCJ reports to the Texas Legislature (discussed in Section IV.G., *supra*) raise significant questions about the veracity and reliability of the other documents Mr. Collier presented at the hearing regarding TDCJ's compliance with its own heat-mitigation policies.[388]

## VI.    AIR-CONDITIONING IS THE ONLY EFFECTIVE PROTECTION FROM EXTREME HEAT.

### A.    Reducing Temperatures to Safe Levels Is the Least Restrictive Means to Address the Risks Posed by Extreme Heat.

Mr. Collier's Rule 30(b)(6) designee testified that installing air-conditioning "is the right thing to do, it is the humane thing to do, and it is something [TDCJ] should have done a long time ago."[389] He testified that it is "the right thing to do because of the increased temperatures that the state is seeing, the increase of medication that . . . inmates are on as opposed to 20 years ago, 30 years ago, 40 years ago," and because "[t]here's a lot of factors that exacerbate the need for wanting to air condition" TDCJ facilities.[390] Mr. Collier's Rule 30(b)(6) designee was not aware of any heat-related illnesses at the Pack Unit since air-conditioning was installed there.[391] And he was not aware of any heat-related illnesses that have occurred in air-conditioned housing areas in the TDCJ system in the last 30 years.[392]

TDCJ's former Director of Facilities, Cody Ginsel, agreed that installing air-conditioning in all of TDCJ's facilities would reduce the risk of heat-related injuries among TDCJ staff.[393] And

---

[388] *Id.* at 282:20-283:6 ("If what [TDCJ is] saying is they're doing all this good stuff but they're doing it [relying on these temperature logs], that's a problem.").

[389] ECF 155, TDCJ 30(b)(6) Dep. at 304:23-305:4.

[390] ECF 155, TDCJ 30(b)(6) Dep. at 38:13-39:11.

[391] *Id.*, 99:25-100:3, 161:8-12.

[392] *Id.*, 99:25-100:3, 161:13-21.

[393] Final Hearing Tr. (Aug. 1, 2024) at 254:19-23.

Mr. Collier's corrections and correctional risk management expert, Paul Morales, confirmed that air-conditioning TDCJ's facilities would "eliminate the risk of injury from the heat."[394] Mr. Collier himself acknowledged that he wants air-conditioning in all TDCJ facilities and recognized that air-conditioning is the best solution to reduce temperatures in TDCJ facilities.[395] He stated that the only reason air-conditioning has not been installed in all housing areas throughout TDCJ is because the Texas Legislature has not appropriated the funds to do so.[396]

Dr. Vassallo explained that TDCJ inmates are "still dying" from extreme heat despite the mitigation measures, because those measures "do[] not remove the heat."[397] Dr. Vassallo opined that having working air-conditioning has been "associated with an 80% reduction in the risk of death due to heat and cardiovascular disease and a 66% reduction in mortality due to cardiovascular disease."[398] "In one study, it was estimated that 50% of the deaths related to a heat wave could have been prevented with a working air conditioner. Lack of air conditioning was reported in 91% of deaths in one report."[399] Dr. Vassallo opined that this data is "directly applicable to the Texas prisons."[400] In her view, "excess morbidity and mortality in TDCJ facilities resulting from the extreme heat of the Texas summers can only be combatted by bringing the temperature in the prisons down."[401] "[P]utting everyone" in the TDCJ system "in air conditioned housing [is]

---

[394] Final Hearing Tr. (Aug. 2, 2024) at 283:8-16.

[395] *Id.* at 254:24-255:20.

[396] Pls.' Hearing Ex. 254, Mr. Collier's Resp. to Interr. 17.

[397] Final Hearing Tr. (July 31, 2024) at 39:4-12.

[398] ECF 50-2, Ex. B, S. Vassallo Decl., ¶ 40.

[399] *Id.*

[400] *Id.*

[401] *Id.*

the only way to eliminate the heat risk and the deaths and illnesses."[402] Or, as Dr. Vassallo put it, if "[y]ou remove the heat" through temperature control, then "nobody dies [from the] heat."[403]

According to the Skarha study, the risk of dying in Texas prisons with airconditioned housing areas actually decreased as the heat index increased.[404] There was no association between an increase in temperature and risk of death in prisons with air-conditioning—which indicates that air-conditioning has a protective effect on human health.[405]

Mr. Williams testified that TDCJ's mitigation measures are not an appropriate solution because they "accept[] the fact that" people "are going to die as a result of" the heat, and that the underlying problem "can't be fixed by other means."[406] In Mr. Williams's view, the only solution to the risks posed by extreme heat is air-conditioning.[407] Mr. Baldwin, likewise, agreed that the solution to the problem of extreme heat is to install air-conditioning.[408]

Mr. Malouff was in the Pack Unit when TDCJ installed temporary air-conditioning pursuant to Judge Ellison's order.[409] Unlike TDCJ's heat mitigation measures, Mr. Malouff believed that the temporary air-conditioning in the Pack Unit was effective at reducing the effects of the heat on him and his fellow inmates.[410]

---

[402] Final Hearing Tr. (July 31, 2024) at 71:11-14.

[403] *Id.* at 39:9-12.

[404] Pls.' Hearing Ex. 70 at 5.

[405] Final Hearing Tr. (July 30, 2024) at 162:22-163:2, 168:16-23; Pls.' Hearing Ex. 70 at 5.

[406] Final Hearing Tr. (July 31, 2024) at 255:3-19.

[407] Final Hearing Tr. (July 31, 2024) at 255:20-256:8.

[408] Final Hearing Tr. (Aug. 2, 2024) at 31:16-19.

[409] Final Hearing Tr. (July 30, 2024) at 187:13-17.

[410] *Id.* at 187:24-188:5.

**B.      Air-Conditioning the Entire TDCJ System is Feasible.**

TDCJ agrees that installing temporary air-conditioning is feasible, and if ordered by the Court to install air-conditioning, it would do so.[411] Mr. Collier also acknowledged that it is feasible to install temporary or permanent air-conditioning.[412] TDCJ's current Director of the Facilities Division, Mr. Ronald Hudson, likewise, agreed that temporary and permanent air-conditioning "can be installed i[n] every TDCJ facility."[413]

TDCJ's recent experience confirms that it can install temporary air-conditioning expeditiously when it has to. Mr. Malouff, who was in the Pack Unit when TDCJ installed temporary air-conditioning in response to Judge Ellison's order, offered unrebutted testimony that it took TDCJ 60 to 90 days to install it.[414]

TDCJ also installed temporary air-conditioning at several units in response to  Governor Abbott's statewide order for undocumented immigrants to be arrested on state criminal charges and incarcerated in TDCJ facilities—which was called "Operation Lone Star."[415] Because these individuals had not been convicted, TDCJ had to comply with the Texas Board of Jail Standards— which, among other things, require that indoor temperatures be between 65° and 85°.[416] To comply with Governor Abbott's order, TDCJ installed temporary air-conditioning in the Briscoe, Segovia, and Lopez Units,[417] and it did so in approximately three to four months—i.e., from May 2021 to

---

[411] ECF 155, TDCJ 30(b)(6) Dep. at 42:16-43:4, 120:3-10.

[412] Final Hearing Tr. (Aug. 2, 2024) at 258:13-16.

[413] *Id.* at 137:5-11.

[414] Final Hearing Tr. (July 30, 2024) at 187:18-23.

[415] Final Hearing Tr. (Aug. 2, 2024) at 126:20-127:10.

[416] *Id.* at 127:14-21 (Hudson); *id.* at 259:8-260:4 (Collier).

[417] *Id.* at 127:22-128:4.

August or September 2021.[418] Those units have all had temporary air-conditioning since then.[419] TDCJ did not have to go through a design phase to comply with Governor Abbott's order for Operation Lone Star.[420]

### C. TDCJ's Current Plan to Install Air-Conditioning is Inadequate.

TDCJ's current air-conditioning plan does not call for the installation of temporary air-conditioning to protect inmates while TDCJ is getting funding for, and designing and constructing, permanent air-conditioning at its unairconditioned facilities.[421] The figures Mr. Hudson provided for the cost of temporarily air-conditioning unairconditioned prisons are "pie in the sky" numbers, because TDCJ has not solicited any bids for installing temporary air-conditioning throughout the system.[422] TDCJ also has not solicited bids for installing permanent air-conditioning throughout the system.[423] According to the Texas Comptroller of Public Accounts' 2024-2025 Certification Revenue Estimate, Texas has an estimated $18.29 billion surplus for this upcoming legislative session.[424] And, although TDCJ has a multi-billion-dollar budget,[425] it has allocated only $115.5 million to adding air-conditioning since 2018.[426]

---

[418] *Id.* at 128:5-13.

[419] *Id.* at 84:6-12, 128:15-130:15.

[420] *Id.* at 156:15-18.

[421] Def.'s Hearing Ex. 21.

[422] Final Hearing Tr. (Aug. 2, 2024) at 123:15-124:23.

[423] *Id.* at 124:24-125:1.

[424] 2024-2025 Certification Revenue Estimate, Texas Comptroller of Public Accounts, https://comptroller.texas.gov/transparency/reports/certification-revenue-estimate/2024-25/docs/cre-2024-25.pdf. Under Rule 201 of the Federal Rules of Evidence, that Court may take judicial notice of a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. The Court finds that the Texas surplus as estimated by the Texas Comptroller of Public Accounts is such a fact, and that the Texas Comptroller of Public Accounts is a source whose accuracy cannot reasonably be questioned.

[425] Pls.' Hearing Ex. 266 at 35-39.

[426] Def.'s Ex. 17.

Approximately 96,500 of TDCJ's 142,240 beds remain unairconditioned.[427] When asked about Defendant's Exhibit 79, Mr. Hudson could not provide a month and year by when air-conditioning will be installed in any of the facilities highlighted in yellow or gray or not highlighted at all—a total of 62 facilities.[428] Mr. Hudson and Mr. Baldwin testified that, at TDCJ's average rate of installing air-conditioned beds since 2018 (1,376 beds per year), it would take 70 years—i.e., until 2094—to install air-conditioning throughout TDCJ.[429] Mr. Hudson also acknowledged that, even at a rate of 3,100 new air-conditioned beds per year (which is what TDCJ averaged in 2023 and 2024), it would take TDCJ 30 years—i.e., until 2054—to install permanent air-conditioning throughout the system.[430] Mr. Baldwin agreed that, as a general matter, it would be absurd, utterly unreasonable, and "not okay" to wait 70 years to fix a danger that is killing people.[431]

### D.  Other Prisons Air Condition Their Systems.

Since 1994, state-wide regulations adopted by the Texas Commission on Jail Standards have required all jails in Texas to maintain indoor temperatures between 65° and 85°.[432] Other government buildings in Texas must maintain "comfortable" levels (e.g., between 68° and 78°).[433] North Carolina's administrative code for its jail system requires "heating, ventilation, and air conditioning systems that are capable of maintaining temperatures in confinement units at not less

---

[427] Pls.' Hearing Ex. 204, Mr. Collier's Resp. to Interr. 2.

[428] Final Hearing Tr. (Aug. 2, 2024) at 151:4-21; Def.'s Hearing Ex. 79.

[429] *Id.* at 34:1-17 (Baldwin); *id.* at 141:6-142:2 (Hudson); Pls.' Hearing Exs. 150, 204.

[430] Final Hearing Tr. (Aug. 2, 2024) at 147:12-148:7; Def.'s Hearing Ex. 17.

[431] Final Hearing Tr. (Aug. 2, 2024) at 34:1-35:7, 38:24-40:15.

[432] 37 Tex. Admin. Code §§ 259.160, 260.154, 261.255.

[433] *See* 25 Tex. Admin. Code § 297.8 (a)(1) (providing that "room temperature for a typical occupied office or classroom environment should be kept between 72 to 76 degrees Fahrenheit in the summer and 70 to 75 degrees in Fahrenheit in the winter and controlled within a temperature range of ±2 degrees in Fahrenheit for a given day").

than 68 degrees Fahrenheit during the heating season and not more than 85 degrees Fahrenheit during the cooling season."[434] Tennessee requires that local correctional facilities "have a temperature of not less than sixty-five (65) degrees Fahrenheit and not more than eighty (80) degrees Fahrenheit."[435] And, while there are no requirements under federal law, the Bureau of Prisons operations manual says that target temperatures should be 76° in the summer and 68° in the winter, with the caveat that facilities may be a few degrees higher or lower.[436] TDCJ has nevertheless refused to implement the same (or similar) standards.

## CONCLUSIONS OF LAW

A plaintiff seeking a preliminary injunction must show that (1) they are likely to succeed on the merits, (2) there is a substantial threat of irreparable harm, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Book People, Inc. v. Wong*, 91 F.4th 318, 336 (5th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The overarching "analysis requires 'a balancing of the probabilities of ultimate success on the merits with the consequences of court intervention at a preliminary stage.'" *Texas v. United States*, 86 F. Supp. 3d 591, 646 (S.D. Tex. Feb. 16, 2015) (quoting *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975)). But, because the preliminary injunction's purpose is to "prevent irreparable injury" and "preserve the court's ability to render a meaningful decision on the merits," the court's "focus always must be on prevention of injury by a proper order." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974); *see also* Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2947 (3d ed.) ("[A] preliminary injunction is an injunction that is issued to protect

---

[434] ECF 50-1, D. Williams Decl. (Apr. 11, 2024) ¶ 19.
[435] *Id.* ¶ 20.
[436] *Id.* ¶ 16.

plaintiff from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the merits.").

"To show a likelihood of success [on the merits], the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasizing the plaintiffs are "not required to prove [their] case in full at a preliminary-injunction hearing"). Mr. Tiede and the Organizational Plaintiffs have done so here.

## I.    MR. TIEDE IS LIKELY TO SUCCEED ON THE MERITS OF HIS EIGHTH AMENDMENT CLAIM.

The Court has already determined that Mr. Tiede is "substantially likely to prove an Eighth Amendment violation because of his enhanced sensitivity to extreme heat due to his medical conditions." (ECF 17 at 4.) While TDCJ houses Mr. Tiede in an airconditioned cell, TDCJ only moved him there after the Court entered a temporary restraining order compelling the TDCJ to do so. *Id.* As for his continued placement in an airconditioned cell, the Court has also determined that "this voluntary cessation does not moot his request for relief, as it is not 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" (ECF 95 at 7 (quoting *Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009) (cleaned up), *aff'd*, 563 U.S. 277 (2011)).)

Mr. Tiede's condition has only worsened since the Court entered its  temporary restraining order, as he was diagnosed with a new "acute or subacute" stroke in his thalamus in April 2024.[437] Despite his undisputed heat-sensitive co-morbidities, Mr. Tiede has not been assigned a "heat score" that would require TDCJ to, consistent with its policy, place him in an air-conditioned

---

[437] *See* Findings of Fact, Section II, *supra*.

cell.[438] Most significantly, every TDCJ witness who testified at the hearing, including Mr. Collier, refused to commit to keeping Mr. Tiede in an airconditioned cell.[439] Thus, Mr. Tiede is at risk of being moved into unairconditioned housing at any time. The evidence also shows that placing Mr. Tiede in unairconditioned housing would be detrimental to his health and put him at substantial risk of serious harm, including death.[440] In particular, Dr. Vassallo offered unrebutted testimony that Mr. Tiede is particularly vulnerable to heat, and that placing Mr. Tiede in unairconditioned housing would put him at substantial risk of death or serious harm.[441]

In sum, the evidence remains sufficient to show that Mr. Tiede is substantially likely to prove an Eighth Amendment violation because of his enhanced sensitivity to extreme heat due to his medical conditions, exposing him to an ongoing risk of injury or death from extreme heat. For the same reasons as those set forth in Section VI. of these Conclusions of Law, Mr. Tiede has shown that any mitigation measures short of placement in an air-conditioned cell do not either eliminate the risk of heat-related illness and death to him. *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015) ("*Ball I*"). Thus, this relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. *See* 18 U.S.C. § 3626(a)(1).

## II.    THE ORGANIZATIONAL PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

The Organizational Plaintiffs have, likewise, shown (1) they are likely to succeed on the merits, (2) there is a substantial threat of irreparable injury, (3) the balance of harms favors an injunction, and (4) the public interest supports preliminary relief. *See Mock v. Garland*, 75 F.4th

---

[438] *See* Findings of Fact, Section II, *supra*.

[439] *See* Findings of Fact, Section II, *supra*.

[440] *See* Findings of Fact, Section II, *supra*.

[441] *See* Findings of Fact, Section II, *supra*.

563, 577 (5th Cir. 2023); *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022).

### A.    Plaintiffs have sufficiently shown an Eighth Amendment violation.

A prison official's failure to take reasonably adequate measures to protect inmates from extreme heat violates the Eighth Amendment when: (1) prison conditions pose an unreasonable risk of serious damage to a prisoner's health (i.e., the objective standard), and (2) the official acted with deliberate indifference to the risk posed (i.e., the subjective standard). *See, e.g., Yates v. Collier*, 868 F.3d 354, 361 (5th Cir. 2017) (collecting cases). What is cruel or unusual is not set in stone but is instead based on what is "socially acceptable," *Ball I*, 792 F.3d at 599, or consistent with "[a] sufficient national consensus," *Roper v. Simmons*, 543 U.S. 551, 562 (2005). In other words, the extreme deprivation of any "minimal civilized measure of life's necessities" violates the Eighth Amendment. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (citation omitted).

### 1.    Plaintiffs are substantially likely to prove the Eighth Amendment's objective standard.

As this Court has recognized, "[i]t is well-established in the Fifth Circuit that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures." (ECF No. 17 at 3 (internal quotation marks and brackets omitted).) Indeed, the Fifth Circuit has recognized this risk for at least the last twenty years. *See Gates v. Cook*, 376 F.3d 323, 340 (5th Cir. 2004). In the two decades since *Gates*, the Fifth Circuit has repeatedly acknowledged the serious risk of harm that excessive heat poses in the prison context absent adequate mitigating measures, and it has consistently found evidence sufficient in these cases to support an Eighth Amendment violation, even when certain mitigating measures were available. (*See* ECF No. 17 at 3 (quoting *Yates*, 868 F.3d at 359 and *Hinojosa v. Livingston*, 807 F.3d 657, 669 (5th Cir. 2015)).)

In *Gates*, the Fifth Circuit held that inmates in the Mississippi Department of Corrections faced a substantial risk of serious harm based on the MDOC's failure to "provide fans, ice water, and daily showers when the heat index is 90 degrees or above," *Gates,* 376 F.3d at 339–40, even though most of the inmates had the benefit of industrial sized fans as well as smaller personal fans. *Id.* at 334. In *Ball I*, the Fifth Circuit affirmed the district court's finding that the heat within a prison housing area posed a substantial risk of serious harm to inmates, where the heat index ranged from 81.5° to 107.79° and surpassed 100° on five or more days during a roughly two-week period. 792 F.3d at 590–94. The Fifth Circuit did so despite the fact that those inmates had continued access to potable water and ice. *Id.* at 590, 592. And in *Cole*, the court found that extremely hot conditions at TDCJ facilities (a heat advisory warned that the heat index could reach "near or above 108" degrees) constituted a substantial risk of serious harm sufficient to satisfy the Eighth Amendment's objective test. 2017 WL 3049540, at *39 (Ellison, J.).

Here, Plaintiffs have, likewise, shown that extreme heat in TDCJ's uncooled prisons constitutes a well-established substantial risk of serious harm that constitutes cruel and unusual punishment. Approximately 96,500 of TDCJ's 142,240 beds remain unairconditioned.[442] In the last two summers, TDCJ logs have shown heat indexes outside as high as 134°, and indoor temperatures above 85° nearly every day from May 1, 2023 to September 30, 2023.[443] This evidence is consistent with testimony from current and former prisoners who have observed temperatures in their units exceeding 110° and 130°.[444] TDCJ agrees that outdoor temperatures at every Texas prison are expected to exceed 85° each summer, and that temperatures prisoners are

---

[442] *See* Findings of Fact, Section VI.C., *supra*.

[443] *See* Findings of Fact, Section III.A., *supra*.

[444] *See* Findings of Fact, Section III.A., *supra*.

exposed to inside unairconditioned prisons are so high and dangerous that they require adequate mitigation measures.[445] Unfortunately, the heat will only get worse. As Dr. Mearns explains, "increasing temperatures, increasing extreme temperatures, and more frequent heat waves" are likely to continue, which will result in an increasing heat index, and number of hours per day with extreme heat index values."[446] Mr. Collier has offered no evidence to the contrary and, in fact, acknowledged that summers are hot in Texas, have been hot for years, and they are likely to continue to be hot.[447]

It is undisputed that heat "is one of the leading weather-related killers in the United States, resulting in hundreds of fatalities each year."[448] As set forth above, a heat index of 88° or higher poses a substantial risk of adverse health outcomes for everyone—even young, healthy people.[449] Those risks include heat exhaustion, heat rash, dehydration, heat cramps, heat syncope, and heat stroke—the last of which carries a "high mortality rate" and can have lasting negative health consequences for those people who do not die.[450] High heat also exacerbates mental illness.[451] People with mental health disorders exhibit higher rates of suicidality, agitation, impulsivity, and slowing of cognitive processing, and it causes mental health episodes requiring hospitalization.[452]

These risks were uncontested by Mr. Collier. Indeed, TDCJ's own training documents acknowledge that "[i]ncreased body temperatures, if left uncontrolled, may lead to delirium,

---

[445] *See* Findings of Fact, Section III.A., *supra*.
[446] *See* Findings of Fact, Section III.A., *supra*.
[447] *See* Findings of Fact, Section III.A., *supra*.
[448] *See* Findings of Fact, Section III.A., *supra*.
[449] *See* Findings of Fact, Section III.A., *supra*.
[450] *See* Findings of Fact, Section III.A., *supra*.
[451] *See* Findings of Fact, Section III.A., *supra*.
[452] *See* Findings of Fact, Section III.A., *supra*.

convulsions, seizures, and possibly even death."[453] Mr. Collier's Rule 30(b)(6) designee acknowledged that extreme heat is a dangerous condition in the system that "has killed inmates, and [has] caused numerous inmates and officers to suffer heat-related illnesses."[454] And Mr. Collier's own internal medicine expert, Dr. Jane Leonardson, agreed that people exposed to severe environmental heat between 90° to 105° F are at serious risk of illness and death.[455]

Plaintiffs need not prove "that death or serious injury has already occurred" to satisfy the Eighth Amendment's objective standard. *Ball I*, 792 F.3d at 593 (citation omitted). Instead, they need only show "a substantial *risk* of serious harm" from the extreme heat. *Id.* at 594. Even so, Plaintiffs' experts Dr. Julie Skarha and Dr. Antonella Zanobetti established that nearly three hundred deaths were attributable to extreme heat in Texas prisons without air-conditioning between 2001 to 2019, or an average of 14 deaths per year.[456] Dr. Skarha and Dr. Zanobetti concluded that a one-degree increase above 85° corresponds to a 0.7% increase in the risk of mortality.[457]

Neither heat-related deaths nor heat-related illnesses have abated since 2019. TDCJ admitted to three heat-related deaths of inmates just last summer alone.[458] That number is almost certainly an undercount, given Plaintiffs' unrebutted evidence of two additional heat-related deaths (neither of which were classified as such by TDCJ), and TDCJ's failure to timely perform autopsies, failure to consistently take core body temperatures, and refusal to classify a death as

---

[453] *See* Findings of Fact, Section II.IA., *supra*.

[454] *See* Findings of Fact, Section II.IA., *supra*.

[455] *See* Findings of Fact, Section III.A., *supra*.

[456] *See* Findings of Fact, Section IV.B., *supra*.

[457] *See* Findings of Fact, Section IV.B., *supra*.

[458] *See* Findings of Fact, Section IV.C., *supra*.

"heat-related" unless heat was the *sole* cause of the inmate's death.[459] Plaintiffs, likewise, presented unrebutted testimony from Dr. Zanobetti and Dr. Skarha that inmates in unairconditioned Texas prisons will continue to die from the heat.[460]

The heat also continues to cause inmates and staff to suffer heat-related illnesses. TDCJ's public reports to the Texas Legislature acknowledged 17 TDCJ inmates suffered heat-related illnesses in 2023, though Plaintiffs' evidence shows this too is likely an undercount, with TDCJ's medical services provider, UTMB, reporting 35 prisoners with heat-related injuries in just June 2023 alone.[461] According to TDCJ's training documents, heat-related illness is the fifth-leading cause of serious injuries among TDCJ employees.[462] TDCJ also reported 35 heat-related illnesses of staff to the Texas Legislature in 2023, and Plaintiffs presented evidence of nearly 80 heat-related workers' compensation claims filed by staff in 2022 and 2023.[463]

Notably, these deaths and heat-related illnesses and injuries occurred during a summer when Mr. Collier's witnesses testified and TDCJ documents indicate the prisons were implementing all of TDCJ's heat mitigation measures, including their "heat score" system, access to cooled respite areas, distribution of water and ice, cool showers, and fans.[464] Based on this evidence, Plaintiffs have shown that every TDCJ inmate in an unairconditioned cell faces a substantial risk of death or serious bodily injury from the extreme heat, absent Court intervention. Plaintiffs have thus satisfied the Eighth Amendment's objective standard for the purposes of a preliminary injunction motion.

---

[459] *See* Findings of Fact, Section IV.D-IV.G., *supra*.

[460] *See* Findings of Fact, Section IV.B., *supra*.

[461] *See* Findings of Fact, Section IV.G., *supra*.

[462] *See* Findings of Fact, Section IV.H., *supra*.

[463] *See* Findings of Fact, Section IV.H., *supra*.

[464] *See* Findings of Fact, Section V., *supra*.

### 2. Plaintiffs are substantially likely to show that Mr. Collier acted with deliberate indifference.

To satisfy the Eighth Amendment's subjective standard, Plaintiffs must show that it is substantially likely that Mr. Collier "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). This knowledge can be inferred "from circumstantial evidence," and the Court "may conclude that [Mr. Collier] knew of a substantial risk of serious harm from the very fact that the risk was obvious." *Gates*, 376 F.3d at 333, 340 (affirming finding of deliberate indifference "based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness"); *see also Ball I*, 792 F.3d at 595 (affirming finding of deliberate indifference based "on the totality of the record evidence" showing prison official's subjective knowledge). This knowledge may also be shown by evidence that the risk is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," and "the circumstances suggest that [Mr. Collier]" was exposed to that information. *Farmer*, 511 U.S. at 842–43. These standards are easily met here.

> **a.** *Mr. Collier knows that inmates face a substantial risk of serious harm, and the risk is obvious, well-documented, long-standing, pervasive, and expressly noted by TDCJ officials in the past.*

To begin with, Plaintiffs have offered evidence showing a substantial likelihood that Mr. Collier knows that inmates face a substantial risk of serious harm from the extreme heat in Texas's unairconditioned prisons, and that risk of harm is obvious, well-documented, long-standing, pervasive, and has been expressly noted by TDCJ officials in the past.

First, Mr. Collier admitted during the hearing that he was aware of the several heat-related deaths, multiple heat-related illnesses of inmates, dozens of workers' compensation claims, dozens of staff-related illnesses, and thousands of heat-related grievances from inmates just in the last two

summers.[465] He heard the testimony of Plaintiffs' experts—Drs. Biswas, Skarha, Zanobetti, Vassallo, and Uribe—regarding the risks posed by extreme heat, the heat-related deaths and illnesses of TDCJ inmates, and the inadequacy of TDCJ's heat-mitigation measures. And Mr. Collier knows that this is not a new phenomenon. Indeed, he testified under oath in the *Cole* case that he believed during the summer of 2019 that inmates confined in temperatures of 95° were at a serious health risk.[466] Mr. Collier's Rule 30(b)(6) designee also acknowledged that the temperatures TDCJ inmates are exposed to during the summer months are so high and potentially dangerous that they are at a very real risk of harm and serious injury, unless adequate measures are taken to protect them.[467] And he admitted that extreme heat is a dangerous condition in the system that "has killed inmates, and [has] caused numerous inmates and officers to suffer heat-related illnesses."[468] Thus, Mr. Collier is personally aware of the substantial risk of harm faced by TDCJ inmates in unairconditioned prisons, despite TDCJ's heat-mitigation measures.

Second, Mr. Collier is well-aware of the substantial risk of harm from extreme heat, given the numerous lawsuits that have been filed against him, his predecessors, and TDCJ over the last twenty-five years for deaths and serious illnesses caused by extreme heat. TDCJ has previously acknowledged heat-related deaths dating back to 1998. As Judge Keith P. Ellison found in a case arising out of the death of TDCJ prisoner Larry McCollum:

> It is undisputed that five men died in 1998 from environmentally-caused hyperthermia while incarcerated in TDCJ facilities. Between 1999 and 2010, five more individuals are known to have died from hyperthermia or other heat-related illnesses while incarcerated in Texas prisons. In 2011, Texas experienced an

---

[465] *See* Findings of Fact, Section V., *supra*.

[466] *See* Findings of Fact, Section IV.A., *supra*. In that case, Judge Ellison found that Mr. Collier was aware that a risk of serious harm existed as a result of the extreme temperatures in the Pack Unit and, alternatively, that the risk of harm was obvious. *See Cole*, 2017 WL 3049540, *40.

[467] *See* Findings of Fact, Section IV.A., *supra*.

[468] *See* Findings of Fact, Section IV.A., *supra*.

"unprecedented" heat wave, and ten more individuals died from hyperthermia. McCollum was the second individual to die of heat-related illness during the summer of 2011.

*McCollum v. Livingston,* No. 4:14-CV-3253, 2017 WL 608665, at *1 (S.D. Tex. Feb. 3, 2017). As the Fifth Circuit has recognized, "TDCJ officials are, or have been, defendants in numerous other cases alleging Eighth Amendment violations based on excessive heat in prison." *Yates*, 868 F.3d at 360 (citing *Hinojosa*, 807 F.3d at 661 (deciding appeal involving TDCJ prisoner who suffered a seizure at night due to high indoor temperatures, "[fell] out of his bed and was convulsing," and died twenty minutes later); *Webb v. Livingston*, 618 F. App'x 201, 204 (5th Cir. 2015) (deciding appeal involving the "heat-related deaths of five prisoners who died while housed in facilities operated by [TDCJ]"); *Valigura v. Mendoza*, 265 F. App'x 232, 233–34 (5th Cir. 2008) (deciding appeal involving prisoner who alleged that "temperatures in the bunk area reached into the nineties and hundreds due to poor ventilation" and that "he was not able to use the restroom or showers without lengthy waits, which caused him severe discomfort"). Mr. Collier admitted that he was aware of ten heat-related deaths in the summer of 2011 alone. Thus, these lawsuits not only placed Mr. Collier on notice of the substantial risk of serious harm Texas inmates face from extreme heat; they also established the obviousness of that risk.

Third, multiple studies were sent to Mr. Collier personally, warning him and TDCJ that heat-related deaths had occurred in TDCJ prisons. For instance, the study published by Dr. Skarha and Dr. Zanobetti in 2022 concluded that there were 271 deaths attributable to extreme heat in Texas prisons without air-conditioning from 2001 to 2019—an average of 14 deaths per year.[469] The same study concluded that there was not a single heat-related death in TDCJ's climate-

---

[469] *See* Findings of Fact, Section IV.A., *supra*.

controlled prisons during this period.[470] Likewise, a study published by Texas A&M in 2022 revealed that 29% of the TDCJ inmates surveyed said that they knew at least one heat-related death in their own unit or at another.[471] The A&M Study also warned that "increasing annual temperatures and the increase of days over 100 degrees in Texas will continue to exacerbate the degradation of health for both incarcerated people and staff in the TDCJ system."[472] Mr. Collier admitted during the hearing that he received both of these studies and reviewed them.[473]

Last, Mr. Collier is well-aware of the substantial risk of serious harm from extreme heat, because of safe-temperature mandates in jails and federal prisons in Texas and in other state prison systems across the country. Since 1994, state-wide regulations adopted by the Texas Commission on Jail Standards have required all jails in Texas to maintain indoor temperatures between 65° and 85°.[474] Notably, this range departs significantly from that required inside other government buildings in Texas to maintain "comfortable" levels (e.g., between 68° and 78°).[475] North Carolina, Tennessee, and the federal Bureau of Prisons have implemented similar standards.[476] TDCJ has nevertheless refused to do the same.

> ### b. Mr. Collier's response to the substantial risk of death and serious harm from extreme heat is inadequate and unreasonable.

The "mere presence of remedial measures" is not a defense to an Eighth Amendment violation. *Webb*, 618 F. App'x at 209 n.7; *see also Cole*, 2017 WL 3049540, at *41 (rejecting Mr.

---

[470] *See* Findings of Fact, Section IV.A., *supra*.

[471] *See* Findings of Fact, Section V., *supra*.

[472] *See* Findings of Fact, Section V., *supra*.

[473] *See* Findings of Fact, Section V., *supra*.

[474] *See* Findings of Fact, Section VI.D., *supra*.

[475] *See* Findings of Fact, Section VI.D., *supra*.

[476] *See* Findings of Fact, Section VI.D., *supra*.

Collier's argument TDCJ was not deliberately indifferent simply because TDCJ "implemented several mitigating measures since the deaths in 2011 and 2012"). Prison officials cannot "insist[] upon a course of action that has already proven futile." *Lewis v. Cain*, No. CV 15-318-SDD-RLB, 2023 WL 7299130, at *47 (M.D. La. Nov. 6, 2023). Nor can they rely on mitigation measures that have nothing more than a "negligible impact" on the danger posed to inmates from extreme heat. *Laube v. Haley*, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002). They are instead required to implement mitigation measures that "adequate[ly] . . . protect inmates from the extreme heat." *Webb*, 618 F. App'x at 209 n.7; *see also Cole*, 2017 WL 3049540, at *41 ("[T]he effectiveness of the measures implemented by TDCJ is relevant to the Court's analysis.").

Seven years ago, Judge Ellison held that many of the same mitigation measures Mr. Collier relies on here—respite rooms, cold showers, access to ice water, and fans—"do not stop Plaintiffs from experiencing the symptoms of heat-related illnesses and do not reduce the risk of serious injury or death to a socially acceptable level." *Cole*, 2017 WL 3049540, at *40. Judge Ellison explained that those measures were, "by and large ineffective at reducing the heat stress placed on Plaintiffs' bodies" and were nothing more than "the bare minimum." *Id.* at *40-42. By implementing such measures, Judge Ellison held, Mr. Collier "ignored the risk of harm faced by the population [he] serve[s]" and was thus deliberately indifferent to the substantial risk of serious harm that inmates in the Pack Unit faced from the extreme heat. *Id.* at *42. The Texas House Corrections Committee reached the same conclusion the following year: "Based on the medical information known about human health and heat-related health risks, TDCJ cannot rely only on mitigation factors to assure the well-being of inmates and corrections personnel."[477]

---

[477] *See* Findings of Fact, Section V., *supra*.

Despite Judge Ellison's rebuke, and the Texas Legislature's clear mandate, and despite having seven years to adequately address the substantial risk of serious harm that extreme heat poses to inmates in unairconditioned cells, Mr. Collier has failed to do so. Indeed, he largely relies on the same mitigation measures in this case that Judge Ellison found inadequate in the *Cole* case.

Unsurprisingly, the uncontroverted evidence shows that those heat-mitigation measures are *still* inadequate seven years later. Even when available, respite is, by its very nature, temporary and places the onus on inmates to recognize when they are developing symptoms of a heat-related illness, even though such symptoms can be subtle and can include cognitive impairments that render an inmate unable to help themselves.[478] Cold showers, even when available, have no statistically significant impact on heat-related mortality and, at best, provide relief for only a few minutes.[479] Fans are not only ineffective but actually *increase* the risk of heat-related illness at heat indexes over 99°.[480] Even unfettered access to ice and water, which Plaintiffs' evidence demonstrates is inconsistent, is insufficient.[481] The Court notes again that TDCJ surveillance video captured Mr. Castillo visiting the water cooler 23 times in the 24 hours before his heat-related death and Mr. Womack was seen passing water bottles in his cell in the hours before his death.[482] And, as Professor Deitch testified, even if these measures worked in theory, understaffing has had an "enormous impact" on TDCJ's ability to implement these heat-mitigation measures.[483]

Nor is TDCJ's "heat score" system—which was implemented as a result of the settlement in the *Cole* case—an adequate remedy to the substantial risk of serious harm faced by TDCJ

---

[478] *See* Findings of Fact, Section V.A., *supra*.

[479] *See* Findings of Fact, Section V.C., *supra*.

[480] *See* Findings of Fact, Section V.D., *supra*.

[481] *See* Findings of Fact, Section V.E., *supra*.

[482] *See* Findings of Fact, Section IV.C.2., *supra*.

[483] *See* Findings of Fact, Section V.A., *supra*.

inmates in unairconditioned facilities. To begin with, although *all* TDCJ inmates (even the young and healthy) face such a risk, only approximately 12,289 of the 134,500 individuals incarcerated in the TDCJ system (i.e., less than 10%) have a heat score. [484] This is reason enough to find the system inadequate. Nor does the system even accomplish its purported goal of protecting especially vulnerable, heat-sensitive inmates. For instance, inmates do not automatically receive a score for having mental illness, taking one of the many medications that impair thermoregulation, or being above the age of 65—all of which Plaintiffs' experts identified as making inmates more susceptible to heat. [485] Indeed, many of the medical conditions and medications that UTMB's policies identify as affecting heat tolerance are not incorporated into TDCJ's heat score algorithm either. [486] If Mr. Tiede—who is 65 years old and has been diagnosed with a stroke, diabetes, hypertension, pulmonary disease, and obesity—does not have a heat score, [487] then the system is arbitrary and ineffective at accomplishing even its stated, already underinclusive goal of protecting heat-sensitive inmates. Mr. Collier thus cannot rely on the heat score system to avoid liability under the Eighth Amendment.

Most troubling to the Court, however, is the fact that none of these measures prevented (i) the several dozen deaths that Ds. Skarha and Dr. Zanobetti attributed to heat even after heat-mitigation measures were implemented, (ii) the three heat-related deaths that Mr. Collier admits occurred last summer, (iii) the two additional heat-related deaths that Dr. Uribe and Dr. Vassallo testified occurred last summer, or (iv) the 35 heat-related illnesses of TDCJ inmates identified by UTMB that occurred in 2022 and 2023. In short, TDCJ's mitigation measures have "not stop[ped]

---

[484] *See* Findings of Fact, Section V.A., *supra*.

[485] *See* Findings of Fact, Section V.A., *supra*.

[486] *See* Findings of Fact, Sections II. and V.A., *supra*.

[487] *See* Findings of Fact, Section VI.C., *supra*.

[TDCJ inmates] from experiencing the symptoms of heat-related illnesses and [did] not reduce the risk of serious injury or death to a socially-acceptable level." *Cole*, 2017 WL 3049540, at *40.

What Mr. Collier has *not* done "in the face of the substantial risk of harm is also relevant to the Court's analysis." *Id.* at *42. Despite knowing of the risks extreme heat poses to all inmates and the inadequacy of TDCJ's mitigation measures, Mr. Collier has no concrete timeline for installing permanent or temporary air-conditioning in TDCJ inmate living areas.[488] TDCJ has not solicited bids for installing either temporary or permanent air-conditioning throughout TDCJ facilities.[489] Although Mr. Collier has added 8,940 cooled beds since 2018 (including the 1,436 ordered as part of the Pack Unit settlement), this averages only 1,376 beds per year.[490] At that rate, it would take TDCJ approximately 70 years—i.e., until 2094—to install air-conditioning throughout the system.[491]  Even crediting the most favorable evidence introduced at the hearing to Mr. Collier, it will take 25 to 30 years to add air-conditioning to all inmate living areas, assuming the Texas Legislature allocates funds to do so.[492] This timeline exposes over 95,000 inmates to the substantial risk of serious injury or death from unairconditioned prisons and, with inmate turnover, would continue to expose hundreds of thousands of inmates to the substantial risk of injury or death from extreme heat over the next two to three decades. Mr. Collier, likewise, did not identify (let alone present any evidence of) a less intrusive alternative to temperature control that would reduce the risk of death and serious bodily injury to a "socially acceptable level." *Ball I*, 792 F.3d at 599.

---

[488] *See* Findings of Fact, Section VI.C., *supra*.

[489] *See* Findings of Fact, Section VI.C., *supra*.

[490] *See* Findings of Fact, Section VI.C., *supra*.

[491] *See* Findings of Fact, Section VI.C., *supra*.

[492] *See* Findings of Fact, Section VI.C., *supra*.

In sum, the Court finds that, despite a significant risk of harm faced by inmates in unairconditioned TDCJ prisons, Mr. Collier has implemented mitigation measures he knows are inadequate—and which are obviously inadequate—to reduce the substantial risks of serious harm posed by extreme heat. And he has implemented (or has a plan to implement) the only reasonable mitigation measure that he knows is adequate to reduce or eliminate the risk—air-conditioning—at a pace that disregards the substantial risk of harm the inmates face. Thus, based on the totality of the evidence, it is substantially likely that Mr. Collier has acted with deliberate indifference. Accordingly, Plaintiffs have shown a likelihood of success on the merits of their Eighth Amendment claim.

### B.    The Organizational Plaintiffs have established associational standing.

The Court has already determined that Plaintiffs have standing, and that the Organizational Plaintiffs "meet the requirements of associational standing." ECF 95 at 6–10 (denying Mr. Collier's Rule 12(b)(1) motion to dismiss). With respect to the latter, the Court specifically determined that "at least one of the Organizational Plaintiffs, Lioness, is a traditional membership organization with hundreds of members who are TDCJ prisoners," and that "the Organizational Plaintiffs' members are not required to participate in this lawsuit individually." ECF 95 at 8, 10.

While the Court does not need to revisit these determinations,[493] the evidence further confirms that Lioness is a traditional "voluntary membership organization with identifiable members."[494] *SFFA III*, 600 U.S. at 201. The evidence shows that Lioness has hundreds of

---

[493] *See, e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA II*"), 397 F. Supp. 3d 126, 184 (D. Mass. 2019) (relying on earlier associational standing analysis when denying Rule 12(b)(1) as part of the court's post-trial conclusions of law) (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA I*"), 261 F. Supp. 3d 99, 110–11 (D. Mass. 2017)) (cited with approval in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.* ("*SFFA III*"), 600 U.S. 181, 199 (2023)).

[494] *See* Findings of Fact, Section I.A., *supra*.

members who have joined voluntarily, support the organization's mission, and are current TDCJ prisoners assigned to unairconditioned units.[495] Moreover, Lioness's members would have standing to sue in their own right—members housed in unairconditioned units in particular face "substantial risk of serious harm and death" from the extreme heat, that injury is traceable to Mr. Collier's deliberate indifference and refusal to take the necessary steps to protect members from the extreme summer heat, and the injunctive relief sought will redress their injuries. *See Crawford v. Hinds Cty. Bd. of Supervisors*, 1 F.4th 371, 375 (5th Cir. 2021) (listing elements for Article III standing). Under *SFFA III*, that is all the evidence that is required to support associational standing. 600 U.S. at 201; *see also VanDerStok v. Garland*, 680 F. Supp. 3d 741, 762 (N.D. Tex. 2023) (relying on affidavits from organizations' leadership describing membership to find that they are traditional membership organizations), *vacated in part on other grounds*, 86 F.4th 179 (5th Cir. 2023); *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *6 (N.D. Tex. Mar. 29, 2024) (same). "Where, as here, an organization has identified members and represents them in good faith, [the Supreme Court's decisions] do not require further scrutiny into how the organization operates." *SFFA III*, 600 U.S. at 201. In short, Lioness is a traditional voluntary membership organization that has standing to sue on behalf its members.

Although the Court only needs to find standing for at least one Plaintiff, the evidence also shows that the remaining Organizational Plaintiffs also meet the requirements for associational standing, as they have constituents housed in unairconditioned units who "were effectively members" of the organization. *Id.* at 199–200 (discussing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 336–44 (1977)). The Court finds that CTD, TCPA, and TX C.U.R.E. each have standing to assert claims on behalf of their constituents, which includes TDCJ

---

[495] *See* Findings of Fact, Section I.A., *supra*.

prisoners housed in unairconditioned units because those prisoners possess sufficient "indicia of membership" in their respective organizations.[496] *Hunt*, 432 U.S. at 344-45.

*Hunt*'s "indicia of membership" test ensures that an organization "represent[s] the individuals it claims as members" and "provide[s] the means by which those individuals express their collective views and protect their collective interest." *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 n.9 (5th Cir. 2012). The test is satisfied when a group serves a "specialized segment" of the community that is "the primary beneficiary of its activities." *Hunt*, 432 U.S. at 344; *see also Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (finding associational standing where constituents—incapacitated criminal defendants—comprised a "specialized segment" of the community that was the primary beneficiary of the group's activities); *AARP*, 226 F. Supp. 3d at 17 (finding associational standing where an organization with a "defined mission" serves a "discrete, stable membership with a definable set of common interests").

CTD, TCPA, and TX C.U.R.E. each have a "defined mission" and serve a "discrete" segment with a "definable set of common interests" in this action.[497] *AARP*, 226 F. Supp. 3d at 17; *see also Am. Leg. Found. v. F.C.C.*, 808 F.2d 84, 90 (D.C. Cir. 1987). Specifically, TPCA and TX C.U.R.E. serve incarcerated Texans and their families, and CTD serves Texans incarcerated with disabilities.[498] The organizations' constituents also play a role in "guiding [the organization's]

---

[496] As Lioness is a traditional membership organization the "indicia of membership" analysis does not need to be addressed. *See SFFA III*, 600 U.S. at 201; *La Unión Del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509, 526 (W.D. Tex. 2022). However, even if Lioness were subject to the "indicia of membership" test for associational standing, it would satisfy the criteria. *See, e.g.*, *AARP v. United States Equal Employment Opportunity Comm'n*, 226 F. Supp. 3d 7, 17 (D.D.C. 2016) (finding that the Court need not address whether AARP was a "traditional membership organization" where it otherwise "satisfies the 'indicia of membership' criteria").

[497] *See* Findings of Fact, Sections I.B. through I.D., *supra*.

[498] *See* Findings of Fact, Sections I.B. through I.D., *supra*.

activities" and can "participate directly in making and implementing day-to-day decisions."[499]  TX C.U.R.E. engages in directly with its constituents, including specific individuals who "have suffered from exposure to excessive heat" in an unairconditioned TDCJ unit.[500] TPCA similarly engages regularly with its incarcerated constituents and has "team members" inside TDCJ prisons work directly with the organization.[501] And CTD's board is "directly selected from its members" and its members "financially support the organization."[502] Thus, each of these organizations "is sufficiently identified with and subject to the influence of those it seeks to represent as to have a personal stake in the outcome of the controversy." *Mink*, 322 F.3d at 1111 (quotations omitted). Under *Hunt*'s "indicia of membership" test, CTD, TCPA, and TX C.U.R.E. also have associational standing to represent the interests of their constituents.

**C.    The Prison Litigation Reform Act's ("PLRA") exhaustion requirement does not apply to the Organizational Plaintiffs.**

Nor are the Organizational Plaintiffs required to exhaust under the PLRA. The Organizational Plaintiffs are not persons capable of being incarcerated or detained, so they are not "prisoners" as the term is defined by the Act. 42 U.S.C. § 1997e(a), (h); *Alabama Disabilities Advoc. Pgm. v. Wood*, 584 F. Supp. 2d 1314, 1316 (M.D. Ala. 2008); *Dunn v. Dunn,* 219 F. Supp. 3d 1163, 1176 (M.D. Ala. 2016). The PLRA's exhaustion requirement thus does not apply to them.

This holding is consistent with those of other courts that have found that those who sue as representatives of prisoners are not "prisoners" under the PLRA, and thus are not bound by the exhaustion requirements of the PLRA. *See, e.g.*, *Tretter v. Pennsylvania Dept. of Corrections*, 558

---

[499] *See* Findings of Fact, Sections I.B. through I.D., *supra*.
[500] *See* Findings of Fact, Section I.B., *supra*.
[501] *See* Findings of Fact, Section I.C., *supra*.
[502] *See* Findings of Fact, Section I.D., *supra*.

F. App'x 115, 157 (3rd Cir. 2014) (unpublished) (representative of deceased inmate and administratrix of his estate was not a "prisoner" required to exhaust administrative remedies); *Rivera-Rodriguez v. Pereira-Castillo,* No. 04-1389(HL), 2005 WL 290160, *6 (D.P.R. Jan. 31, 2005) (finding that the plain language of the PLRA excludes family members and guardians of incarcerated minors); *see also Wormley v. United States,* 601 F. Supp. 2d 27, 46 (D.D.C. 2009) (finding PLRA applies only to a "prisoner" and does not require exhaustion by non-prisoners even for claims related to their earlier detentions).

The Court declines to follow the holding of *Green Haven Prison Preparative Meeting of Religious Society of Friends v. New York State Department of Corrections and Community Supervision*, 16 F.4th 67 (2d. Cir. 2021). Central to the holding in that case was the finding that those prisoners formed their organization expressly to avoid the requirements of the PLRA. *Id.* at 82. No such evidence exists here; instead, Plaintiffs' evidence demonstrates that each of the Organizational Plaintiffs existed for several years before this suit was filed.[503] Plaintiffs' evidence also shows that though obtaining air-conditioning for Texas prisoners is central to the missions of the Organizational Plaintiffs, it is not the only mission of the Organizational Plaintiffs who advocate more broadly for safe prison conditions for their members and constituents.[504]

## III.    TDCJ PRISONERS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

"[A] harm is irreparable, in the context of a preliminary injunction, where there is no adequate remedy at law[.]" *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). "An injunction is of no help if one must wait to suffer injury before the court grants it." *Texas v. United States*, 809 F.3d 134, 173 n.137 (5th Cir. 2015). For this reason, "[w]hen an alleged deprivation of a

---

[503] *See* Findings of Fact, Sections I.B. through I.D., *supra*.
[504] *See* Findings of Fact, Sections I.B. through I.D., *supra*.

constitutional right is involved, . . . most courts hold that no further showing of irreparable injury is necessary." Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) (quoted in *Cole*, 2017 WL 3049540, at *43).

Plaintiffs have shown that TDCJ inmates in unairconditioned prisons will experience irreparable harm, absent court intervention. TDCJ's own public reports to the Texas Legislature from 2023 identify that, at minimum, three TDCJ inmates died and 17 more were injured as a result of the extreme heat in their unairconditioned living areas last summer.[505] Plaintiffs' evidence, including the testimony of Drs. Skarha, Zanobetti, Vassallo, and Uribe, demonstrate that extreme heat has injured and killed additional TDCJ inmates in addition to those identified by TDCJ itself.[506]

And the symptoms inmates suffer—standing alone—are constitutionally significant injuries justifying preliminary relief. *See Blackmon v. Garza*, 484 F. App'x 866, 872 (5th Cir. 2012) (headaches, dizziness, nausea, lightheadedness, difficulty catching breath, and blurred vision, even without medical documentation of the symptoms, are sufficient injuries).[507]

The record evidence shows that exposure to the risks of extreme heat itself is also irreparable injury requiring preliminary relief. *See Ball I*, 792 F.3d at 593-94. Dr. Vassallo testified that exposure to a heat index of 88° or higher poses a substantial risk of adverse outcomes for everyone and, again, Defendant's witness, Dr. Leonardson agreed that temperatures at and above 90° exposes inmates to a serious risk of heat-related illness and death.[508] While the Court acknowledges that Mr. Collier has a goal of installing air-conditioning throughout the inmate

---

[505] *See* Findings of Fact, Sections IV.C. and IV.G., *supra*.

[506] *See* Findings of Fact, Sections IV.D. through IV.G., *supra*.

[507] *See* Findings of Fact, Section III.A., *supra*.

[508] *See* Findings of Fact, Section III.A., *supra*.

living areas in all TDCJ prisons, goals to make prisons safe do not satisfy the Eighth Amendment, and hundreds of thousands of inmates will remain exposed to high temperatures in TDCJ's unairconditioned prisons in the 25 to 30 years it will take to air-condition all inmate living areas. Without court intervention, TDCJ inmates will thus continue to suffer scores of heat-related deaths and injuries.

The Court finds there is no adequate remedy at law for these constitutional violations, as they will continue absent injunctive relief.

### IV.   THE REMAINING FACTORS FAVOR INJUNCTIVE RELIEF.

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987). When the state or one of its officials is a party, as is the case here, the balance of hardship is considered in tandem with the public's interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *United States v. Abbott*, No. 23-50632, 2024 WL 3580743, at *11 (5th Cir. July 30, 2024).

Mr. Collier has tried to defend the unconstitutional and inhumane living conditions based on the lack of money at his disposal, and the Texas Legislature not having funded state-wide air-conditioning in TDCJ prisons. But "[e]ven if the remedies ordered would be 'fiscally catastrophic' for TDCJ, . . . the Fifth Circuit has held that 'inadequate resources can never be an adequate justification for depriving any person of his constitutional rights.'" *Cole*, 2017 WL 3049540, at *43 (quoting *Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986)); *see also Gates*, 501 F.2d at 1319 (collecting cases where "the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts"). Put another way, Mr. Collier's obligation "to eliminate existing unconstitutionalities does not depend upon what the Legislature may do, or upon what the Governor may do, or, indeed, upon what [he]

may actually be able to accomplish." *Wyatt v. Aderholt*, 503 F.2d 1305, 1315 (5th Cir. 1974); *see also Farmer*, 511 U.S. at 853-54 (Blackmun, J., concurring) ("[O]ur Constitution sets minimal standards governing the administration of punishment in this country, and thus it is no answer to the complaints of the brutalized inmate that the resources are unavailable to protect him from what, in reality, is nothing less than torture." (citation omitted)).

The Court agrees with the reasoning of the court in *Jones'El v. Berge*, which found that:

> [i]t is no defense for defendants to argue that the taxpayers may object to providing air conditioning to state prisoners.  Defendants constructed a facility in which inmates are subjected to temperatures that can pose a serious risk to their well-being, particularly if they are taking medications or have health conditions that prevent their bodies from adjusting to high heat. If air conditioning is the only means of avoiding that risk, that is a function of defendants' decisions to build the facility as they did. Leaving inmates vulnerable to serious health consequences or death is not a reasonable alternative.

No. 00-C-421-C, 2003 WL 23109724, at *1 (W.D. Wis. Nov. 26, 2003), *aff'd sub nom*, *Jones-El v. Berge*, 374 F.3d 541 (7th Cir. 2004); *see also Ensley Branch, N.A.A.C.P. v. Seibels*, 31 F.3d 1548, 1574 (11th Cir. 1994) ("The Constitution does not put a price on constitutional rights, in terms either of time or money. The rights guaranteed by the Constitution are to be made effective in the present." (citation omitted)); *Battle v. Anderson*, 594 F.2d 786, 792 (10th Cir. 1979) ("[C]onstitutional treatment of human beings confined to penal institutions . . . is not dependent upon the willingness or the financial ability of the state to provide decent penitentiaries.").

Further, while Mr. Collier produced some evidence concerning the cost of implementing temporary and permanent air-conditioning in TDCJ's unairconditioned inmate living areas, Mr. Hudson admitted that TDCJ's cost estimates were not based on any actual bids but were instead "pie in the sky" numbers,[509] rendering these estimates too unreliable for the Court to credit at this

---

[509] *See* Findings of Fact, Section VI.C., *supra*.

stage of proceedings. Mr. Collier agrees that installing temporary and permanent air-conditioning throughout the TDCJ system is feasible.[510] And it shows that TDCJ has been able to obtain additional funds from the Governor's office and the Texas Legislature in the past or to otherwise allocate funds to comply with court orders and state jail standards requiring air-conditioning.[511] While the Court acknowledges that air-conditioning TDCJ inmate living areas will come with significant cost, Texas has an estimated $18.29 billion surplus for this upcoming legislative session, and TDCJ has a multi-billion-dollar budget.[512]

The public interest, likewise, favors entering a preliminary injunction. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (quoting *Awad v. Ziriax,* 670 F.3d 1111, 1132 (10th Cir. 2012)). Preserving inmates' health "is in the public interest," whereas allowing "in-custody inmate death[s] is necessarily not in the public interest." (ECF 19 at 4.)  Keeping inmates in extreme temperatures for extended periods of time serves no legitimate penological purpose. *Cf. Madrid v. Gomez*, 889 F. Supp. 1146, 1172 (N.D. Cal. 1995) ("Leaving inmates in outdoor cages for any significant period—as if animals in a zoo—offends even the most elementary notions of common decency and dignity. It also fails to serve any legitimate penological purpose in any kind of weather, much less cold and rainy weather."). Instead, it "can only be considered punishment for punishment's sake." *Jones'El*, 164 F. Supp. 2d at 1098-1117.

---

[510] *See* Findings of Fact, Section VI.B., *supra*.

[511] *See* Findings of Fact, Section VI.B., *supra*.

[512] *See* Findings of Fact, Section VI.C., *supra*.

Because the Court has found that the rights of TDCJ inmates housed in unairconditioned prisons are being continuously violated by the extreme heat in TDCJ's unairconditioned inmate living areas, this factor weighs in favor of granting a preliminary injunction.

## V.    THE COURT WILL WAIVE THE BOND REQUIREMENT.

In entering a preliminary injunction, a federal court may waive the bond requirement or otherwise elect to require no security. *See City of Atlanta v. Metro Atlanta Rapid Transit. Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981). Doing so is particularly appropriate in the realm of public interest litigation where, as is the case here, indigent and not-for-profit organizations seek to enforce constitutional rights. *Id.*; *see also Cole*, 2017 WL 3049540, at *44 (waiving the requirement of bond in similar litigation). The Court requires no security from Plaintiffs.

## VI.    THE COURT HAS THE POWER TO ISSUE THE REQUESTED RELIEF.

Although Mr. Collier's counsel suggested that the Court cannot order the State to do anything in this context,[513] even if necessary to remedy unconstitutional conditions, TDCJ is not above the law. Courts "must not shrink from their obligation to enforce the constitutional rights of *all* persons, including prisoners." *Brown v. Plata*, 563 U.S. 493, 511 (2011) (quotation marks omitted and emphasis added); *see id.* ("A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society. . . Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.").

The PLRA, however, limits the preliminary relief this Court can order. "Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that

---

[513] Final Hearing Tr. (July 30, 2024) at 25:8-17.

harm." 18 U.S.C. § 3626(a)(2). The Court must "give substantial weight to any adverse impact on public safety or the operation of the criminal justice system." *Id.* Preliminary relief automatically expires after 90 days, "unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period." *Id.*

Under the PLRA, "plaintiffs are not entitled to the most effective available remedy," but they are nevertheless "entitled to a remedy that eliminates the constitutional injury." *Ball I*, 792 F.3d at 599 (citation omitted). In other words, the remedy must "reduce[] the risk of harm to a socially acceptable level." *Id.* As the Supreme Court has held, in ordering a state-wide reduction in California's prison population due to the unconstitutional conditions caused by overcrowding:

> The population reduction potentially required is nevertheless of unprecedented sweep and extent. Yet so too is the continuing injury and harm resulting from these serious constitutional violations. For years the medical and mental health care provided by California's prisons has fallen short of minimum constitutional requirements and has failed to meet prisoners' basic health needs. Needless suffering and death have been the well-documented result. Over the whole course of years during which this litigation has been pending, no other remedies have been found to be sufficient.
> . . .
> This Court now holds that the PLRA does authorize the relief afforded in this case and that the court-mandated population limit is necessary to remedy the violation of prisoners' constitutional rights.

*Plata*, 563 U.S. at 501-02.

The Court has concluded that the Organizational Plaintiffs have demonstrated a likelihood of success on the merits of their Eighth Amendment claim. They have shown that the extreme heat in unairconditioned prisons, even with the TDCJ's mitigation measures in place, exposes all TDCJ inmates to a substantial risk of serious injury or death.[514] And they have demonstrated the

---

[514] *See* Findings of Fact, Sections III. through IV., *supra*.

mitigation measures do not either "eliminate the constitutional injury" or "reduce[] the risk of harm to a socially acceptable level." *Id.* Plaintiffs offered unrebutted testimony from Dr. Vassallo and Dr. Uribe that John Southards, Elizabeth Hagerty, John Castillo, Armando Gonzales, and Patrick Womack died from the heat and would not have died last summer if they had been in air-conditioned cells.[515] And Plaintiffs provided unrebutted testimony from Dr. Skarha and Dr. Zanobetti that TDCJ inmates will continue to die in unairconditioned cells each summer.[516] *See Plata*, 563 U.S. at 535 (in fashioning "injunctive relief to remedy serious constitutional violations in the prisons. . . [c]ourts can, and should, rely on relevant and informed expert testimony when making factual findings"). It is not "socially acceptable" for any inmates to die from the heat simply because they lack air-conditioning, let alone five in a single summer. *Ball I*, 792 F.3d at 599.

TDJC has tried all mitigation measures short of air-conditioning. None have prevented heat-related deaths or illnesses, nor have any reduced the risk of serious harm or death from extreme heat to a "socially acceptable" level. *Id.* Mr. Collier, likewise, did not identify any alternative, less-intrusive mitigation measures at the hearing, let alone offer any evidence that such measures would "eliminate[] the constitutional injury" inflicted by extreme heat. *Id.* Instead, as Dr. Vassallo and Mr. Williams testified, putting everyone in the TDCJ system in air-conditioned housing is the *only way* to eliminate the heat risk and the deaths and illnesses.[517] Mr. Collier has, likewise, presented no evidence that installing air conditioning will have "any adverse impact on public safety or the operation of a criminal justice system." *Ball I*, 792 F.3d at 598-99. To the

---

[515] *See* Findings of Fact, Sections IV.C. and IV. D., *supra*.

[516] *See* Findings of Fact, Section IV.B., *supra*.

[517] *See* Findings of Fact, Section VI.A., *supra*.

contrary, Mr. Collier's Rule 30(b)(6) designee admitted that installing air conditioning throughout TDCJ "is the right thing to do, it is the humane thing to do, and it is something [TDCJ] should have done a long time ago."[518] Maintaining the inmate living areas at safe temperatures below 85° is thus a necessary, narrowly tailored remedy that is no more intrusive than required to meet the heat crisis in TDCJ's unairconditioned prisons. *Cf. Plata*, 563 U.S. at 500 ("After years of litigation, it became apparent that a remedy for the constitutional violations would not be effective absent a reduction in the prison system population.").

This relief is also not foreclosed by *Ball I*, for three reasons. First, *Yates* flatly rejected the argument that *Ball I* prohibited an injunction requiring air-conditioning. *Yates*, 868 F.3d at 370 ("Relying on our decision in *Ball v. LeBlanc*, Defendants argue that the PLRA categorically prohibits an injunction requiring that the Pack Unit be air-conditioned. *This is not so*." (emphasis added)). As the *Yates* court explained, *Ball I* "held that air-conditioning was not appropriate in that case, because other acceptable and less-intrusive remedies had yet to be tried—not that air-conditioning was an impermissible remedy." *Id.* And the *Yates* court reaffirmed the district court's assertion that air conditioning inmate housing areas could be ordered if it was "indeed the least intrusive means of correcting the violation." *Id.* at 370 (quoting *Cole v. Livingston*, No. 4:14-CV-1698, 2016 WL 3258345, at *10 (S.D. Tex. June 14, 2016) (Ellison, J.)). Here, every alternative, less-intrusive remedy has been tried by TDCJ and has failed to either eliminate the risk of heat-related illness and death or reduce it to a "socially acceptable" level. *Ball I*, 792 F.3d at 599.[519]

---

[518] *See* Findings of Fact, Section VI.A., *supra*.

[519] *See also Ball v. LeBlanc*, 881 F.3d 346, 356 n.2 (5th Cir. 2018) ("*Ball II*") (Higginson, J., concurring in part) ("I read *Ball I* to narrowly say that air conditioning was not a permissible remedy absent evidence that the more modest measures approved of in *Gates* were insufficient for these plaintiffs.").

Second, *Ball I* found a maximum heat index unnecessary, given that the injunction in *Gates* lacked such a limit, and there was "no showing" in *Ball I* that "the Constitution mandated more relief for these prisoners for the same prison condition in this case." *Id.* at 600. Here, however, Plaintiffs presented unrebutted evidence that temperatures over 85° pose a substantial risk of serious harm. Dr. Skarha and Dr. Zanobetti found a one-degree increase above a heat index of 85° corresponds to a 0.7% increase in the risk of mortality, and Dr. Vassallo determined that a heat index of 88º or higher poses a substantial risk of adverse health outcomes for everyone—even young, healthy people.[520] And in *Yates*, the court confirmed that the *Gates* injunction does not reflect the permissible limits of relief. *Yates*, 868 F.3d at 371 ("Of course, just because *Gates* affirmed a different injunction on a different record does not speak to whether the Plaintiffs' requested relief in this case would be permissible under the PLRA.").

And third, *Ball I* "held that a facility-wide injunction was not appropriate under the PLRA because only the three named plaintiffs were at issue." *Yates*, 868 F.3d at 370. In other words, installing facility-wide air conditioning was necessarily overly broad in *Ball I*, because that relief was not "limit[ed] . . . to the particular plaintiffs before the court." *Ball I*, 792 F.3d at 599 ("Ball, Code, and Magee are the only plaintiffs before the court," so "any relief must apply only to them, if possible."). Here, however, the Organizational Plaintiffs represent *every* inmate in the TDCJ system[521] (all of whom face a substantial risk of serious harm), so the Court's relief must be tailored accordingly. *See Plata*, 563 U.S. at 531-32 ("The scope of the remedy must be proportional to the scope of the violation."). Because the constitutional violation is system-wide, nothing short of

---

[520] *See* Findings of Fact, Sections III.A. and IV.B., *supra*. *Ball II*, likewise, does not prohibit the relief ordered here, because the Fifth Circuit's sole task in that case was "to interpret and enforce the mandate issued by [the] panel" in *Ball I. See Ball II,* 881 F.3d at 348 n.2.

[521] *See* Findings of Fact, Section I., *supra*.

system-wide relief will suffice. *See id.* ("The order also is not overbroad because it encompasses the entire prison system," given the findings of a "systemwide [constitutional] violation" and "systemwide deficiencies").

Although normally a court is required by Rule 65 of the Federal Rules of Civil Procedure to describe, in reasonable detail, the acts required by its injunction, the Supreme Court has held that in cases against state prisons, a district court must give "adequate consideration to the views of state prison authorities." *Lewis v. Casey*, 518 U.S. 343, 362 (1996). Thus, instead of "dictat[ing] precisely what course the State should follow," the Court orders that Mr. Collier "devis[e] a Constitutionally sound" plan to ensure the temperatures in inmate living areas are reduced to safe temperatures. *Id.*

The Court therefore orders that Mr. Collier must develop a plan to maintain the apparent temperatures in all TDCJ inmate living areas during the summer months at no higher than 85° beginning April 15, 2025. This Court finds that this relief is narrowly drawn, does not extend further than necessary to correct the harm, and is the last intrusive means necessary to correct the violation of Plaintiffs' Eighth Amendment right. The Court does not order Mr. Collier to reduce temperatures to a level that is comfortable, but only to a level that reduces the significant, and constitutionally unacceptable, risk of harm to an acceptable one. Because Texas's hot summer temperatures are ongoing, the Court orders Mr. Collier to submit his plan to the Court within 15 days of this order.

The PLRA also prohibits the Court from ordering prospective relief that "requires or permits a government official to exceed his . . . authority under State or local law or otherwise violates State or local law unless (i) Federal law requires such relief to be ordered in violation of State or local law; (ii) the relief is necessary to correct the violation of a Federal right; and (iii) no

other relief will correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(B). The Court concludes that the relief it orders today does not require Mr. Collier to exceed his authority under Texas law; however, if it is determined that he does not have the authority to comply with this order, the Court concludes that federal law requires the relief to be ordered, as the relief is necessary to correct the violation of TDCJ inmates' rights, and no other relief will correct this violation.

Based on the foregoing, it is ORDERED that:

1.    Plaintiffs' Emergency Motion for Preliminary Injunction is granted;

2.    Mr. Tiede must be kept in air-conditioned housing for the duration of his sentence, which order will become final 89 days from the entry of this order (as required by 18 U.S.C. § 3626(a)(2)), unless the parties stipulate to an extension  of the deadline before that date;

3.    Mr. Collier shall, within 15 days from the date of this order, submit a plan to the Court that will ensure, beginning April 15, 2025, that the apparent temperatures in all TDCJ inmate living areas will be maintained at no higher than 85° during the summer months from April 15 to October 15; and

4.    Within 15 days from the date of Mr. Collier's submission of the above-referenced plan, Plaintiffs may file a response to Mr. Collier's submission, if they so choose.

Based on Mr. Collier's submission and Plaintiffs' response (if any), the Court will conduct any further proceedings and enter any further orders it deems necessary to ensure that the constitutional injury is remedied effectively and expeditiously—including a final order that will be entered within the time period prescribed by 18 U.S.C. § 3626(a)(2).

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

DATED: August 22, 2024

Respectfully submitted,

/s/ Kevin D. Homiak

Brandon Duke
Texas Bar No. 24094476
O'MELVENY & MYERS LLP
700 Louisiana St., Suite 2900
Houston, Texas 77002
Telephone:  (832) 254-1500
Facsimile:  (832) 254-1501
Email:        bduke@omm.com

Jeff Edwards
Texas Bar No. 24014406
Michael Singley
Texas Bar No. 00794642
David Anthony James
Texas Bar No. 24092572
Lisa Snead
Texas Bar No. 24062204
Paul Samuel
Texas Bar No. 24124463
EDWARDS LAW
603 W. 17th Street
Austin, Texas 78701
Telephone: 512.623.7727
Facsimile:  512.623.7729
Email:        jeff@edwards-law.com
              mike@edwards-law.com
              david@edwards-law.com
              lisa@edwards-law.com
              paul@edwards-law.com

Thomas A. Olsen (admitted *pro hac vice*)
Kevin D. Homiak (admitted *pro hac vice*)
Ellen R. Blatt (admitted *pro hac vice*)
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-5647
Telephone:    303.244.1800
Facsimile:    303.244.1879
Email:        olsen@wtotrial.com
              homiak@wtotrial.com
              blatt@wtotrial.com

Erica Grossman (admitted *pro hac vice*)
HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC
1437 High Street
Denver, Colorado 80218
Telephone:    303.860.1331
Email:        erica@hheglaw.com

Jodi Cole
Texas Bar No. 24045602
LAW OFFICE OF JODI COLE, PLLC
203 East Murphy Street
Alpine, Texas 79830
Telephone:    432.837.4266
Facsimile:    512.692.2575
Email:        jcole@jodicole.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE (CM/ECF)</u>

I HEREBY CERTIFY that on August 22, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which served this pleading on all counsel of record.

*/s/ Kevin D. Homiak*
Kevin D. Homiak